# Exhibit 1



# COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

UNITED STATES SENATE

OFFICE OF OVERSIGHT AND INVESTIGATIONS

MAJORITY STAFF

# AGGRESSIVE SALES TACTICS ON THE INTERNET AND THEIR IMPACT ON AMERICAN CONSUMERS

**Staff Report for Chairman Rockefeller**
**November 16, 2009**

**Table of Contents**

**Executive Summary**............................................................................................................i

**I.**     **Background on Aggressive Online Sales Tactics**............................................1
         a.  Post-Transaction Marketing................................................................2
         b.  Data Pass and "Preacquired Account" Marketing..............................3
         c.  "Free-to-Pay Conversions".................................................................5
         d.  Consumers' Experience of Aggressive Online Sales Tactics............6
**II.**    **Background on Affinion, Vertue, and Webloyalty**........................................8
         a.  Affinion/Trilegiant/Cendant/CUC......................................................9
         b.  MemberWorks/Vertrue/Adaptive Marketing.....................................10
         c.  Webloyalty.........................................................................................12
**III.**   **The Committee's Investigation**.....................................................................13
**IV.**    **Overview of the Online Post-Transaction Sales Industry**...........................13
         a.  Partnership Terms..............................................................................14
         b.  The Financial Advantages of Data Pass............................................16
**V.**     **Evidence of Misleading Offers and Consumer Confusion**...........................17
         a.  Low Levels of Member Awareness.....................................................18
         b.  Employee Training on Cancellations and Member Questions...................20
         c.  High Rates of Cancellations and Low Rates of Usage.......................22
**VI.**    **Partner Awareness of the Problem**...............................................................24
         a.  "Customer Noise"..............................................................................24
         b.  Concerns Raised by Partners.............................................................26
**VII.**   **Conclusion**....................................................................................................30

**Exhibits**
**Exhibit 1:** Sample Interstitial Pages
**Exhibit 2:** Aggressive "Post-Transaction" Sales Tactics in an Online Purchase
**Exhibit 3:** Clubs and Services Offered by Affinion, Vertue, and Webloyalty
**Exhibit 4:** E-Commerce Partner Income from Post-Transaction Marketing
**Exhibit 5:** Length of Consumer Enrollment in Affinion, Vertue, and Webloyalty
          Membership Clubs

## **Executive Summary**

In May 2009, Chairman Rockefeller launched an investigation into a set of controversial e-commerce business practices that have generated high volumes of consumer complaints. Since that time, Commerce Committee staff has been investigating three Connecticut-based direct marketing companies – Affinion, Vertrue, and Webloyalty – as well as the hundreds of online websites and retailers that partner with these three companies to sell club memberships to online shoppers. Although this investigation is not yet complete, it is clear at this point that these three companies use highly aggressive sales tactics to charge millions of American consumers for services the consumers do not want and do not understand they have purchased.

### *Controversial Sales Practices Migrate to the Internet*

Over the past fifteen years, the Internet has grown into an important commercial channel for American consumers and businesses. More than half of all American adults have either made an online purchase or an online travel reservation, and in the first half of 2009, e-commerce revenue accounted for more than $60 billion of U.S. retail sales.

The rapid growth of e-commerce has promoted business innovation, but it has also attracted direct marketing businesses that use aggressive sales tactics against online shoppers. These tactics involve selling unfamiliar membership programs to consumers who are in the process of purchasing familiar products offered by trusted websites. Many of these controversial practices are new to e-commerce, but are well-known in other commercial channels, especially in direct mail and telemarketing, and have been the subject of numerous legal actions. The three direct marketing companies that are the subject of this investigation – Affinion, Vertrue, and Webloyalty – are all operated by management teams that have years of experience in employing these aggressive sales tactics against consumers.

The three companies gain access to online consumers by entering into financial agreements with reputable online websites and retailers. In exchange for "bounties" and other payments, reputable on-line retailers agree to let Affinion, Vertrue, and Webloyalty sell club memberships to consumers as they are in the process of buying movie tickets, plane tickets, or other online goods and services. The sales tactics used by these three companies exploit consumers' expectations about the online "checkout" process.

With the cooperation of their online "partners," the three companies insert their sales offers into the "post-transaction" phase of an online purchase, after consumers have made a purchase but before they have completed the sale confirmation process. These offers generally promise cash back rewards and appear to be related to the transaction the consumer is in the process of completing. Misleading "Yes" and "Continue" buttons cause consumers to reasonably think they are completing the original transaction, rather than entering into a new, ongoing financial relationship with a membership club operated by Affinion, Vertrue, or Webloyalty.

Even more misleading and confusing is the "data pass" process Affinion, Vertrue, Webloyalty, and their partners use to automatically transfer consumers' credit or debit card

information from the familiar web seller to the third-party membership club. Passing consumers' billing information directly to Affinion, Vertrue, or Webloyalty, without requiring consumers to re-enter it, deprives consumers of notice that they are entering a new, ongoing financial relationship with an unfamiliar company. After a 30-day "free trial" period, Affinion, Vertrue, or Webloyalty begin charging the consumer a monthly fee of $10-$20 dollars until the consumer cancels the membership.

### *The Senate Commerce Committee Investigation*

The Committee opened this investigation because thousands of online consumers have complained to state attorneys general, the Better Business Bureau, and other consumer advocates that the enrollment process described above is misleading and deceptive. These consumers complain that they did not consent to sharing their billing information with a third party membership club. They also say they only learned they had been enrolled in one of these membership clubs after seeing a "mystery charge" on their monthly credit card or checking account statement months after the purchase.

These complaints suggest that the aggressive sales tactics of Affinion, Vertrue, Webloyalty, and their partners are harming large numbers of American consumers. They also suggest that these companies' tactics may be negatively affecting consumers' overall attitude towards online commerce.

Since opening this investigation, Committee staff has collected and reviewed thousands of pages of documents produced by Affinion, Vertrue, and Webloyalty; interviewed dozens of Internet consumers who have complained about unknowingly and inadvertently enrolling in the programs offered by the three companies; interviewed employees of e-retailers currently and formerly in partnerships with the three companies; and met with numerous e-commerce experts.

Although it is not yet complete, the key findings of the Committee staff's investigation thus far are the following:

- **Using aggressive sales tactics to enroll consumers in unwanted membership clubs is a billion-dollar business.** Affinion, Vertrue, Webloyalty and their e-commerce partners have earned over $1.4 billion in revenue by using aggressive tactics to charge Internet shoppers for club membership programs. Since 1999, Internet consumers have been enrolled more than 35 million times in Affinion, Vertrue, and Webloyalty's membership clubs. In June 2009, there were 4 million Internet consumers currently enrolled in these three companies' membership programs.

- **Hundreds of well-known websites and online retailers have earned hundreds of millions of dollars employing aggressive online sales tactics.** More than 450 e-commerce websites and retailers have partnered with Affinion, Vertrue, and Webloyalty to employ aggressive sales tactics against their online customers. Of the $1.4 billion in total revenue earned through using these tactics, $792 million of this total was earned by Affinion, Vertrue, and Webloyalty's e-commerce partners. Eighty-eight e-commerce companies have earned more than $1 million through using these tactics,

including 19 that have made more than $10 million.  Classmates.com has made more than $70 million using these controversial practices.

- **Affinion, Vertrue, and Webloyalty have knowingly charged millions of consumers for services the consumers do not use and are unaware they have purchased.** Internal documents reviewed by Committee staff show that Affinion, Vertrue, and Webloyalty know that most of the "members" they acquire through their aggressive online sales tactics do not understand they have been enrolled in a program that charges their credit or debit card on a recurring basis.  Most consumers enrolled in the clubs cancel their memberships when they discover the monthly charge and never receive any benefit from their club membership.  One Webloyalty employee candidly commented in an e-mail that, "at least 90% of our members don't know anything about the membership."

- **Affinion, Vertrue, and Webloyalty's customer service centers are almost entirely dedicated to handling the large volume of calls from angry and confused consumers requesting cancellations.**  Affinion, Vertrue, and Webloyalty receive millions of calls every year from angry, frustrated consumers cancelling their membership or asking questions about the charge on their credit or debit card.  One Webloyalty employee acknowledged in an e-mail that most of its calls were "from members who are questioning charges or want to cancel their membership," while a Vertrue employee had estimated that "cancellation calls represent approximately 98% of call volume."  The companies' internal manuals train their call center representatives to answer questions such as, "what is this charge?" or "who are you?"

- **E-Commerce companies know that their customers are being harmed by the aggressive sales tactics of Affinion, Vertrue, and Webloyalty.**  The e-commerce companies partnered with Affinion, Vertrue, and Webloyalty understand that more aggressive sales tactics lead to higher revenue.  In the words of one company official, "to generate more revenue through Webloyalty, it seems we must be more aggressive (and deceptive) in our marketing techniques."  Thousands of customers have contacted the companies using words like "fraud," "tricked," "deceptive," "misleading," "scam," "deceitful," "dishonest," "betrayed," and "robbed" to describe their experiences.  This "customer noise" has led a number of e-commerce partners to request a more "conservative" approach or to end their relationships with Affinion, Vertrue, or Webloyalty.

## I.    Background on Aggressive Online Sales Tactics

In the past fifteen years, the Internet has rapidly grown from an entertaining diversion to an integral part of the daily life of hundreds of millions of Americans.  By 2008, more than seventy percent of Americans were using the Internet on a regular basis for a variety of purposes, including online banking and shopping, and over half of all American adults had either made an online purchase or an online travel reservation.[1]  For the first two quarters of 2009, e-commerce revenue accounted for more than $60 billion of U.S. retail sales.[2]

While these figures show that American consumers are increasingly taking advantage of the convenience and efficiency of Internet shopping, they continue to express concerns about the security of their personal information when they are shopping online.  Large percentages of online consumers also report that they sometimes feel frustrated, overwhelmed, or confused by online shopping.[3]

One of the factors contributing to consumers' lingering unease about online shopping is the aggressive sales tactics that many companies are using against their customers.  The tactics the Committee has focused on involve offering consumers unfamiliar services from unfamiliar third party companies as consumers are in the process of purchasing familiar products offered by trusted websites.  The unfamiliar services offered are typically discount club memberships which charge a monthly fee between $9 and $20.  A prominent feature of the post-transaction offers is up-front gifts, such as "$10 Cash Back on Your Next Purchase!" which is presented to consumers as if it is related to the websites where they have just made purchases.

While these club membership offers are presented to online consumers in different ways, they all share the following elements:

> *Post-Transaction Marketing:  The third party offer comes as online consumers are completing their purchases on familiar retailers' websites.*  After consumers have completed inputting their billing information into a "check out" purchase page on familiar e-retailers' sites, but before they have completed confirmation of the transaction, unfamiliar third party companies will attempt to enroll consumers in membership clubs offering discounts or other services.  Due to the positioning of these offers in the purchase process, they are commonly referred to as "post-transaction" offers.

---

[1] Pew Internet & American Life Project, *Online Shopping:  Internet Users Like the Convenience but Worry about the Security of Their Financial Information* (Feb. 2008).  In a 2009 survey, 59% of adult Americans said they had purchased products online and 52% had used the Internet to book travel reservations.  Pew Internet & American Life Project, *The Internet and the Recession* (July 2009).

[2] U.S. Census Bureau, *Estimated Quarterly U.S. Retail Sales (Adjusted): Total and E-Commerce* (Aug. 17, 2009) (available at http://www.census.gov/retail/mrts/www/data/pdf/09Q2.pdf).

[3] Pew Internet & American Life Project, *Online Shopping:  Internet Users Like the Convenience but Worry about the Security of Their Financial Information* (Feb. 2008).

***Data Pass:  Consumers do not have to enter their billing information again to be enrolled in the clubs offered by the third party.***  Internet consumers can usually accept the third party post-transaction membership club offer without having to type in their credit or debit card numbers again.  As a result of so-called "data pass" or "card-on-file" arrangements between retailers and the third party companies, online consumers' credit card or debit card account numbers can be automatically transferred from the websites where the consumers are shopping to the third party companies.

***Free-to-Pay Conversions:  Consumers enrolled in the clubs are automatically charged a monthly fee after a free trial period.***  The membership programs offered by the third parties are generally free for the first 30 days.  This practice is also known as "free-to-pay conversion."  Online consumers will be charged on a monthly basis after the 30-day period unless they actively opt out of the program, commonly referred to as a "negative option."

The combination of these aggressive online sales practices has caused thousands of consumers to complain to state attorneys general, the Better Business Bureau, and other consumer advocates that unfamiliar companies have charged them monthly fees for services they did not want and were unaware they had purchased.

### A.  Post-Transaction Marketing

Online consumers shopping at websites that do not use the controversial tactics described above typically progress through several standard pages as they make a purchase.  Once consumers select their merchandise and click the "Buy" or "Add to Shopping Cart" button, they typically have four remaining steps:  (1) proceeding to checkout by clicking another link usually labeled "Proceed to Checkout"; (2) entering their shipping, billing, and credit card information in data fields on the checkout page; (3) clicking a button labeled, "Accept" or "Confirm" to finish the transaction; and (4) obtaining a receipt or order number confirming the purchase on the confirmation page.[4]

In a manual for Internet users, the confirmation process was summarized for novice users in the following manner:

Once you submit your credit card billing and shiping information, the site processes the transaction just like the clerk at Macy's who swipes your MasterCard at the register.  In a few seconds, you should see a receipt, complete with order number and purchase summary.  You can print this out for your records.[5]

E-commerce companies engaged in aggressive third party post-transaction marketing add additional steps to this process, making it much less like "the clerk at Macy's" referenced in the manual.  They make it less akin to a "brick and mortar" purchase by using:  "interstitial" sales

---

[4] David Pogue and J.D. Biersdorfer, *The Internet:  The Missing Manual* (2006).

[5] *Id.*

offer pages, which appear between the checkout page and the confirmation page; "pop up" windows which appear on top of the confirmation page; and hyperlinks or "banners" that are included directly on the confirmation page itself.

On the "interstitial" page, third party e-commerce companies offer "$10 Cash Back on This Purchase" or "$10 Cash Back on Your Next Purchase" combined with an offer to purchase a club membership. The offer to purchase a discount club membership is secondary in placement to the "$10 Cash Back on this Purchase" and is typically located in the page's fine print. This "interstitial" page presents consumers with an offer they must accept or reject before they can reach the page that provides confirmation and the order number for the original purchase. (See Exhibits 1 & 2).

For customers to reach the confirmation page, they must either accept the offer to join a membership club offered by the third party sellers (by clicking a large, colorful "Yes" button) or click a much less conspicuous "No Thank You" hyperlink. In general, the name of the familiar website with which the consumer has just completed a transaction is displayed on this page, making it more difficult for the consumer to discern that this "interstitial" page is actually owned and operated by the third party company, not the website on which the consumer has been shopping.

E-commerce companies also use "pop up" windows that appear on top of, but do not totally conceal, the consumer's confirmation page. These pages look very similar to the enrollment offers presented via "interstitial" pages, but they do not require the customer to accept or reject the offer in order to proceed to the confirmation page.

A less intrusive post-transaction marketing technique also used by e-commerce companies is placing a hyperlink to an enrollment offer ("banner") on the confirmation page,



which can be accessed via clicking a button labeled, "Continue." A "Continue" button is used despite the fact that the customer has completed the transaction at this point. An example of a "Continue" button displayed on a confirmation page is provided here.

### B. Data Pass and "Preacquired Account" Marketing

A central element of the aggressive online tactics the Committee staff has been investigating is that a consumer can be signed up for a third party membership program without entering his or her credit card information. Instead of requiring the consumer to enter this billing information a second time to confirm acceptance of the new offer, the retailer will pass the consumer's credit card and billing information to the third party once the consumer has provided information the third party company regards as "proof of enrollment," such as an e-mail address.[6]

---

[6] In August 2009, Webloyalty's attorney informed the Committee that "in response to its own analysis and testing over time, as well as in connection with resolution of class action litigation and concerns

This "data pass" or "card on file" process – where a third party company obtains a consumer's billing information not directly from the consumer, but from a website where the consumer has just made a purchase – is a well-known and controversial practice in the direct mail and telemarketing industries. In these retail channels, it is generally known as "preacquired account" marketing.

In the telemarketing setting, "preacquired account information" has been defined by the Federal Trade Commission (FTC) as "any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer or donor during the telemarketing transaction pursuant to which the account will be charged."[7]

Preacquired account marketing conducted over the telephone, like "data pass" on the Internet, has caused consumers to complain that they unknowingly and inadvertently enrolled in membership programs. Due to the problems inherent in preacquired account telemarketing, the FTC chose to regulate the practice in 2003 after concluding that:

> The record makes clear, in fact, that it is the very act of pulling out a wallet and providing an account number that consumers generally equate with consenting to make a purchase, and that this is the most reliable means of ensuring that a consumer has indeed consented to a transaction...[T]he Commission still believes that whenever preacquired account information enables a seller or telemarketer to cause charges to be billed to a consumer's account without the necessity of persuading the consumer to demonstrate his or her consent by divulging his or her account number, the customary dynamic of offer and acceptance is inverted.[8]

In recommending regulations for preacquired account telemarketing to the FTC in 2000, the National Association of Attorneys General told the FTC that the use of preacquired account

---

raised by the Committee's inquiry and state regulators, [that]…as of August 1, 2009…current Webloyalty enrollment pages require that consumers re-enter the last four digits of their credit card or debit card before they are enrolled." Letter from Jane Sherburne to Senator John D. Rockefeller IV (Aug. 31, 2009). On November 13, 2009, Affinion announced that, in "responding to concerns raised by the Senate Commerce Committee", it would now be "[r]equring that the consumer gives—at a minimum—the last four digits of their account or credit card number for every online transaction involving pre-acquired account information and a free to pay conversion." Affinion Group, *Affinion Unveils Enhanced Online Marketing Standards* (Nov. 13, 2009). On November 16, 2009, Vertrue also announced it "will obtain from the consumer the last four digits (at a minimum) of their payment account as further acknowledgement of the offer" to address "concerns specifically identified by the U.S. Senate Committee on Commerce, Science and Transportation with regard to certain post-transaction marketing practices on the Internet." Adaptive Marketing LLC, *Adaptive Marketing LLC Calls for Industry-Wide Internet Marketing Standards* (Nov. 16, 2009).

[7] Federal Trade Commission, *Telemarketing Sales Rule*, 68 Fed. Reg. 4580, 4595 (Jan. 29, 2003) (final amended rule).

[8] *Id.* at 4619.

4

information presents "inherent opportunities for abuse and deception."[9]  Requiring a consumer to re-enter his or her account information "is a readily recognizable means for a consumer to signal assent to a deal" and gives a consumer final control over purchase decisions.  The Attorneys General noted:

> The telemarketer with a pre-acquired account turns this process on its head.  The pre-acquired account telemarketer not only establishes the method by which the consumer will provide consent, but also decides whether the consumer actually consented.[10]

The online data pass process that is the subject of the Committee's investigation presents exactly the same informational problems that concerned state and federal officials examining the telemarketing industry.  As Harvard Business School Professor Benjamin Edelman recently told the Committee:

> Consumers rely on the process of providing a credit card number as a barrier to unexpected charges.  Users rightly expect that by clicking from site to site, button to button, they do not incur financial obligations.  This expectation is part of what makes the web fun, flexible, and low-risk:  Users believe they cannot incur financial obligations except by typing their credit card numbers, and users expect to be able to cancel an unwanted transaction if a site requests a credit card number that a user does not care to provide.[11]

### C.  "Free-to-Pay Conversions"

The e-commerce marketing practices being examined by the Committee also employ a marketing technique known as "free-to-pay" conversion, which enrolls consumers in a membership program for free for a period of time (usually 30 days) before their credit card or checking account is charged.  In the course of proposing amendments to the Telemarketing Sales Rule, the FTC explained that consumers are often "confused about their obligations when a product or services is offered to them for a trial period at no cost."[12]

Citing testimony submitted by state attorneys general, the FTC explained that free trial offers are presented to consumers as "low involvement marketing decisions."  Because consumers often do not understand that the marketers already have their billing information, consumers "mistakenly believe they must take some action before they will be charged."  At the end of the free trial period, the marketer starts billing the consumer, "even when consumers have

---

[9] Letter and Comments from the National Associations of Attorney Generals (NAAG) to Donald Clark, Secretary Federal Trade Commission, FTC File No. P994414 (May 30, 2000).

[10] *Id.*

[11] Prepared Statement of Professor Benjamin Edelman to the U.S. Senate Committee on Commerce, Science, and Transportation (Nov. 2009).

[12] Federal Trade Commission, *Telemarketing Sales Rule*, 67 Fed. Reg. 4494, 4501 (Jan. 30, 2002) (proposed amended rule).

taken no additional steps to assent to a purchase or authorize the charge, and have never provided any billing information themselves."[13]

Based upon this evidence, the FTC concluded that, "in any transaction involving both preacquired account information and a 'free to pay conversion,' the evidence of abuse is so clear and abundant that comprehensive requirements for obtaining express informed consent in such transactions are warranted."[14]

### D.  Consumers' Experience of Aggressive Online Sales Tactics

Over the past few months, Committee staff has reviewed thousands of complaints written by consumers who claim they were unknowingly enrolled in membership clubs while they were shopping online.  Committee staff has spoken with many of these consumers about their experiences.  These consumers regularly cite the placement of the third party offers, the data pass process, and delayed charges as the sources of their confusion and dissatisfaction.

Committee staff believes that these consumer experiences are typical.  Most consumers, even very web savvy consumers, do not clearly understand the third party companies' membership club offers and do not understand that they can be enrolled without entering their credit card numbers.  The cases discussed below provide several representative examples of how consumers experience this process.

*Kari Glennon*  In May 2009, Kari Glennon, a resident of Bellingham, Washington, realized that she had been signed up for a membership club called "Shopping Essentials" while buying a gift certificate on the Restaurants.com website in October 2008.  She wrote Vertrue, the operator of the "Shopping Essentials" club, to ask for a refund and to let them know that "I am being charged a monthly fee of $14.95 for a membership that I was unaware of."  In her letter, she describes how she called Vertrue and discovered she was a Shopping Essentials club member.

> When I called into your organization on 5/26/09 to inquire about the charges to my credit card, I spoke with Sherry…and her supervisor Jamie…I was told by Jamie during my conversation that there was a banner on that site and that if I clicked it and entered my e-mail address, I was automatically a member. Becoming an on-line member to an organization seems obvious when entering an e-mail address, but paying for it is another matter.  I did not give my credit information for the purpose of signing up for a membership.  I gave my credit card information to Restaurants.com for a purchase of a gift certificate only.  If my credit card information was used for more than that purpose, it was done so without my knowledge or authorization.[15]

---

[13] *Id.*

[14] Federal Trade Commission, *Telemarketing Sales Rule*, 68 Fed. Reg. 4580, 4621 (Jan. 29, 2003) (final amended rule).

[15] Letter from Kari Glennon to Shopping Essentials (May 26, 2009) (Vertrue Doc. 18957).

Ms. Glennon concluded her letter with the following comment:

> As someone who has been in the professional marketing field for over 16 years, I find it unfortunate that situations like this still arise.  Whenever you have a product to market, intangible or otherwise, it should be made clear to the consumer what the process is and what they are purchasing.  Anything else creates confusion and situations like the one I am writing in about.[16]

**Chris Steffen**  In April 2007, a frustrated consumer from Los Angeles, California, named Chris Steffen wrote the following complaint to Movietickets.com.

> I'm not sure how or when this happened and I'm sure part of it is oversight or my own fault.  But somehow through the purchasing of movie tickets through your site I was signed up for Reservation Rewards and charged 10 dollars a month membership for multiple months.  This means that when I ordered tickets through your service, the cost to me was not only the price of the tickets, but the inadvertent cost of being enrolled in a service plan I was not aware of.[17]

Mr. Steffen also wrote a complaint to Webloyalty, the operator of the Reservation Rewards club.  Addressing his complaint to "Joni," the Webloyalty representative he had communicated with, Mr. Steffen expressed his frustration.

> Imagine yourself, Joni, getting on a computer to book movie tickets for the next big show and you're in a hurry because you and your friends decided to go at the last minute.  You want to make sure you order your seats in time so you can go have dinner before the show.  Then, at first glance you get what looks like a coupon for 10 bucks off your next purchase of tickets.  You don't read the fine print because you're in a hurry and next thing you know you're signed up for some worthless service.[18]

**David Murray**  In February 2008, a Massachusetts hospital executive named David Murray realized he had been enrolled in Affinion's "LiveWell" membership club while shopping at 1-800-Flowers.com several months earlier.  Mr. Murray wrote an e-mail to 1-800-Flowers.com expressing his concerns about the LiveWell enrollment process and asking the company, "Do you really think what you did was morally right?"  One of his criticisms focused on the confusion surrounding the origin of the discount offer.  He wrote:

> The Order Confirmation states the following: "Your purchase is complete.  Click here to claim $15.00 Cash Back on this purchase!"  This is not true and is deceitful.  You aren't offering $15.00 back unless the client signs up to this company called "LiveWell."  And even then, you're not offering it – LiveWell is.

---

[16] *Id.*

[17] E-mail from Chris Steffen to Movietickets.com employee (Apr. 11, 2007) (Webloyalty Doc. 50825-26).

[18] E-mail from Chris Steffen to Webloyalty employee (Apr. 12, 2007) (Webloyalty Doc. 50827).

> Who in the hell is LiveWell?  It doesn't say on the email.  So there is no $15.00 to
> be had from 1800Flowers at all.[19]

Mr. Murray also complained that the data pass process made it unclear that he was actually
making a purchase.

> At no time, during this process, is there an opportunity to keep this from
> happening.  There is no warning, no interim message telling me what I'm actually
> about to do.  Had there been that opportunity, I readily concede that it was my
> fault for clicking.  But there wasn't that opportunity.  As you can see, the
> consumer (in this case, me) is automatically enrolled and you have to call to
> cancel within a month of the "free membership" to keep from getting charged
> $11.99 per month.[20]

Finally, Mr. Murray expressed his anger that 1-800-Flowers.com, a company with which his
earlier experiences were "nothing but positive," would allow him to be enrolled in the LiveWell
club.

> What I feel terrible about is that your Customer Service is doing this to unsophisticated
> consumers who don't know what steps they should take when a corporation does that to
> them, and how many people are signed up to this company and are going to get charged
> for something they didn't want?  Worse, is this really something 1800Flowers wanted to
> be associated with?  It was just a mean thing to do to someone.  I have an old saying.  It
> may be legal, but is it moral?  Well, I don't think it's legal.  And I know it wasn't moral.
> Don't be immoral.[21]

## II.    Background on Affinion, Vertrue, and Webloyalty

Affinion, Vertrue, and Webloyalty – the three leading companies engaged in the
aggressive online sales tactics described above – are all located in or around Norwalk,
Connecticut.  All three companies are managed by executives who started their careers at Comp-
U-Card (CUC), a Connecticut company that pioneered the marketing of discount membership
clubs.

All three companies have also been the targets of law enforcement investigations and
private lawsuits stemming from their use of aggressive marketing practices.  Affinion and
Vertrue have used direct mail, telemarketing, and e-commerce channels, while Webloyalty has
used only the e-commerce channel, to enroll members and charge their credit cards or checking
accounts.  Committee staff has compiled a list of nearly 100 different clubs and services these
three companies sell or have sold to consumers (See Exhibit 3).

---

[19] E-mail from David Murray to 1-800-Flowers employee (Feb. 4, 2008) (Affinion Doc. AFSE-4-5078-
79).

[20] *Id.*

[21] *Id.*

### A. Affinion/Trilegiant/Cendant/CUC

Affinion is a successor corporation to CUC which was started in 1973 and sold memberships to various auto, dining, shopping and travel discount clubs. In 1997, CUC merged with HFS Incorporated and the new company rebranded itself as Cendant.[22]

Shortly after the merger, Cendant announced that CUC had falsely inflated the number of club memberships it had sold, thereby overstating its 1995-97 earnings by at least half a billion dollars.[23] A later investigation by the Securities and Exchange Commission determined that CUC had been filing false financial statements since 1985, and that the company's misstatement of its income "was of historic proportions."[24] CUC's founder and former chief executive, Walter A. Forbes, was criminally prosecuted and sentenced to more than 12 years in federal prison. CUC's former Vice Chairman, E. Kirk Shelton, was also prosecuted and sentenced to 10 years in federal prison. Both CUC executives were ordered to pay $3.2 billion in restitution.[25]

In 2001, Cendant rebranded its membership club unit as "Trilegiant" and, in 2005, sold it to Apollo Management, a New York-based private-equity group, which in turn renamed the company Affinion.[26] Trilegiant/Affinion has been the subject of numerous law enforcement actions and private lawsuits in connection with its aggressive marketing practices.

On March 18, 2005, for example, Florida Attorney General Charlie Crist announced that his office had reached a settlement with Trilegiant under which Trilegiant "agreed to provide compensation to consumers wronged by the company's tactics in marketing various club memberships." Trilegiant also agreed to pay the State of Florida an additional $400,000.[27]

A few months later, California Attorney General Bill Lockyer filed suit against Trilegiant and Chase Bank charging that the companies "mislead consumers into becoming members of various membership programs without the consumers' knowledge or consent."[28] According to the Attorney General, Trilegiant and Chase sent "reward" checks to consumers and did not adequately disclose that if consumers cashed the checks the defendants would automatically and

---

[22] Affinion Group, Inc., *Form 10-K Annual Report for Period Ending Dec. 31, 2008* (Feb. 27, 2009).

[23] *How Two Whistle-Blowers Sparked Fraud Probe That Crushed Cendant*, Wall Street Journal (Aug. 13, 1998).

[24] Securities and Exchange Commission, Order Instituting Public Administrative Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, *In the Matter of Cendant Corporation, Respondent* (File No. 3-10225) (June 14, 2000).

[25] U.S. Department of Justice, U.S. Attorney, District of New Jersey, *Former Cendant Chairman Walter Forbes Sentenced to 151 Months in Federal Prison for Lead Role in Massive Accounting Fraud* (Jan. 17, 2007).

[26] *Cendant Scions Navigate Credit Crunch*, Wall Street Journal (Sept. 16, 2009).

[27] State of Florida, Office of the Attorney General, *Attorney General Reaches Settlement Over Club Memberships* (Mar. 18, 2005).

[28] State of California, Department of Justice, Office of the Attorney General, *Attorney General Lockyer Files Consumer Lawsuit Against Chase, Trilegiant in Membership Club Scheme* (July 12, 2005).

9

repeatedly charge the consumers' bank accounts. In December 2006, California and 15 other state attorneys general reached a $14.5 million settlement with the two companies.[29]

In July 2008, Trilegiant settled a number of class action lawsuits. The suits alleged that Trilegiant enrolled consumers in membership clubs through deceptive or unfair means. Trilegiant agreed to pay up to $25 million in refunds to settle the lawsuits.[30]

### B.  MemberWorks/Vertrue/Adaptive Marketing

In 1989, Gary Johnson, a former CUC vice president, founded Cardmember Publishing Company. In 1996, the company's shares began to be publicly traded under the name MemberWorks.[31] In 2004, MemberWorks changed its name to Vertrue. Three years later, in 2007, Vertrue was de-listed and sold for approximately $800 million to a group of private equity investors led by One Equity Partners, the private equity arm of J.P. Morgan.[32] Vertrue currently markets club memberships under the auspices of its subsidiary Adaptive Marketing, LLC.

The Attorneys General of Minnesota, New York, California, and Iowa have all sued MemberWorks/Vertrue alleging that it engaged in deceptive practices in connection with the aggressive sale of membership programs. In 1999, the Attorney General of Minnesota, Mike Hatch, filed suit against MemberWorks alleging that the company used deceptive and misleading practices to sell club memberships to Minnesota consumers.[33] MemberWorks paid $75,000 to settle the Minnesota action and agreed to make a number of changes to its business practices.

In 2000, New York Attorney General Eliot Spitzer announced a settlement with MemberWorks as part of a "continuing investigation of banks and credit card issuers that violated their cardholders' privacy rights by selling their personal account information to telemarketers in return for a substantial commission."[34] According to the Attorney General:

---

[29] State of California, Department of Justice, Office of the Attorney General, *Attorney General Lockyer Announces $14.5 Million, Multi-State Settlement with Chase Bank and Trilegiant to Resolve Allegations of Deceptive Practices Related to Membership Plans* (Dec. 11, 2006). The other states involved in this settlement were: Alaska, Connecticut, Illinois, Iowa, Maine, Michigan, Missouri, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Vermont, and Washington.

[30] Order of Final Approval and Judgment, (Jul. 18, 2008), *Pederson v. Trilegiant,* IL 3rd Jud. Circuit Ct. (No. 01-L-1126). For further information on these cases, see the information collected on www.Trisettlement.com.

[31] *Fertile Sales Turf: Fee-Based Card Services; MemberWorks' Gary Johnson Counts the Ways He Can Sell to Cardholders,* The American Banker (Apr. 10, 1997).

[32] Vertrue, Inc., *Vertrue Inc. Announces Agreement to Be Acquired by an Investor Group Including Management for $48.50 Per Share or Approximately $800 Million* (Mar. 22, 2007) (available at http://investors.vertrue.com/phoenix.zhtml?c=60678&p=irol-newsArticle&ID=976542&highlight).

[33] Second Amended Complaint, (Apr. 17, 2000), *Hatch v. MemberWorks, Inc*., Minn. Dist. Ct. 4th Jud. District (No. MC99-010056).

[34] New York State Attorney General, *National Telemarketing Firm to Reform Practices. Bank Privacy Investigations Result in Settlement on Unauthorized Credit Card Charges* (Sept. 18, 2000).

MemberWorks made wide use of negative option plans with its 'risk free' 30-day free trial membership offer.  Although these plans offer consumers a free period in which to consider the advantages of the service, many who accepted the initial free trial did not understand that MemberWorks had access to their credit card numbers and would charge them if they failed to cancel during the trial period.[35]

In order to settle the matter, MemberWorks agreed to, among other stipulations, tape every consumer's consent to ensure it was knowingly given.  MemberWorks also paid $75,000 to cover the cost of the investigation.

In 2001, MemberWorks and Sears, Roebuck and Co. agreed to pay $2 million to settle charges made by California Attorney General Bill Lockyer that the companies misled and confused consumers about their membership programs.  The suit alleged that "consumers were not informed that defendants had the ability to charge their credit cards without the consumers providing their credit card numbers or ever signing anything."[36]

In 2004, MemberWorks paid $950,000 to settle a complaint brought by Florida Attorney General Charlie Crist, alleging that the company had placed unwanted charges on Floridians' credit cards.  According to the Attorney General:

The company typically marketed its products in conjunction with infomercial products, and consumers calling to order products were told they would receive a MemberWorks membership as a bonus for their purchase.  The bonus actually resulted in a credit card charge for MemberWorks' membership programs if the consumer did not actively seek to cancel the purchase.[37]

Most recently, in 2006, Iowa Attorney General Tom Miller sued MemberWorks/Vertrue and explained that:

The suit concerns a marketing scheme in which consumers' credit cards and bank accounts are charged for memberships in so-called discount buying programs – even though many consumers don't know they are members, are not aware that they are being charged yearly or monthly membership fees, and make no use whatsoever of the so-called membership benefits.[38]

---

[35] Id.

[36] State of California, Department of Justice, Office of the Attorney General, *Attorney General, District Attorneys Settle Consumer Protection Complaint Against MemberWorks, Sears Over Discount Club Memberships* (Apr. 27, 2001).

[37] State of Florida, Office of the Attorney General, *Attorney General Announces Settlement with MemberWorks*, (Jun. 29, 2004).

[38] State of Iowa, Depart of Justice, Office of the Attorney General, *Miller Sues MemberWorks, Inc.*, (May 15, 2006).

The Iowa Attorney General took the case against MemberWorks/Vertrue to trial earlier this month, and an opinion is likely early next year.

Not every case against Vertrue has resulted in a negative outcome for Vertrue. Vertrue and its subsidiary Adaptive Marketing recently won a motion to dismiss a lawsuit alleging that Vertrue and the e-retailer VistaPrint deceived consumers into joining a rewards programs by offering them cash back if they completed an online survey. The federal judge dismissed the case, finding that the defendants' web pages were not deceptive. The plaintiffs have appealed this decision to the 5th Circuit Court of Appeals.[39]

### C.  Webloyalty

Webloyalty was founded in 1999 by another CUC/Cendant veteran, Richard Fernandes. According to press reports, Mr. Fernandes ran CUC's Auto Service division and then its Interactive Services division, "where he launched many of the Company's major Internet programs." [40]  Webloyalty is owned by the Greenwich, Connecticut private-equity group, General Atlantic, LLC.

Although Committee staff is unaware of any formal law enforcement actions against Webloyalty, according to media reports, Webloyalty is currently under investigation by Connecticut Attorney General Richard Blumenthal because of the high number of consumer complaints about the company.[41]

Earlier this year, Webloyalty agreed to settle a class action lawsuit, in which the plaintiffs alleged that they had been harmed by Webloyalty's "Coupon Click Fraud" scheme. According to the lawsuit:

> The scheme involved fraudulent and deceptive sale of its 'Reservation Rewards' discount products to unwitting consumers who make legitimate online purchases from various web retailers, including Fandango, and the unauthorized transfer of private credit and debit card account information by the web retailer to Webloyalty.[42]

In order to settle the case, Webloyalty agreed to make a number of changes to its online offers and disclosures, and it also agreed to pay out up to $10 million to consumers who had inadvertently signed up for Webloyalty's membership clubs.[43]

---

[39] *In re VistaPrint Corp. Marketing and Sales Practices Litigation,* No. 4:08-md-1994 (S.D. Tex.) (Aug. 31, 2009).

[40] *eLOT Appoints New Board Member*, Business Wire (Mar. 7, 2000).

[41] *Never Heard of Reservation Rewards?  Check Your Credit Card*, Wallet Pop Blog (Mar. 31, 2009) (available at http://www.walletpop.com/blog/2009/03/31/never-heard-of-reservation-rewards-check-your-credit-card/).

[42] Class Action Complaint, (Sept. 11, 2006), *Kuefler v. Webloyalty.com* (D. Mass.) (No. 06-cv-11620-JLT)  (later consolidated with four similar cased by the Judicial Panel on Multidistrict Litigation and restyled *In re: Webloyalty.com, Inc. Marketing and Sales Practices Litigation,* MDL 07-01820).

[43] *Id.*

## III.    The Committee's Investigation

In May 2009, the Committee opened an investigation into the use of aggressive sales tactics on the Internet.  On May 27, 2009, Chairman Rockefeller sent letters to Webloyalty, Inc., and Vertrue, Inc., requesting information and documents related to their online business practices.[44]  On July 10, 2009, Chairman Rockefeller expanded the investigation by sending a similar information request letter to Affinion Group, Inc.[45]  On July 28, 2009, Chairman Rockefeller issued a subpoena to Vertrue to obtain documents responsive to the May 27, 2009, requests, which were being withheld by the company.[46]  Affinion and Webloyalty have voluntarily cooperated with the Committee's requests.

On November 6, 2009, Chairman Rockefeller sent requests for information to sixteen companies that are partnered with Affinion, Vertrue, or Webloyalty and have apparently engaged in the controversial online sales practices with the companies.  The letters were sent to:  1-800-Flowers.com, Inc.; AirTran Holdings, Inc.; Classmates.com, Inc.; Continental Airlines, Inc.; FTD, Inc.; Fandango, Inc.; Hotwire, Inc.; Intelius, Inc.; MovieTickets.com, Inc.; Orbitz Worldwide, Inc.; Pizza Hut, Inc.; Priceline.com, Inc.; Redcats USA, Inc.; Shutterfly, Inc.; US Airways Group, Inc.; and VistaPrint USA, Inc.[47]

In the course of the investigation, the Committee has received over 300,000 pages of documents from the three companies:  approximately 80,000 from Affinion, approximately 128,000 from Vertrue, and approximately 104,000 from Webloyalty.  The documents include over 100,000 pages of documents related to complaints from the companies' former customers.  The companies also produced screenshots of the enrollment offers used by the companies on the Internet, employee handbooks, contracts, correspondence between the companies and their partners, and internal e-mails and correspondence.

Committee staff has interviewed dozens of former customers who have complained to Affinion, Vertrue, and Webloyalty about their business practices, executives for the e-commerce companies and e-retailers that have partnered with the three companies, and experts in e-commerce marketing.

## IV.    Overview of the Online Post-Transaction Sales Industry

Documents reviewed by Committee staff show that more than 450 e-commerce companies and e-retailers have entered into "partnership" agreements with Affinion, Vertrue, and Webloyalty over the past ten years.  Under the terms of these contracts, the "partners" allow

---

[44] Letter from Sen. John D. Rockefeller IV to Mr. Gary A. Johnson (May 27, 2009); Letter from Sen. John D. Rockefeller IV to Mr. Richard J. Fernandes (May 27, 2009).

[45] Letter from Sen. John D. Rockefeller IV to Mr. Nathaniel Lipman (July 10, 2009).

[46] Letter from Sen. John D. Rockefeller IV to Mr. Gary A. Johnson (July 28, 2009).

[47] Senate Committee on Commerce, Science and Transportation, *Chairman Rockefeller Requests Information from Web Retailers in "Mystery Charges" Investigation* (Nov. 6, 2009).

the three companies to market membership programs to their customers, and Affinion, Vertrue, and Webloyalty agree to share a portion of their revenues with the partners.

Financial information provided to the Committee by the companies shows that Affinion, Vertrue, and Webloyalty and their e-commerce partners have generated over $1.4 billion in revenue from Internet consumers who have been charged for membership programs. Of the $1.4 billion in total revenue, $792 million went to the e-commerce companies that partnered with Affinion, Vertrue, and Webloyalty.

The websites and e-retailers that have partnered with Affinion, Vertrue, and Webloyalty include some of the most well-known and high-traffic e-commerce websites on the Internet. They include travel sites, airline sites, electronics sites, movie ticket sites, and the websites for popular "brick and mortar" companies. Eighty-eight e-retailers have made more than $1 million through partnering with Affinion, Vertrue, and Webloyalty and, of the 88, 19 companies have made more than $10 million (See Exhibit 4). Classmates.com, which has been partnered with each company at different times and has earned more than any other partner, generated approximately $70 million in revenue.

Since 1999, Internet consumers have been enrolled more than 35 million times in Affinion, Vertrue, and Webloyalty's membership clubs. In June 2009, there were 4 million Internet consumers currently enrolled in the membership programs.

### A. Partnership Terms

While the specific terms and conditions between Affinion, Vertrue, and Webloyalty and their e-commerce partners differ from contract to contract, their agreements typically give partners a financial incentive to expose their shoppers to aggressive third-party offers. Generally, the more aggressively an e-commerce company is willing to market Affinion, Vertrue, or Webloyalty's membership clubs to its customers, the more money it will earn.

Affinion, Vetrue, and Webloyalty's e-commerce partners are paid based upon either the number of customers who sign up for the membership clubs ("joins"), or the number of customers who see the offer ("impressions"). In some partnerships, both payment methods are used to calculate a retailer's profits.

Payments based on the number of consumers who join an Affinion, Vertrue, or Webloyalty club are called "bounties." This payment system (also known as CPA, "Cost Per Acquisition") provides a very straightforward incentive to the retailer to use more aggressive sales tactics. Every consumer "join" means an additional bounty payment usually ranging between $10 and $30. When Webloyalty pitched its marketing program to Aloha Airlines in January 2006, it explained the method of payment and the potential partnership by stating, "Aloha Airlines wins by getting…$$$ bounty from Webloyalty for every customer who elects to accept offer."[48]

---

[48] Webloyalty presentation to Aloha Airlines (Jan. 2006) (Webloyalty Doc. 29325).

Payments based on impressions are calculated using a term known as CPM (Cost Per Mil). Under this system, e-commerce partners receive a payment for every 1,000 of their customers who view the enrollment offer from Affinion, Vertrue, or Webloyalty. This method can be very profitable for e-commerce companies with high-traffic websites because the enrollment offer can be shown to millions of Internet consumers. If the e-commerce partner is willing to show the offer to each one of its customers who make a purchase on its website, this can result in millions of "impressions" and millions of dollars in profit.

Payment terms in the contracts are routinely tied to a statistic known as the "conversion rate." This statistic measures the success of the enrollment offers by comparing the total number of customers who view the offer to the subset who actually enroll in the club. This statistic is tracked very closely by Affinion, Vertrue, and Webloyalty and each company uses it as a method to determine payments to its partners.

Affinion, Vertrue, and Webloyalty typically pay higher CPMs as the conversion rate increases. The table below provides an example of a sliding scale used in a contract reviewed by Committee staff.

| CPM | Net Conversion |
|---|---|
| $2,650 | ≥ 9.50% |
| $2,525 | 9.00%-9.49% |
| $2,375 | 8.50%-8.99% |
| $2,250 | 8.00%-8.49% |
| $2,100 | 8.00%-8.49% |
| $1,950 | 7.50%-7.99% |
| $1,825 | 7.00%-7.49% |
| $1,675 | 6.50%-6.99% |
| $1,550 | 5.50%-5.99% |
| $1,400 | 5.00%-5.49% |
| $1,275 | 4.50%-4.99% |
| $1,125 | 4.00%-4.49% |
| $1,000 | 3.50%-3.99% |
| $925 | 3.30%-3.49% |
| $850 | ≤3.29% |

To illustrate how this system works, if a company displayed the enrollment offer to one million visitors on its site every year, and 2% of its customers joined an Affinion, Vertrue, or Webloyalty club, the company would receive a payment of $850,000, according to the rates listed in the table. But if its conversion rate were a higher 5%, the company would receive $1.4 million. This sliding scale payment system gives retailers a strong financial incentive to allow Affinion, Vertrue, and Webloyalty to employ aggressive sales tactics that mislead customers but increase conversion rates.

An important fact to keep in mind is that the revenue web retailers earn from their partnerships with Affinion, Vertrue, and Webloyalty has no associated costs for the web retailers and is therefore 100% profit. Revenues from these partnerships, therefore, can become very

important to a company's overall profitability. For example, when the CEO of 1800Petmeds, a Webloyalty partner, requested that the "Continue" button be removed from the company's offer page because it was misleading customers, a Webloyalty employee responded:

> We can do that, but with these changes your CEO is decimating a program that delivered more than $516,000 in pure profit to you in 2008. If you operate your website on a 10% net profit margin, our payments to you represent over $5 million in sales revenue.[49]

### B. The Financial Advantages of Data Pass

As discussed in Section I above, most companies automatically transfer their customers' billing information to Affinion, Vertrue, and Webloyalty once consumers have presented what the companies call "proof of enrollment," such as an e-mail address. Documents reviewed by Committee staff show that Affinion, Vertrue, and Webloyalty are well aware that this "data pass" process produces higher rates of "joins" than an enrollment process that requires consumers to re-enter their credit card information to accept a membership club offer.

For example, a Webloyalty document tracking average conversion rates in 2006 and 2007 presents the following conversion information for consumers who join membership clubs through the data pass process (referred to in this document as "card on file") versus those who join by entering their credit card information ("non-card on file"):[50]

|  | "Card on File"<br>Net Conversion Rate | "Non-Card on File"<br>Net Conversion Rate |
|---|---|---|
| **Q3 2006** | 4.51% | 1.26% |
| **Q4 2006** | 4.54% | 0.91% |
| **Q1 2007** | 4.04% | 0.68% |
| **Q2 2007** | 3.84% | 0.89% |
| **Q3 2007** | 4.04% | 0.94% |
| **Q4 2007** | 3.91% | 1.65% |

According to these figures, consumers are about four times more likely to join Webloyalty's membership clubs if their credit card data is transferred automatically from the retailer.

Not surprisingly, based upon statistics such as these, Affinion, Vertrue, and Webloyalty push their partners and potential partners to display offer pages that allow their customers to enroll in the membership programs without re-entering the credit card or debit card number they used for the original purchase. In a presentation to a potential partner, Webloyalty provided the following graphic to explain its point that "non-card on file" enrollment offers would lead to

---

[49] E-mail from Webloyalty employee to 1800Petmeds employee (Feb. 11, 2009) (Webloyalty Doc. 88550).

[50] Webloyalty document "Average Conversion Rates Per Quarter – All Flows" (Jan. 10, 2008) (Webloyalty Doc. 19371).

"Low $Revenue", while "card on file" would lead to "High $Revenue" for the e-commerce company.[51]



In another presentation to a partner, Webloyalty bluntly stated that requiring the consumer to re-enter credit card information would hurt conversion. It noted, "with data collection on the page [y]ou can expect at least a 70% decrease in conversion."[52] In an e-mail to a potential partner, Affinion estimated that the conversion rate would be four times higher if the partner used data pass than if the partner required its customers to re-enter their credit card number ("non-data pass").[53]

## V.    Evidence of Misleading Offers and Consumer Confusion

Affinion, Vertrue, and Webloyalty understand that "data pass" and other aggressive online sales tactics drive up the rate of consumer "joins" to their programs. They also know that most of the consumers who "enroll" in their membership clubs through these aggressive tactics do so unknowingly and inadvertently.

Internal documents and information produced by Affinion, Webloyalty, and Vertrue to the Committee indicate that the three companies receive an overwhelming amount of negative feedback from consumers once the consumers learn they are paying "members" of clubs they have never heard of. The three companies' "customer service" operations are almost entirely dedicated to handling the large volume of calls from confused and angry consumers requesting cancellations, and asking how the company obtained their credit card information.

Given that most "members" are unaware they were enrolled in the programs, information provided by Affinion, Vertrue, and Webloyalty not surprisingly shows that most "members" cancel their membership once they realize they are being charged on a monthly basis. It also

---

[51] Webloyalty presentation "Revenue Continuum" (Webloyalty Doc. 27485).

[52] Webloyalty presentation "Non-card on file" (Webloyalty Doc. 27691).

[53] Affinion document "Products Overview" (Feb. 19, 2009) (Affinion Doc. AFSE 04-736).

shows that a very large percentage of the members never utilize the benefits of the programs or even take the simple step of logging into the companies' websites to access the benefits they are paying for each month.

### A. Low Levels of Member Awareness

Internal data and member surveys commissioned by Affinion, Vertrue, and Webloyalty clearly show that the three companies understand that the majority of their paying "members" have little or no awareness of their financial relationship with the companies.

One of the documents Vertrue produced to the Committee, for example, is a summary of June 22, 2009, feedback from consumers who had visited one of its membership websites. Of the "members" who completed the survey, 43% indicated they were visiting "to find about the charge on my credit card that I did not recognize" and 44% indicated they were visiting "to cancel the program." Only one member indicated he or she was there "to find out more about my membership benefits" and none of the respondents were there "to obtain my member ID."[54] In another question, 60% of the respondents indicated they were "extremely dissatisfied" with the site. In response to Vertrue's invitation to offer a comment or explain why they were satisfied or dissatisfied with the website, members provided more than 100 highly negative comments, including:

- "Don't know how I got it, I don't use it, I don't want it…you've heisted money from me for several months for something that I have no idea what it is and will never use it, so I'm cutting you off, both here and at my bank;"
- "Because I didn't authorize this service or know how my card # was gotten;"
- "Stop tricking people into your phony service;"
- "I never willingly joined, I want a reimbursement. I have never even heard of you;" and
- "I have no idea why you charged me 19.95. Where did you get my debit card information? I have no recollection of doing business with valmax."[55]

Internal data tracked by Webloyalty shows that it has known for years that the majority of its members were unknowingly enrolling in the membership clubs it offered. A "Disposition Report" run in September 1, 2003, appears to show that, of the 66,922 members who cancelled their Reservation Rewards membership in August 2003, 51,560, or 77%, had indicated "Did Not Authorize/Was Not Aware" as their reason for cancellation.[56] "Disposition Reports" run in the following years showed similar trends and, in 2008, a Webloyalty call center employee, while participating in a discussion about proposed call center script changes, acknowledged in an

---

[54] Internal Vertrue e-mail (Jun. 23, 2009) (Vertrue Doc. 118778-84).

[55] Id.

[56] Webloyalty document "Disposition Report by Product – Last Full Month" (Sept. 1, 2003) (Webloyalty Doc. 97613).

e-mail message that "[a]t least 90% of our members don't know anything about the membership."[57]

Customer surveys commissioned by Webloyalty and its e-commerce partners in 2004 and 2006 further confirm that most of Webloyalty's members were unaware they had enrolled in the company's membership clubs. A July 2004 telephone poll commissioned by Webloyalty and conducted at the request of its partner Redcats USA, which owns brands such as Brylane and Jessica London, showed that few of Redcats' customers knew they were paying members of Reservation Rewards, a Webloyalty membership program. As part of the survey, 308 past or current members of Reservation Rewards – half of whom were described as "active" members – were asked a series of questions. Among the findings of the survey were the following:

- 234 of these members (76%) either did not recall being offered a Reservation Rewards membership or said they had declined a membership offer;
- Only 62 of the members (20%) remembered receiving an e-mail notifying them of their Reservation Rewards membership;
- Only 5 of the members (1.6%) said they had received a $10 cash back offer; and
- Only 4 of the members (1.3%) said they had used Reservation Rewards discounts.[58]

In analyzing the results for Redcats USA, a marketing research firm noted, "It is quite concerning that only half (51%) of the Active segment clearly remembered signing up for the program."[59] Customer surveys conducted for Choice Hotels International, Inc. and Classmates.com, both Webloyalty partners, produced similar results. For Choice Hotels, a marketing research firm found that "[o]ne-half of guests reached on the member list did not know for sure if they are members of Reservation Rewards" and, based upon the survey of members who enrolled through Classmates.com, Webloyalty concluded that "[a]wareness of WL services is low among respondents."[60]

Although Affinion has not provided the Committee with member surveys, it has, at different times, tracked members' reasons for complaining to the Better Business Bureaus and state attorneys general. From January 2007 through February 2009, 85%, of the 1,550 serious complaints forwarded by the Better Business Bureaus and state attorneys general were related to online customers "asserting that they never agreed to join" the membership programs.[61]

---

[57] Internal Webloyalty e-mail (Oct. 21, 2008) (Webloyalty Doc. 89166).

[58] Webloyalty document, "Web Loyalty & Brylane Customer Research. A Quantitative Assessment" (Jul. 2004) (Webloyalty Doc. 84776 *et seq*).

[59] *Id.,* at 804785

[60] Webloyalty presentation "Choice Hotels International Reservations Rewards Study" (Jan. 14, 2004) (Webloyalty Doc. 80623); Webloyalty document "Webloyalty thoughts on Classmates Market Research Member Survey" (May 11, 2006) (Webloyalty Doc. 84884).

[61] Affinion letter, "Additional Information Provided by Affinion to Senate Committee on Commerce, Science, and Transportation" (Nov. 5, 2009) (Affinion Doc. ASFW 05-01).

From January through April 2009, Affinion also tracked "customer contacts with the Affinion Support Desk, which handles customer requests that are not satisfied by the Customer Service Representative (also referred to as the Front Line Agent) and are elevated to a supervisor."[62]  The spreadsheet showed that thousands of "customer contacts" could not be handled by "Front Line Agents" because the customers were categorized as "Unaware of Service" or "Disputing Enrollment."  While this data is limited to escalated contacts and does not include the millions of consumers who likely canceled their Affinion membership programs once they learned their credit card was being charged, it further suggests that a substantial percentage of Affinion's members are unaware they were enrolled in Affinion's membership programs.

For example, from January through April 2009, Affinion's Support Desk received 7,649 elevated "customer contacts" related to "billing" or "cancellation and suppression requests" from customers of 1-800-Flowers.com, AirTran Airways, Classmates.com, and Priceline who had been enrolled in Great Fun, an Affinion discount program.[63]  Of the 7,649 customer contacts, Affinion categorized a large percentage as "Unaware of Service," "Disputing Enrollment," or "Bank Representative Cancelled."  Despite placing these "contacts" in categories which suggest customer confusion and frustration, Affinion did not categorize these customer "contacts" as complaints.[64]

**Escalated Customer Contacts with Affinion's "Support Desk" Regarding
Its "Great Fun" Discount Club:  January – April 2009**

| Affinion Partner | Escalated "Customer Contacts" Regarding "Billing" and "Cancellations and Suppression Requests" |
|---|---|
| 1-800-Flowers.com | 618 |
| AirTran Airways | 838 |
| Classmates.com | 872 |
| Priceline | 5,221 |

### B.  Employee Training on Cancellations and Member Questions

When consumers realize they are being charged for a club membership they did not intend to enroll in and do not use, they contact Affinion, Vertrue, and Webloyalty to stop the monthly charges to their credit card or debit card.  As a result, the three companies' customer service centers are almost entirely dedicated to handling the large volume of calls from angry and confused consumers requesting cancellations and an explanation for the charge.  As a Webloyalty employee recently acknowledged in an internal e-mail, the call center representatives spend most of their time answering calls "from members who are questioning charges or want to cancel their membership."[65]  Affinion and Vertrue's internal documents show that most of their

---

[62] Affinion letter, "Affinion Response to Committee Follow-up Questions 1-3" (Oct. 9, 2009) (Affinion Doc. ASFW 06-01).

[63] Affinion spreadsheet, "Reason by Service & Client" (Aug. 21, 2009) (Affinion Doc. ASFE 04-59-82).

[64] *Id.*

[65] Internal Webloyalty employee e-mail (Feb. 16, 2009) (Webloyalty Doc. 88263).

calls are also related to cancellations or members questioning enrollment or the charge on their credit card or bank statement.

In a training manual, Affinion has informed its newly hired call center representatives that during an "8-hour shift" they will take "between 75-100 calls" and that "approximately 80% of these calls will be from members wishing to cancel their membership."[66]  In March 2008, Vertrue employees acknowledged a similar problem in an e-mail regarding a "Call Center Optimization" meeting.[67]  In discussing methods for reducing the cost associated with the call centers, Vertrue employees estimated that it received "7 million customer calls per year" and that "cancellation calls represent approximately 98% of call volume."[68]

In addition to cancellations, the employee manuals and scripts that Affinion, Vertrue, and Webloyalty provide to their call center representatives show that each company dedicates a significant amount of time training their employees on how to respond when members call to ask questions related to how they were enrolled, what the membership program is, or why there is a charge on their credit card or bank account statement.

A "Quick Reference Guide" distributed to Webloyalty employees explained that it was important to ask members why they were canceling their membership for Travel Values Plus, a membership program offered by Webloyalty.  It stated, "[m]any times the reason is that they had no idea what Travel Values Plus was and you will then have the opportunity to explain."[69]  Another page in a Webloyalty manual offered a list of the "Top Ten Reasons a Member Calls" and offered "Cancel my membership" and "What is this charge?" as the top two reasons.[70]  Other Webloyalty manuals provided call center representatives with a process for handling members asking the questions: "what is this charge?" or "who are you?"[71]

The "Great Fun Merged Product Script" that Affinion has provided to its call center representatives also shows they are trained on how to handle members who are calling to question enrollment or the charge on their bank statement.  The second heading in the manual's table of contents refers to a section entitled, "If Questioning the Charge/Enrollment," which instructs call center representatives to answer the member's question by stating, "The charge you see posted on your account is the (Monthly/Annual) membership fee for (Product).  We received a positive response online that activated your membership."[72]

---

[66] Affinion training manual, *Great Fun New Hire Training Manual* (Oct. 2, 2006) (Affinion Doc. AFSE 04-18772).

[67] Internal Vertrue e-mail, "Call Center optimization meeting" (Mar. 20, 2008) (Vertrue Doc. 111093).

[68] Vertrue, "Adaptive Call Center Optimization" (Mar. 18, 2008) (Vertrue Doc. 111095).

[69] Webloyalty document, *Quick Reference Guide: October 2006* (Webloyalty Doc. 26561).

[70] Webloyalty document, *Manual/Introduction – February* 2006 (Webloyalty Doc. 56370).

[71] Webloyalty training manual, "What is this Charge?/Who are you?:" (Webloyalty Doc. 26055).

[72] Affinion document, *Great Fun Merged Product Script:* (Sept. 18, 2006) (Affinion Doc. AFSE 03-1810, 1813).

21

A manual for Vertrue employees provides instructions remarkably similar to those provided to Affinion and Webloyalty employees. It provides a "Scripted Response" to answer the question, "How Did I Get Signed Up for this???"[73] The provided response states:

> Our records indicate that you agreed to try *[AM PROGRAM NAME]* while visiting the *[Client/Partner name]* website. For the order to be processed, you were required to enter and confirm your e-mail address. Additionally, by accepting the trial membership, you agreed to be enrolled using the billing source that you authorized and that after the 30 day trial membership, you would be billed the program fee.[74]

## C. High Rates of Cancellations and Low Rates of Usage

Affinion, Vertrue, and Webloyalty's internal data on their members' rates of cancellations and their rates of usage of the programs' benefits provide further evidence that online consumers are not aware they have been enrolled in membership clubs offered by the companies. Overwhelmingly, consumers cancel their memberships once they realize they are being charged on a monthly basis and very few consumers use the benefits offered by the membership programs.

Information provided by Affinion, Vertrue, and Webloyalty shows that the majority of the consumers the companies charge for services cancel their membership within five months of receiving the first charge on their credit card or checking account statement. Exhibit 5 to this report shows the number of members who have enrolled in Affinion, Vertrue, or Webloyalty's membership programs and remained members for at least one month, six months, one year, and five years. For the three companies, about a quarter of their members (26.2%) cancel during the free 30-day period, less than a third of their members (29.5%) are still members after six months and only 13.9% remain members for more than one year.

The cancellation pattern observed for these online consumers is similar to the one observed by the Minnesota Attorney General's office during its investigation into a preacquired account marketing campaign. In that case, where hundreds of thousands of bank customers were sold membership clubs or insurance policies through preacquired account marketing, investigators observed that most of these bank customers canceled not in the 30-day free trial period, but in the following months when they started seeing their credit card charges.[75] According to Professor Prentiss Cox, who supervised the Minnesota Attorney General's investigation, this pattern is "consistent with a large majority of the cancelling customers not understanding the solicitation and cancelling only after the charge appears on their accounts."[76]

---

[73] Vertrue document, *Online/Internet Marketing Main Menu* (May 31, 2007) (Vertrue Doc. 82269).

[74] *Id.*

[75] Prentiss Cox, *Invisible Hand of Preacquired Account Marketing*, forthcoming in Harvard Journal on Legislation, Vol. 47, No. 2 (2010). (Available at SSRN: http://ssrn.com/abstract=1460963. He explains, "If all consumers understood the free trial offer…the temporal pattern of cancellations should be heavily weighted toward cancellations during the free trial period.")

[76] *Id.*, at 24.

Information provided to the Committee by Affinion, Vertrue, and Webloyalty also shows that the vast majority of consumers who enroll in their programs never receive the "cash back award" or other incentive promised them in the enrollment offer.  As discussed in Section I above, a prominent feature of the post-transaction offers Affinion, Vertrue, and Webloyalty make to consumers is an up-front gift offer such as "$10 Cash  Back on Your Next Purchase!", which appears to be related to the website where the consumer has just made a purchase.

While the language and appearance of the offer suggests that clicking the "Yes" button automatically gives consumers a discount on their next purchase, the fine print informs consumers that they must take additional steps to receive the benefit.  According to information provided by the three companies, of the 34,262,674 members who were promised automatic cash gifts or other incentives, only 3% actually received the promised enrollment benefit.

Another indication that online consumers are unaware of their Affinion, Vertrue, or Webloyalty club memberships is their failure to log on to the clubs' websites to view and use the purported benefits offered by the clubs.   Evidence currently available to Committee staff suggests that the so-called member "usage rates" for Affinion, Vertrue, and Webloyalty are very low.

For example, Vertrue provided the Committee with the number of members who log in to their membership club websites.  In 2006, 100,091 members logged in to the membership clubs' websites; in 2007, 215,191 members logged in to the membership clubs' websites; and in 2008, 377,428 members logged in to the membership clubs' websites. While Vertrue has not yet explained to Committee staff whether these numbers include consumers attempting to cancel their membership, how many are multiple logins by the same consumer, or how many of these consumers actually received a club service after logging in, these figures, at best, represent only a small percentage (approximately 10-20%) of the total number of Vertrue club "members" in these years.

Information Webloyalty provided to the Committee also suggests its clubs have very low member usage rates.  A February 28, 2005, Webloyalty document titled, "Product Usage Statistics," appears to show that the rate of benefit usage for members enrolled through the data pass process ranged between .2% and 11.4% for a six month period between 2004 and 2005. [77] A "Site Usage" table presented to the Webloyalty Board of Directors in March 2006 reported that between 70% and 80% of Reservation Rewards club "members" enrolled through data pass had either never visited the Reservation Rewards site at all or viewed only the club's home page without ever accessing additional pages.[78]

In his statement to the Commerce Committee, Professor Benjamin Edelman cites publicly available web traffic data to reach a similar conclusion.  He notes that while Webloyalty claims to have more than two million paying club members, none of the company's club web pages rank among the Internet's top 100,000 sites for web traffic.   Professor Edelman concludes that,

---

[77] Webloyalty document, Product Usage Statistics (Feb. 28, 2005) (Webloyalty Doc. 56115).

[78] Webloyalty document, "Reservation Rewards: Member Site Usage" (March 27, 2006) (Webloyalty Doc. 103997).

"this gap between signups and users confirms that Webloyalty's marketing failed to obtain meaningful consent from the users who purportedly 'accepted' Webloyalty's offer."[79]

At this point in the investigation, Affinion, Vertrue, and Webloyalty have not provided the Committee with comprehensive data related to their rates of usage. Committee staff has reason to believe that this information is kept by the companies as a matter of course and that it would not be difficult to provide the information to the Committee. Consumer usage of these services is a key question because a low usage rate "is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances."[80]

## VI.    Partner Awareness of the Problem

Committee staff has spoken to more than a dozen e-commerce partners of Affinion, Vertrue, and Webloyalty and has reviewed thousands of pages of e-mail communications between Affinion, Vertrue, and Webloyalty and their e-commerce partners. The interviews and the e-mail communications provide abundant evidence that the e-commerce partners are aware that their customers are being misled by the enrollment offers from Affinion, Vertrue, and Webloyalty. This evidence also shows that e-commerce partners have repeatedly raised concerns about customer confusion over the data pass process and the enrollment offers. Many partners terminated their relationship because they determined it was not in the best interest of their customers.

### A.  "Customer Noise"

When e-commerce partners enter into financial partnerships with Affinion, Vertrue, and Webloyalty, the three companies promise to handle cancellations, complaints, and other "customer service" issues. As a result of this arrangement, when consumers see a membership club charge on their credit card or bank statements, they are provided only a club name and a toll free number operated by Affinion, Vertrue, and Webloyalty.

The purpose of routing customer service issues through the three Connecticut companies is to prevent what Webloyalty promotional materials call "negative impact on partner brands." Affinion, Webloyalty, and Vertrue handle dissatisfied customers in order to insulate the partners from their own customers' criticism, which is commonly described as "customer noise" by the companies.

For example, in November 2008, 1-800-Flowers.com's Director of Third Party Marketing wrote an e-mail to her Affinion contact complaining that "we have had increasingly more frequent feedback from our own teams that your agents are telling our customers to call us...." She asked for Affinion's help "to determine…how we can reduce the negative comments

---

[79] Prepared Statement of Professor Benjamin Edelman to the U.S. Senate Committee on Commerce, Science, and Transportation (Nov. 2009).

[80] *FTC v. Cyberspace.com*, 453 F.3d 1196, 1201 (9th Cir. 2006).

from our customers back to our internal agents."[81]   Affinion's Vice President of Relationship Management quickly responded to this e-mail. She wrote:

> I am troubled by this report.  This is a STRICT no-no in our centers.  We tell agents not to do it and don't give them our client's phone numbers and so on.  If we hear instances [of] it in our monitoring/test calls, they will "fail" that call and get dinged on their incentive payments.[82]

In spite of the elaborate precautions Affinion, Vertrue, and Webloyalty take to prevent negative feedback about their membership clubs from getting back to their partners, most, if not all, of the e-retailers partnered with Affinion, Vertrue, and Webloyalty know that the companies' aggressive sales tactics make many of their customers dissatisfied and angry.  Committee staff has reviewed thousands of pages of communications from angry consumers sent directly to the partners.  Under standard procedures followed by all three companies, partners forward the complaints to Affinion, Vertrue, and Webloyalty for resolution.

For example, in April 2009, the Manager of the Customer Relations Department (CRD) for AirTran Airways sent an e-mail to one of AirTran Airways' marketing executives stating:

> We continue to receive complaints in CRD from customers regarding the Great Fun option.  The complaints are mainly focused around:

> Customer received a charge on their credit card for the membership, however the customer claims they never authorized the charge or requested the membership.

> Customers attempted to cancel the membership; but continue to get charged for the monthly membership fee.  They often call Great Fun several times to cancel to no avail.

> In CRD we explain the process for signing up for the membership.  However several customers on separate occasions have been adamant that they have never signed up with Great Fun.[83]

The AirTran marketing executive forwarded this e-mail to his contact at Affinion, requesting help in addressing what he called "a growing concern about the raising [sic] complaints."[84]

---

[81] E-mail from 1-800-Flowers.com Director of Third Party Marketing to Affinion Vice President, Relationship Management (Nov. 20, 2009) (Affinion Doc. ASFE 04-31).

[82] E-mail from Affinion Vice President of Relationship Management to 1-800-Flowers Director of Third Party Marketing (Nov. 20, 2008) (Affinion Doc. ASFE 04-30).

[83] Internal AirTran Airways e-mail from Manager – Customer Relations Department (Apr. 29, 2009) (Affinion Doc. AFSE 04-3803).

[84] E-mail from AirTran employee to Affinion employee (May 6, 2009) (Affinion Doc. AFSE 04-3904).

In June 2009, another Affinion partner, Priceline.com, forwarded Affinion a "tracker" document detailing serious consumer complaints the company had received in May and June of 2009.[85] The comments included in this document show that Priceline is aware that Affinion's club membership offers are making Priceline users extremely unhappy. A few examples are:

- Hi, I just noticed a recurring monthly charge of $11.99 on my VISA bill for TLG*GREATFN.... I called the 800 number referenced and canceled…I have no idea how this charge got on my VISA or what it is for. I certainly didn't get anything from it. They said it was through something I did on Priceline. Are you guys in on this? Is this part of a scam? Is Priceline an accessory to this fraud? I feel like I've been tricked and robbed.

- A few months ago, I purchased the tickets through priceline. I was not aware that in the process of purchasing tickets I was somehow enrolled in an organization called Great Fun. I feel that this happened very deceitfully. I just wanted you to know that this will be a consideration in the future.

- How do I send a message to you regarding your product of Great Fun. This company has billed me for over a year without my concent [sic] or knowledge. Priceline should be more responsible than to subject their customers to this sort of unsuspected, unwanted solicitation! I have written the company, my credit card company & the office for Consumer Protection for Connecticut.[86]

## B. *Concerns Raised by Partners*

In response to these "customer noise" issues, Affinion, Vertrue, and Webloyalty's partners regularly raise concerns about the companies' aggressive sales tactics. In some cases, partners ask the companies to take steps to reduce consumer complaints. In other cases, partners have decided to end their relationship with Affinion, Vertrue, or Webloyalty due to negative consumer experiences. The concerns expressed by partners in these communications seem to have changed very little over the past decade.

In 2002, the Director of Business Development for an e-commerce company partnered with Webloyalty wrote directly to Rick Fernandes, the Chief Executive Officer of Webloyalty, stating:

We have worked with webloyalty for about 5 weeks now and have had enough time and data to make a solid assessment that the execution of the program is not in our best interest. Even with what we thought might be a suitable authorization process, has turned out to have extremely negative consequences and we have been unable to correct with the flexibility that we need to address a problem of this magnitude….We feel that if the customer is interested in participate [sic] in

---

[85] E-mail from Priceline call center employee to Affinion employee (June 17, 2009) (Affinion Doc. AFSE 04-1653).

[86] *Id.*

this program, your website should sell them without us passing their secure info in the process.[87]

In January 2003, a Webloyalty employee described the customer complaints that another Webloyalty partner had received:

Let me clarify that we ARE in jeopardy with this client and these represent a small number of many more complaints their staff insiders consider 'brutal and unprecedented'…[88]

The company later terminated the partnership in 2005 and stated, "This decision comes after detailed discussions with Senior management.  They understand what this program generates and that it has the potential to generate even more.  However, we are going through a re-branding mobilization in 2005 and the Webloyalty banners do not fit into that plan."[89]

In August 2003, Webloyalty's Senior Vice President for Business Development and Account Management sent an e-mail summarizing partners' concerns to senior Webloyalty executives, including Rick Fernandes, the Chief Executive Officer, that stated:

What clients tell us…

1. Pre-bill notification is buried in pre-bill e-mail.  Make it more upfront.
2. Special reward is perceived as misleading.  It's not a reward it's an obligation.  Test special offer.
4. [sic] The segue "Congratulations, Thank you for your purchase" is misleading.  Sounds like it's a thank you from client and it's not, it's an offer from WL [Webloyalty].
5. Continue button is misleading – customer does not have to continue.
6. Yes button is misleading, should say enroll, sign up, etc.
7. Language about data pass is buried.  Customers are unaware their data is being passed.
8. Trial and price point is buried – it's clear you get 30 days free, but not clear you'll be automatically renewed if you don't cancel.  And then the fee is buried too.[90]

---

[87] E-mail from Webloyalty  partner Director of Business Development to Richard Fernandes, Chief Executive Officer of Webloyalty (Sep. 10, 2002) (Webloyalty Doc. 75740).

[88] Internal Webloyalty e-mail (Jan. 07, 2003) (Webloyalty Doc. 102451).

[89] E-mail from Webloyalty partner Operational Vice President of Customer Marketing to Webloyalty employee (Nov. 5, 2004) (Webloyalty Doc. 74077).

[90] Internal Webloyalty E-mail from Senior Vice President for Business Development and Account Management to Richard Fernandes, Chief Executive Officer of Webloyalty, and other Webloyalty employees (Aug. 25, 2003) (Webloyalty Doc. 14019).

In April 2004, the employee of a Webloyalty e-commerce partner, which operated a virtual shopping cart for Internet merchants, sent an e-mail to a Webloyalty employee stating the following:

> …I do keep hearing the same thing from our merchants who are calling up wanting the program removed.  They are telling us their shoppers are saying:
>
> 1) They have been tricked into buying and or signing up for something
> 2) They did not know there was a cost involved with the program
> 3) The cost was hidden at the bottom of the page, or not very clear
> 4) They do not know who to call to get more info, so they call the merchant (who gets ticked off, calls us and wants out of the program).
> 5) They do not know who is offering the program or who to contact so again they call the merchant (who gets ticked off, calls us and wants out of the program).[91]

In January 2006, Webloyalty employees discussed concerns that an e-retailer partner had raised.  The e-mail stated:

> He mentioned that they are getting a lot of noise with our program and that people are writing blogs about…what a scam WLI RR [Webloyalty Reservation Rewards]  is…He's very concerned…Bottom line is he wants to test more conservative pages against the control to find a page that's more clear and see what it does to his financials.[92]

In May 2006, an employee for Avon informed Affinion that a customer complaint had "been escalated to our CEO and the customer…felt it was completely misleading."[93]  The Avon employee went on to state that "[w]e need to discuss how we can modify the offer page to make it more clear to the user that their credit card info will be passed upon their approval, possibly by adding a check box."[94]  An information technology specialist working with Avon.com to resolve a customer complaint later advised:

> I think the big problem was that it was pretty misleading.  It wasn't clear that we were passing the customer details (cc number etc) across when they clicked on the banner.  I think people often proceeded through out of curiosity, believing that if they didn't provide they [sic] billing data that they couldn't be charged, regardless of what they clicked on or accepted.  What they don't realise [sic] is that Great Fun did have their billing details already.[95]

---

[91] E-mail from Webloyalty partner employee to Webloyalty employee (Apr. 30, 2004) (Webloyalty Doc. 74483-84).

[92] Internal Webloyalty e-mail (Jan. 9, 2006) (Webloyalty Doc. 76770).

[93] E-mail from Avon eMarketing Manager to Affinion Associate Client Manager (May 22, 2006) (Affinion Doc. 04-16516).

[94] *Id.*

[95] E-mail from Avon employee to Affinion employee (Oct. 26, 2007) (Affinion Doc. AFSE 04-16527).

In January 2007, an e-retailer that had partnered with Webloyalty sent an e-mail to Webloyalty stating that, "...we have had regular complaints from our customers…[w]e simply cannot have complaints such as this."[96]  He went on to note that, "The particularly cheerless concern is that to generate more revenue through Webloyalty, it seems we must be more aggressive (and deceptive) in our marketing techniques."[97]

In March 2007, an employee for another e-retailer partnered with Webloyalty sent an e-mail expressing concerns about complaints.  He stated, "We are getting an unbelievable number of complaints on our current set-up.  Customers (ours are older) are feeling tricked and many state they are not coming back to our sites because of it.  Don't know if that is true, but I still want to talk about it."[98]

In November 2007, a 1-800-Flowers.com employee raised "a major red flag" about the company's partnership with Affinion.  He cited a number of recent consumer complaints about the company's partnership with Affinion to sell the "LiveWell" membership club, and he noted that, "for every one who complains vociferously, there are dozens, even hundreds that do not."[99] He continued:

> I know that our relationship with Affinion is a huge boost to our revenue; on the other hand, I am gravely concerned that for every dollar we get from Live Well, we may be trading off many more dollars in angry and lost customers.[100]

In February 2008, another e-retailer expressed concerns to Webloyalty in an e-mail by stating:

> We're all still very concerned about the negative impact we are experiencing to our reputation online.  And, we continue to get enough angry callers that our call center manager…has to personally field about 3 of the angriest callers a week. (we estimate that if [our call center manager] is getting 3 our call center is getting 15 and your team is probably getting 75 or more per week)…Webloyalty has been unwilling to share with us any data that would help us to understand how our customers are using the program – or whether they are…To be quite candid…we don't have a clue how our customers feel about this program.  Maybe 99% of them love it and 1% complain.  Maybe 99% hate it but only 1% complain.[101]

---

[96] E-mail from Webloyalty partner employee to Webloyalty employee (Jan. 15, 2007) (Webloyalty Doc. 95116).

[97] *Id.*

[98] E-mail from Webloyalty partner employee to Webloyalty employees (Mar. 02, 2007) (Webloyalty Doc. 81039).

[99] Internal 1-800-Flowers.com email (Nov. 7, 2007) (Affinion Doc. AFSE 5-3452).

[100] *Id.*

[101] E-mail from Webloyalty partner employee to Webloyalty employees (Feb. 6, 2008) (Webloyalty Doc. 95894).

Two months later, the e-retailer informed Webloyalty that "we have decided to part ways because as time went by it became clear to us that our customers don't want this program."[102]

In May 2008, an Affinion employee discussed concerns raised by Hotwire, an Affinion partner, in an e-mail to a colleague. She stated, "Hotwire is claiming that they're receiving a high volume of CS [customer service] noise—approx 1 out of every 6 members calls them to complain."[103]

Also in May 2008, Vertrue supplied a "New Product Questionnaire" to one of its retailer partners, VistaPrint, in order to learn VistaPrint's thoughts about the rewards program the two companies had partnered on. One question asked, "What are the top 3 likes and dislikes with VistaPrint Rewards?" For dislikes, VistaPrint replied, "Customer Noise"; "Ability/Difficulty to redeem benefits, including $10 Cash Back"; "Clarity of the offer"; and "20% off not on purchase of gift card but later."[104]

In June 2008, the Director of Client Services for Vertrue's Adaptive Marketing acknowledged that Restaurant.com had raised concerns by stating, "we will create some mockups for ways the Restaurant.com marketing flow can be changed for the purpose of making the marketing less aggressive, in hopes of reducing customer noise and negative impact to the Restaurant.com brand."[105] This official also admitted that while more "conservative" marketing would "help to reduce consumer noise," it would also likely have "some negative impact on conversion and revenue."[106]

## VII.    Conclusion

Affinion, Vertrue and Webloyalty use aggressive sales tactics intentionally designed to mislead online shoppers. These three companies exploit shoppers' expectations about the online purchasing process to charge millions of consumers each year for services the consumers do not want and do not understand they have purchased. Hundreds of e-commerce merchants – including many of the best-known, respected websites and retailers on the Internet – allow these three companies to use aggressive sales tactics against their customers, and share in the revenues generated by these misleading tactics. While Congress and the Federal Trade Commission have taken steps to curb similar abusive practices in telemarketing, there has not yet been any action to protect consumers while they are shopping online.

---

[102] E-mail from Webloyalty partner employee to Webloyalty employees (April 16, 2008) (Webloyalty Doc. 96060).

[103] Internal Affinion e-mail (May 20, 2008) (Affinion Doc. AFSE 06-2506).

[104] Vertrue questionnaire (May 7, 2008) (Vertrue Doc. 111917).

[105] E-mail from Vertrue Director, Client Services to Restaurant.com employee (Jun. 9, 2008) (Vertrue Doc. 105186).

[106] *Id.*