**Exhibit B**

Prepared Statement of Robert J. Meyer

Presented to the

United States Senate

Committee on Commerce and Transportation

November 17, 2009

Robert J. Meyer
Gayfryd Steinberg Professor of Marketing
The Wharton School
University of Pennsylvania
Philadelphia, PA 19104

**Chairman Rockefeller, Ranking Member Hutchinson, Members of the Committee:**

My name is Robert Meyer.  I am the Gayfryd Steinberg Professor Marketing at the Wharton School of the University of Pennsylvania, where I have served on the faculty since 1990.  Prior to arriving at Penn I served on the marketing faculties at the University of California, Los Angeles and Carnegie-Mellon University. Throughout my career my research has focused on the study of consumer decision making, particularly the psychological processes that lead consumers to adopt novel goods and services. In addition to my research, I have spent the past twenty-seven years teaching the practice of marketing at the undergraduate, graduate, and executive levels both in the United States and abroad.   My complete curriculum vitae is available at http://marketing.wharton.upenn.edu/documents/cv/Meyer_Vita_Dec_2007.pdf.

I  was invited by the committee to offer testimony on a class of post-transactional marketing methods used by firms to sell subscription memberships in third-party benefit programs on line.  I originally became familiar with these practices while serving as an expert in a private class-action suit involving a direct marketing company in 2007, and more recently while serving as an expert for the Iowa Attorney General's office.  The selling methods of concern are those where a customer makes a volitional purchase at a familiar website and is then transferred—often without their awareness--to a separate site maintained by a third-party.   At this new site the customer is typically offered a free premium (such as a gift card or discount) for agreeing to trial membership in a program offering an array of benefits, such as the potential ability to obtain price discounts from known retailers.  If the customer agrees to this trial, the credit card information that was provided to the first party during the original transaction is automatically transferred to the third party.  If the customer does not cancel the membership within the trial period, the third party then uses this billing information to charge the customer a monthly membership fee.  A common characteristic of these transactions is that many consumers unwittingly agree to the trial memberships without being cognizant that they have purchased anything or are at financial risk, and, as a result, they incur several months of membership charges before they are able to cancel.

## Overall assessment

My overall opinion of these practices is threefold:

- First, the sales methods used by these firms do not constitute marketing as the term is commonly understood and practiced by ethical businesses and as is taught in major schools of management.  In almost all cases the membership programs being offered to consumers hold limited if any value, no attempt is made to communicate information about the programs in a way that would allow informed choices by consumers, and the firms who use these methods display little interest in building or nurturing long-term relationships with contacted customers.  In contrast, the sales methods are the cornerstone of a scheme in which firms seek to earn profits by luring customers into paying for memberships in programs that they would not subscribe to given their full awareness.

- Second, while the substantive content of the sales practices varies, this deception is achieved though a coordinated series communications that display a distinctive common architecture. These include the use of web designs that obscure the relationship that exists between the first and third party sellers, offering enticements of free premiums or incentives that consumers will have little chance of ever obtaining, creating false beliefs that no financial risks are incurred by agreeing to the transaction, and by creating exit barriers that make it difficult to avoid and/or recover unintended membership payments, such as by making continued membership the default option for consumers who are not fully cognizant of what they have signed up for.

- Third, this architecture achieves deception by exploiting a series of well-known psychological biases that are known to limit consumers' abilities to make fully informed choices in markets.  The most general of these is the creation of web environments that lead consumers to make decisions using automated or unconscious processes that do not fully consider all of the information that is available or presented  in a decision setting.  Examples include site designs the create the false impression that the offer is being made by a familiar, trusted, seller, designs that misdirect consumer's attention away from text that might describe the true nature of

3

the transaction, and by exploiting tendencies to choose default "accept" options when there is confusion about the correct course of action in a web session.

I should also note that the lack of ethicality of these practices is inflated by the fact that they are often targeted at vulnerable populations who are ill-equipped to absorb the financial losses they impose. Specifically, the practices are likely to be particularly effective when targeted at consumers of limited means for whom the small cash enticements promised by the programs would represent significant assets, and/or older consumers who have had limited experience in navigating the web. Naïve consumers with limited web experience may be taken in for no other reason than harboring beliefs that the sellers follow the same norms of ethical exchange that they have common to expect in traditional markets, where payment for goods and services is a volitional choice made by the consumer, not something one has to opt out of.

Finally, the persistence of these sales schemes also pose a potential long-term risk to legitimate businesses who conduct sales in an ethical manner over the web. As these practices proliferate, the negative experience of consumers who are taken in by these selling schemes may serve to foster feelings of mistrust toward legitimate sellers, this impeding the growth of a major modern channel of commerce.

In the sections below I elaborate the basis of this opinion. The discussion is partitioned into two phases. I first provide an overview of the approach to selling used by firms and describe the common architecture that characterizes most web scripts. I then discuss the psychological mechanisms that explain why these scripts are effective in deceiving consumers into purchasing memberships in programs that have no material value.

## The Deceptive Architecture

### Overall structure

Although the web designs and program scripts used by the third-part firms vary in their specific content, almost all display a common architecture that is comprised of six essential parts:

4

- *An initial legitimate sales setting.* A customer first visits a familiar first-party web site in which they make a volitional purchase using a credit card provided by the customer;

- *A disguised link and enticement.* After making the purchase customers are taken to a landing page maintained by a third-party seller that describes an opportunity to realize a free benefit, such as dollars off a previous purchase or a cash gift card. This page is disguised to look like it is maintained or endorsed by the first party seller, such as by featuring the first party seller's logo on the website.

- *Distraction and confusion ploys.* The landing page then describes the conditions required to receive the premium in a way that minimizes the likelihood that a consumer will pay close attention to its details, and potentially misconstrue what the premium is being awarded for. This is achieved by including distracting elements in the web site-- such as fake surveys—that direct the consumer's attention away from critical details about the membership program and its terms.

- *Concealment of the payment mechanism.* The landing pages never require customers to provide their credit card or billing information, an omission that fosters beliefs that nothing has been purchased, and that the consumer faces no financial risk going forward.

- *Post-acceptance retention ploys.* To maximize the chances that monthly charges are incurred before the consumer can cancel, the firm employs such tactics as the use of modest charge levels and nondescript program names that are likely to be overlooked in consumers' monthly credit card statements, and requiring consumers to be an active member of the program for a longer than the "free trial" period before the promised premium is be awarded.

- *Negative-option pricing.* Finally, the centerpiece of the architecture is a negative-option pricing scheme that makes acceptance of membership the default action for consumers, shifting the burden of effort in the sales process from the seller to the consumer. Whereas in traditional markets it is the burden of the seller to convince the buyer that offered goods or services are worth paying for, under negative-option pricing the default assumption is the opposite, making it the responsibility of the consumer's to take action to stop payment if he or she feels the good or service is not worthwhile.

Figures 1 through 3 I provide examples of how these elements are implemented.  Figures 1a-1c illustrates the sequence of web pages that would be viewed by a customer who makes a purchase at *Vistaprint*, a familiar online merchant of pre-printed gift cards, labels, and home office supplies (*www.vistaprint.com*).  As shown in Figure 1a, when the consumer concludes his or her purchase at Vistaprint, he or she does not leave the site, but is rather taken to a new page—seemingly still part of the Vistaprint site—that promises $10 cash back on the previous purchase as a "special thank you" for their purchase (Figure 1b).  The web site also seems to imply that the primary condition for receiving the cash back is the completion of a short survey that prominently appears on the right-hand side of the page (Figure 1c).  What few consumers likely realize, however, is that both the ownership of the page and the survey are ruses; this new site is not part of the Vistaprint site, but is a page maintained by an unaffiliated third-party direct marketing firm (in this case, Vertrue) who has no intention of using or analyzing the survey data.  Rather, the goal of the survey is to direct the consumer's attention away from dense text to the left that describes the real purpose of the site, which is attract monthly memberships in a subscription program. Specifically, by agreeing to apply for the $10 cash-back discount the customer is  consenting to trial membership in a program that costs $14.95 a month, and is giving Vertrue permission to secure his or her credit card information from Vistaprint for billing purposes (Figure 1d).  Variations this same general sequence of tie-ins and mis-directs are illustrated in Figures 2 and 3 (a-c).

What is not depicted in the Figures is that the sequence of deceptive actions continues after the customer consents to participate—often unknowingly.  Few consumers, for example, will ever receive the promised $10 "cash back" in the Vistaprint solicitation.  The reason is that Vertrue, the direct marketer, deliberately attempts to minimize redemption rates by requiring the consumer to complete two phases of forms that must be completed and mailed back in, a process that takes up to 8-10 weeks.  Because active membership is typically required at the time the refund is awarded, customers who manage to cancel their memberships within the "free trial" period never receive the promised premium.  Finally, for those few customers who are aware of their membership in these programs and attempt to utilize their advertised benefits, they will quickly encounter similar usage barriers. To illustrate, most programs promise discounts on gift cards that can be used at well-known merchants, but these can be secured only if the customer

6

first purchases the cards at full price, then endures similarly-lengthy transaction costs to realize the savings. As a result, actual usage of the benefits of these programs is typically negligible—either because customers are never aware that they are members, or the costs of making claims are such as to render the programs useless.

**Summary Assessment**

It is my belief that these aspects of the web scripts—from the opening link to the programs themselves—form a carefully-crafted scheme for generating revenue by fostering and then arbitraging ignorance: maximizing the number of customers being makes lured in to the sales scheme on the front end, and then minimizing the number of customers who had the knowledge or ability to withdraw from it on the back end.

Each aspect of the script plays a clear-cut role in achieving this goal. The initial setting of a familiar web site not only provides a mechanism for securing the customer's credit card information without their knowledge, but also fosters a misplaced sense of trust in the legitimacy of the subsequent disguised appeal by the third-party seller. The use of monetary enticements and distracters then lures customers into signing up for a membership program whose terms and conditions are not understood, or, in many cases, without the consumer's conscious awareness that they have signed for anything. Finally, once agreement is secured from customers, an array of post-sale concealment tactics are used to insure that at least some charges are incurred by consumers before they discover their purchasing mistake.

### How and Why the Schemes Work

A remarkable feature of the numerous consumer complaints that have been filed with better business bureaus and state attorney general offices in connection with these practices is the ubiquity of claims by consumers that they have no recollection of ever having consented to membership in programs—even when confronted with evidence to the contrary. What is notable about these schemes is thus that their effect goes well beyond simply misleading consumers as to the real value of the trial memberships that they are consenting to. Rather, they induce many consumers to take actions that they have no conscious awareness of, and whose consequences are discovered only months after the initial web contact.

While a number of factors contribute to the effectiveness of these schemes, the most fundamental is that they work by exploiting one of the most fundamental frailties of human decision making: the tendency to make decisions using automated—and often unconscious--heuristics that respond to only limited aspects of an information environment. As noted by Kahneman (2002), human decision making is currently widely seen as being governed by two cognitive systems: automated rules or heuristics (System I) that produce rapid actions and perceptions over which we have little conscious control, and a deliberative or reasoned rules (System II) that more carefully consider features of the environment, and over which we have considerable conscious control. The deceptive sales schemes used by direct marketers work by endowing web sites with features that encourage decisions to be made by System I (instinctive) processes, while suppressing features that would activate System II (reasoned) processes—processes that would otherwise alert and discourage consumers from signing up for programs that have little real value.

To elaborate on this idea, the schemes described above lure consumers into consenting to memberships by fostering and exploiting the following four decision biases that are often associated with System I (automated) problem solving:

- *Optimism biases* that cause consumers' to selectively interpret the information provided by the firm in a favorable (or trusting) light;
- *Conditioned-response biases*, in which certain behaviors and perceptions are automatically triggered when a decision maker is exposed to familiar cues;
- *Inter-temporal judgment biases*, which include tendencies to overweight short-term prospects and to postpone deliberations when there is uncertainty about the best course of action;
- *Status-quo (default) biases*, or the tendency to prefer inaction (accept the status quo) to action when confronted with uncertainty in a decision environment.

Each of these biases and how they induced unintentional choices in response to the web schemes will be described and illustrated in turn.

**The Optimism Bias**

A central starting element of the various schemes is an initial tie-in to a familiar web site—typically one that the consumer had just made a volitional purchase—followed, in most

cases, by the promise of a free premium—such as cash gift card or dollars off the previous transaction.  These features have two likely psychological effects.  First, the tie-in works to insure that the feelings of positive affect and trust that the consumer had developed in the course of the initial, volitional, transaction would persist while the consumer was reading and processing the information presented in the new landing page.  If consumers believed that the web screen they were viewing was merely a continuation of the same exchange with the initial seller, they would have little reason to "raise their antennas" when viewing this new information—thus making it more likely this new information would be processed using System I (automated, heuristic) thought processes rather than System II (deliberative).

The second effect is that when these feelings of trust are accompanied by an offer of a free reward (a positive cue), this new information would be processed not just in a heuristic manner, but also with a *positive bias*. The basis of this conclusion is the large literature on biases in human inference, which has repeatedly laid credence to the adage that people tend to "hear what they hope to hear" when processing information.   The academic term for this is confirmatory or *goal-motivated* reasoning (e.g., Kunda 1990; Weinstein 1980; Meyer, Zhao, and Han 2007).  Once a decision maker has a goal or desired outcome in mind for a task, he she will selectively process that information that consistent with the goal rather than inconsistent.  Hence, for example, when asked to estimate how long it will take to finish a project people consistently underestimate durations—an effect called the "planning fallacy" (e.g., Buehler, Griffin and Ross 1994 ).  The reason this arises is that when estimating completion times people are more likely to imagine those scenarios that lead to early completion than late.  Likewise, when imagining how useful new-product features will be prior to their adoption, consumers often over-estimate later use by the same mechanism: given that the goal is to use features, scenarios in which we indeed use them come to mind more readily than those in which we do not.

The same mechanism would be at work here.  Given the goal of obtaining cash back on a purchase or a free gift card consumers would have been motivated to selectively process information in a way that most easily rationalize their attainment—such as by believing that the offers were legitimate and there would not be "catches" that put them at risk.  In short, once a consumer adopted a belief that the lures were real and being made by a seller for which he or she felt trust, he or she would have been hooked; the consumer would have no motivation to search for and/or interpret information on the site such in a way that would disconfirm this belief.

**Conditioned Response Biases**

A central feature of System I processes is that consumer perceptions and behaviors are often driven more by the cues consumers *expect* to see an environment rather the cues that are objectively there.  Hence, in the same way that a hiker in a forest who has a phobia for snakes might jump when seeing a rope on the ground,  when processing web site information consumers may be prone to perceive and respond to what they *expect* to web site to contain rather than what it objectively does.

The schemes considered here are designed to exploit these illusory perceptions. For example, a consumer who quickly views the solicitation illustrated in Figure 1b-1d and sees the Vistaprint logos would presume that it is a Visatprint site, which would trigger a set of expectations about the kind of content and offer terms that would be normally be associated with a legitimate Vistaprint promotion. For example, a consumer would naturally assume that the survey on the page was there as part of Vistaprint's marketing research efforts, and that the "$10 cash back" was being awarded as an incentive for completing this survey—a well-established practice.  Likewise, and most critically, the consumer would have no perception of having purchased anything (or committing to purchase) after having clicked the "yes" button at the bottom of the survey for the simple reason that all of the cues that are normally when making a purchase from Vistaprint--such as provision of credit card information and a description of what is being purchased—are absent.  The fact that some many consumers leave the site unaware that they have committed to making a purchase is thus not surprising; for most, the transaction was never perceived as such.

Another example of the exploitive use of conditioned responses is given in Figures 3a-3c, which shows a different kind of solicitation tied to the Intelius people-search site (www.Intelius.com).  When a customer visits the Intelius site, for a small fee they can get a report of available public information on a person of interest.  After paying the fee with a credit card, they click a red button that says, "confirm the purchase and show my report" (Figure 3a). But when clicking this button they are not shown the report but are rather unexpectedly taken to a new site maintained by Vertrue designed to solicit membership in a benefit program called "24 Protect Plus" .  A central feature of the page is a request for an email address, under which is a

prominent red button labeled "yes and show my report"—presented in the same font as the earlier button.  Having no expectations of having to navigate a promotion, and simply wanting to see the report that has been paid for, many consumers will reflexively click the red button again—an action that will trigger automatic membership.

**Inter-temporal Judgment Biases: Hyperbolic Discounting and Preferences for Deferral**

One of the most robust findings in studies of decision making is that when consumers are asked to consider options that promise up-front benefits at the expense of delayed costs they tend to put excessive weight on the former—a bias known as hyperbolic discounting  (e.g., Loewenstein and Prelec 1992; Trope and Lieberman 2003).  This bias helps why consumers who are exposed to the prospect of a free premium in exchange for trial membership in a program might under-attend to fine-print descriptions of its terms and conditions, such as the what would be required to cancel. When considering the notion of afree-trial period, consumers would tend to mentally focus more on the pleasure that will be derived from the up-front premiums (e.g., the promise cash back) than the costs of time and energy that might be involved in later canceling the service—something that would lead them to accept trial membership in a program that they would later regret.

Curiously, the third-part promoters of these schemes then exploit this bias again after a consumer accepts membership as a means of discouraging attempts to claim the premium or utilize their membership programs.  As noted above, redemption typically requires the consumer to incur significant up-front transaction costs (such as sending in forms and/or paying full price for gift cards), with benefits being significantly delayed by multiple week "processing times".  A consumer prone to hyperbolic discounting would thus likely conclude that the up-front effort is not worthwhile, thus fulfilling the firm's hope that they will never utilize the program benefits that they signed up for.

A tendency for consumers to be lured by prospects of free trial periods could also be explained by the widely-documented tendency to defer deliberations when presented with choices for which the best course of action is uncertain (e.g., Tversky and Shafir 1992).  In many cases such instincts are rational; deferral allows more time for a thoughtful analysis of the decision problem and/or allows other options to emerge that are superior to the ones currently

11

being considered (Meyer 1997).  In other cases the appeal lies simply in a preference for making errors of omission rather than commission; in most consumer contexts decisions *not* to buy a product are more easily reversible than decisions *to* buy (Dhar 1997; Samuelson and Zeckhauser 1988).

The web schemes can be seen as exploiting this instinct as a way of "freeing them" from the need to read in close detail terms and condition of the programs and learn about their benefits. Consumers are encouraged to believe that the effortful task of deciding whether the program can be delayed until later, whereas the benefits of the prize can be enjoyed immediately. In other words, the consumer is persuaded to believe that they are *not* immediately purchasing anything or contracting for any future purchase; they are being awarded a free prize simply if they would agree to *consider* the programs for *possible* purchase at a later point.

**Status-Quo Biases**

The payment mechanism used by the third-part sellers—negative-option pricing--here is an unusual one. While negative-option pricing is sometimes justified on the basis of consumer convenience (to avoid the need for effortful renewal), the motivation is anything but that; the goal was to extract unwanted charges by exploiting another well-known bias in consumer decision making alluded to above: the preference for default or status-quo courses of action given uncertainty (e.g.,  Johnson, Hershey, Meszaros, and Kunreuther 1993; Kahneman, Knetch, and Thaler 1991; Samuelson and Zeckhauser 1988).

Once the firm has access to the consumer's credit card information and charge authorization, they are, in essence, holding the consumer's wallet hostage.  The longer it takes for consumers to discover that they have unwittingly signed up for membership, or the longer it takes for them to discover that the benefit programs have limited value, the more money they make as pure profit; each month of delay means more charges to the consumer.

Consistent with this, the firms set up significant barriers to charge detection. The monthly charges levels—typically $14.95—are designed to be low enough to just fall under the radar screen for many consumers who do not careful reconcile their credit card statements each month. For consumers who focus only the size of the overall bill, they would know something was amiss only if the *total amount* (or monthly minimum payment) was significantly higher than in the

past—a perception that a $14.95 charge is unlikely to induce.  In addition, even for consumers who do carefully reconcile their bills, the firms are careful to use program names that could easily be confused with legitimate firms or businesses.  Finally, a consumer who signs up for one of these programs is typically sent a "membership package" in the mail—but it is commonly designed to resemble a junk-mail solicitation would be discarded by many consumers, particularly if they had no awareness that they had signed up for anything.

The negative-option pricing mechanism essentially turns the tables on how transactions are normally conducted in a marketplace; whereas *not* buying a good or service is normally the default action in markets, here it is the default.  This is a reversal that consumers would have had little experience dealing with, something that would likely lead to numerous cases of automatic purchases being made for programs that they neither wanted or, possibly, even knew they were acquiring. The reversal also highlights an unfortunate paradox of the transaction: as noted above, consumers were drawn to the appeal of a "free trial" period in the belief that it allowed them to avoid taking the overt action of purchasing the services—when in fact, it had just the opposite effect. By accepting the free trial they were implicitly making the decision—which was surely unintentional—to to make purchasing the passive act, and not purchasing the effortful one.

### Conclusion and Remedies

My overall assessment of these web schemes is straightforward: they represent an enterprise whose primary purpose is to foster and exploit weaknesses in consumer decision making in an effort to con consumers into purchasing memberships that hold limited value and without their fully informed consent.  The combination of the sellers' perceived need to use deceptive selling tactics and the low rate of utilization of the benefits supposedly provided by their programs implies they did not believe they were marketing a good or service that held value for consumers.  As such, the operation cannot be defined as either a legitimate marketing operation or a legitimate consumer business.

In my view the suggested remedies for these practices are also straightforward:

- Negative-option pricing should be prohibited for any service or program that enlists customers through "free-trial" periods.  When the trial period has expired the

13

default assumption must be that the consumer has elected *not* to adopt the program. Adoption would occur only if, at the end of the trial period or earlier, the consumer takes a positive action to secure membership, providing complete payment and billing information

- Firms that partner in selling goods and services on the web should be prohibited enacting automatic "hand-offs" and from passing on customers' credit card and billing information. While at the end of a sale at one site a customer may be presented with the *option* to visit a new site offering potential benefits, visiting the new site should require a volitional act by the consumer. Likewise, if a new purchase is to be made at the new site, it should require the consumer to re-provide his or her billing information.

- In such partnership arrangements, firms should also be required to utilize web designs and scripts that make it unambiguous that the consumer has left the original web site and is now in site managed by separate firm, so as to minimize confusion as to the identity of the seller a customer was dealing with.

Of course, the enactment of such remedies would likely eliminate the profit potential current direct marketers who use the web scripts of concern, as few consumers would voluntarily choose to pay for memberships in the programs if fully informed. But they would have the positive effect of precluding a recurrence of the losses suffered by consumers who fell prey to the deceptive practices discussed here.

14

# References

Buehler, R., D. Griffin, M. Ross. 1994. Exploring the planning fallacy: Why people overestimate their task completion times. *Journal of Personality and Social Psychology*. **67** (3) 366-381.

Dhar, Ravi (1997), "Context and Task Effects in Choice Deferral", *Marketing Letters* Special Issue on the Time Course of Preferences, 8 (1) .

Johnson, E. J., Hershey, J., Meszaros, J., & Kunreuther, H.. 1993. Framing, Probability Distortions, and Insurance Decisions. *Journal of Risk and Uncertainty*, 7, pp. 35-51

Kahneman, Daniel (2002), "Maps of Bounded Rationality: A Perspective on Intuitive Judgment and Choice", Nobel Prize Lecture, December 8, 2002.

Kahneman, D., Knetsch, J. L. & Thaler, R. H.. 1991. Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias. *Journal of Economic Perspectives*, 5, 1, pp. 193-206

Kunda, Ziva. 1990. The case for motivated reasoning. *Psychological Bulletin*. **108** (3) 480-498.

Loewenstein, G. and D. Prelec (1992), "Anomalies in Intertemporal choice: Evidence and an Interpretation," *Quarterly Journal of Economics*, 107, 573-598.

Meyer, R.J. 1997, "The Effect of Set Composition on Stopping Behavior in a Finite Search Among Assortments", *Marketing Letters* Special Issue on the Time Course of Preferences, 8 (1) .

Meyer, Robet, Shengui Zhao and Jin Han. 2007., "Biases in Valuation and Usage of Innovative Product Features", Marketing  Science, in press.

Samuelson, W. & R. J. Zeckhauser. 1988. Status quo bias in decision making. *Journal of Risk and Uncertainty*, 1, pp. 7-59.

Trope, Yaacov, Nira Liberman. 2003. Temporal construal. *Psychological Review*. **110** (3) 403-421.

Tversky, Amos, and Eldar Shafir. 1992. "Choice Under Conflict: The Dynamics of Deferred Decisions", *Psychological Science*, 3 (November), 358-361

Weinstein, Neil D. 1980. Unrealistic optimism about future life events. *Journal of Personality and Social Psychology*. **39** (5) 806-820.



Figure 1a

16

**Ingredient 1: The false linkage to the first-party Site**

References to Vistaprint lead consumers to believe that they are still at Vistaprint's site, and this offer is being made by Vistaprint



Figure 1b



Figure 1c



Figure 1d



Another example of the False-survey ploy, here piggy-backed on a solicitation to join a different membership program ("24Protect Plus")

Figure 2



Figure 3a

21



Figure 3b



Figure 3c