**Exhibit G**



A Report by the staff of the FTC's
Division of Enforcement

Federal Trade Commission
January 2009

# Contents

**Executive Summary**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**i**

**Negative Option Marketing Workshop Report**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**1**

**I.**    **Background Regarding the Types of Negative Options**. . . . . . . . . . . . . . . . . . . . . . . . .**2**

**II.**   **Summary of Panels and Comments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**3**

      A.    Panel One:  The Benefits and Costs of Negative Option Offers . . . . . . . . . . . . . . . .3
            1.    Benefits of Negative Option Offers to Sellers . . . . . . . . . . . . . . . . . . . . . . . . .3
            2.    Benefits of Negative Option Offers to Consumers . . . . . . . . . . . . . . . . . . . . . .4
            3.    Potential Problems with Negative Option Offers for Consumers. . . . . . . . . . .5
            4.    Panelist Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
      B.    Panel Two:  Analysis of Consumer Behavior Online . . . . . . . . . . . . . . . . . . . . . . . .6
            1.    Consumer Online Behavior. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
            2.    Online Notices and Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
            3.    Panelist Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
      C.    Panel Three:  Application of the Clear and Conspicuous Standard to Online Offers
          with Negative Option Features . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
            1.    The Clear and Conspicuous Standard and Online Research. . . . . . . . . . . . . .10
            2.    Clear and Conspicuous Negative Option Disclosures . . . . . . . . . . . . . . . . . .12
            3.    Panelist Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
      D.    Panel Four:  Making Effective Disclosures in Negative Option Marketing Online  . .14
            1.    Summary of FTC Staff's Mock Advertisement Exercise . . . . . . . . . . . . . . . .15
            2.    Summary of the Mock Advertisement Disclosures . . . . . . . . . . . . . . . . . . . . .15
            3.    Evaluation of the Disclosures in the Mock Advertisements . . . . . . . . . . . . . .19
            4.    Negative Option Disclosures Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
      E.    Comments Filed in Response to Federal Register Notice  . . . . . . . . . . . . . . . . . . . .25

**III.**  **Marketing Principles for Online Negative Option Offers**. . . . . . . . . . . . . . . . . . . . . . .**26**

**IV.**  **Suggested Areas for Future Research** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**28**

**V.**    **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**29**

**Endnotes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**30**

**Appendices:  Mock Advertisement Exercise** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**39**

# Executive Summary

On January 25, 2007, the Federal Trade Commission hosted a workshop that brought together industry representatives, consumer groups, and members of the academic community to discuss negative option marketing.  The FTC uses the phrase "negative option marketing" broadly to refer to a category of commercial transactions in which sellers interpret a customer's failure to take an affirmative action, either to reject an offer or cancel an agreement, as assent to be charged for goods or services.  Negative option marketing can pose serious financial risks to consumers if appropriate disclosures are not made and consumers are billed for goods or services without their consent.  With the explosion of Internet marketing over the past ten years, negative option offers are as much a fixture of online advertising as in any other advertising media.  The workshop focused particularly on Internet-based negative option offers, because they are relatively new and present distinct issues regarding the form, content, and timing of disclosures.

There are four types of plans that fall into the negative option marketing category – prenotification negative option plans; continuity plans; automatic renewals; and free-to-pay or nominal-fee-to-pay conversion offers.  First, in prenotification negative option plans, such as book or music clubs, sellers send periodic notices offering goods.  If consumers take no action, sellers send the goods and charge consumers.  Second, in a continuity plan, consumers agree in advance to receive periodic shipments of goods or provision of services, which they continue to receive until they cancel the agreement.  Third, in an automatic renewal, a magazine seller, for example, may automatically renew a consumer's subscription when it expires and charge for it, unless the consumer cancels the subscription.  Finally, sellers also structure trial offers as free-to-pay, or nominal-fee-to-pay, conversions.  In these plans, consumers receive goods or services for free (or at a nominal fee) for a trial period.  After the trial period, sellers automatically begin charging a fee (or higher fee) unless consumers affirmatively cancel or return the goods or services.

In addition, some negative option offers include upsell or bundled offers.  An upsell occurs when a consumer completes a primary transaction and then receives a solicitation for an additional product or service.  A bundled offer occurs when a seller packages two products or services together so that they cannot be purchased separately.

At the workshop, the participants discussed the four types of negative option plans as well as upsell and bundled offers.  The workshop included four panel discussions.  The first panel discussed the benefits and drawbacks of negative option offers to both sellers and buyers.  The

second panel discussed online consumer behavior.  The third panel analyzed the FTC's "clear and conspicuous" standard in light of current research regarding online disclosures and the application of this standard to online negative option offers.  The final panel discussed online negative option disclosures using mock Internet advertisements, including negative option offers created by industry and consumer groups.  All four panels made recommendations for online negative option offers.

This report summarizes the workshop presentations and comments in response to the related Federal Register Notice.  The report also identifies five principles for marketing online negative option offers based upon recent FTC cases and the workshop panelists' comments.

During Panel One, the panelists discussed the costs and benefits of negative option offers.  Negative option offers can benefit sellers by allowing them to stock inventory more efficiently because they can ship products to consumers on a predetermined schedule.  In addition, negative options help sellers avoid costs related to renewals.  These decreased operating costs can generate increased profit.  Consumers also can benefit from negative option offers by receiving uninterrupted service, often with a greatly simplified renewal process.  In some plans, consumers can examine products before purchasing.  Because consumers must take action to cancel contracts, which they may consider burdensome, sellers may provide buyers up-front benefits, such as introductory gifts or free trials, to entice them to agree to the offer.

The panelists, however, remarked that despite their benefits, negative option plans also pose potential problems for consumers.  First, consumers lack bargaining power in these transactions because their silence constitutes acceptance of an offer and they must take action to reject future products or services.  Second, some negative option practices generate significant consumer dissatisfaction.  According to panelists, negative option plans offered as an upsell by a third-party seller – a seller distinct from the party offering the initial product – have been a source of considerable consumer dissatisfaction.  Due to inadequate disclosures, consumers may be unaware that they agreed to a second purchase; may not know the second seller; and may not have consented to the transfer of their financial account information.  To avoid consumer dissatisfaction, panelists recommended that sellers clearly disclose the existence and terms of the offer and obtain consumers' consent.

Panel Two focused on consumer online behavior.  The panelists explained that marketers seeking to make clear and conspicuous negative option disclosures face challenges in getting consumers to see and read their disclosures.  The panelists revealed that many online consumers

exhibit certain characteristics, including inattention, unwarranted confidence, exuberance, and a desire for immediate gratification, which make them less likely to see and read disclosures. Panelists further explained that, as result of these online characteristics, consumers become "click-happy" and quickly navigate through webpages, without paying much attention because they believe nothing will go wrong and want to complete the transaction as rapidly as possible. As a result, consumers often do not read or understand the terms of the agreements they accept. To combat consumers' exuberance and inattention, the panelists recommended using short notices that include only the information material to consumers.  Panelists discouraged the use of pre-checked boxes to obtain consumer consent because online research indicates consumers ignore them.  Panelists also recommended marketers use simple, clear cancellation procedures to allow consumers to cancel contracts.

During Panel Three, the panelists discussed the "clear and conspicuous" standard for making online disclosures and its application to online negative option offers.  The FTC's business guidance, <u>Dot Com Disclosures:  Information about Online Advertising</u>, states that to evaluate whether a disclosure meets the standard, sellers should examine the disclosure's prominence, presentation of information, placement on the page, and proximity to the offer.  Applying this guidance, panelists recommended that sellers use fonts, colors, and backgrounds that are easy to see and read.  Long disclosures that require a lot of scrolling or clicking should be avoided, according to this panel.  Panelists also discouraged disclosures worded in legal jargon or labeled with headings such as "More Info."  Panelists noted that disclosures should be placed in a location on the webpage that consumers are likely to see.  Finally, the panelists recommended that sellers consider whether they should use certain web design features, such as pop-up windows or hyperlinks, to make material disclosures.  They stated that, to ensure that consumers see and read disclosures, marketers may need to place disclosures on ordering pages.

Panel Four continued the clear and conspicuous disclosure discussion using a mock advertisement created for the workshop.  Two panelists, the Electronic Retailers Association and Consumer Reports WebWatch, presented advertisements for a recipe card club negative option plan.  Two discussants on the panel critiqued the advertisements and provided recommendations for making effective negative option disclosures online.  Both advertisements contain an early disclosure of some of the negative option terms.  One disclosure, however, is shorter and more simply worded, and the discussants preferred the shorter disclosure.  Both advertisements also contain additional disclosures that appear as consumers proceed through the transaction.

The discussants noted that some of the disclosures are in small fonts and are densely worded, minimizing the chances that consumers will see or read them.  One discussant emphasized the need to place disclosures in locations where consumers are likely to look, such as near the price and quantity information; and to use formatting, such as bullets and clear labels, to grab consumers' attention.  This discussant also recommended making disclosures early in the transaction when consumers are still considering the offer as opposed to when they are completing address and payment information at a later point.  The discussant noted that during the payment stage consumers are more focused on trying to complete the transaction than on learning about the terms of the offer.

As noted above, throughout the day, panelists provided numerous recommendations regarding online negative option disclosures.  Based on these recommendations and the Commission's recent cases, this report identifies five principles the staff developed to guide marketers in complying with Section 5 of the FTC Act when marketing online negative option offers.

1) Marketers should disclose the material terms of the offer in an understandable manner.

   The material terms of negative option offers include: the existence of the offer; the offer's total cost; the transfer of a consumer's billing information to a third party (if applicable); and how to cancel the offer.  Marketers should avoid making disclosures that are vague, unnecessarily long, or contain contradictory language.

2) Marketers should make the appearance of disclosures clear and conspicuous.

   To make online negative option disclosures clear and conspicuous marketers should place them in locations on webpages where they are likely to be seen, label the disclosures (and any links to them) to indicate the importance and relevance of the information, and use text that is easy to read on the screen.

3) Marketers should disclose the offer's material terms before consumers pay or incur a financial obligation.

   Marketers should disclose an offer's material terms before consumers agree to purchase the item.  Consumers often agree to an offer by clicking a "submit" button; therefore, disclosures should appear before consumers click that button.

4) Marketers should obtain consumers' affirmative consent to the offer.

   Marketers should require that consumers take an affirmative step to demonstrate consent to an online negative option offer.  Marketers should not rely on a pre-checked box as evidence of consent.

5) Marketers should not impede the effective operation of promised cancellation procedures.

   Marketers should employ cancellation procedures that allow consumers to effectively cancel negative option plans.  Marketers should not engage in practices that make cancellation burdensome for consumers, such as requiring consumers to wait on hold for unreasonably long periods of time.

Following these principles will maximize the likelihood of compliance with Section 5, although whether a particular negative option offer violates Section 5 will depend on an individualized assessment of the advertisement's net impression and the marketer's business practices.

# Negative Option Marketing Workshop Report

On January 25, 2007, the Federal Trade Commission hosted a workshop entitled "Negative Options: A Workshop Analyzing Negative Option Marketing."[1]  The workshop brought together industry, consumer groups, and members of the academic community to discuss issues and marketing principles for businesses seeking to make negative option offers in a truthful, non-deceptive manner, particularly in the online marketplace.[2]

Negative option offers, marketed online or offline, can benefit consumers, but they also have potential pitfalls.  The problematic aspects of negative option marketing tend to fall into three broad categories:

1) failing to disclose adequately or misrepresenting the material terms of negative option offers;

2) failing to obtain consumers' express informed consent before billing or charging them; and

3) failing to provide effective means for consumers to cancel a negative option.

Internet-based negative option marketing poses unique issues.[3]  For example, webpage design affects the form, content, and timing of negative option disclosures.  Marketers must consider whether to disclose material terms on the ordering pages, in hyperlinks, or in pop-up windows. In addition, marketers must determine the appropriate stage of the transaction to make material disclosures.  Additionally, online research suggests that people interact with webpages differently than print materials and may not read the same notices and disclosures online that they would offline.  Participants at the Negative Option Workshop discussed all these issues and more.

This report summarizes the presentations and discussions from the workshop, along with comments received in response to a related Federal Register Notice ("FRN").  Part I of this report describes the types of negative option offers.  Part II summarizes the workshop presentations and discussions as well as the comments filed in response to the FRN.  Part III sets forth marketing principles FTC staff have developed to guide online negative option marketers in complying with Section 5 of the FTC Act.  Finally, Part IV discusses issues to consider in the future, as technology evolves and consumer behavior research progresses.

# I.    Background Regarding the Types of Negative Options

The FTC uses the phrase "negative option marketing" broadly to refer to a category of commercial transactions in which sellers interpret a customer's failure to take an affirmative action, either to reject an offer or cancel an agreement, as assent to be charged for goods or services.  These transactions change the typical relationship between the buyer and seller, in which the buyer responds affirmatively to each offer made by the seller.  Instead, in a negative option transaction, the buyer and seller agree in advance that one or more subsequent offers from the seller will be deemed to be accepted unless the buyer explicitly rejects the offer.  Four types of plans fall within the negative option marketing category:  pre-notification negative option plans; continuity plans; automatic renewals; and free-to-pay or nominal fee-to-pay conversion plans.

In a pre-notification negative option plan, consumers receive periodic notices offering goods, often books or recorded music, and will receive the goods and incur a charge unless they specifically reject the offer.  In a continuity plan, consumers agree in advance to receive periodic shipments of goods or provision of services.  These consumers continue to receive shipments or services and incur charges until they take steps to cancel the arrangement.  In automatic renewal negative option offers, sellers automatically renew contracts, such as a one-year magazine subscription, at the end of a fixed period unless consumers instruct otherwise.  Marketers often structure trial offers as free-to-pay, or nominal fee-to-pay conversion plans, wherein consumers receive a good or service for free (or at a nominal price) for an introductory period.  They only incur a charge or pay a greater amount if they do not take affirmative action to cancel, reject, or return the good or service before the end of the trial period.

In addition, some negative option offers include bundled and upsell offers.  A bundled offer (which differs from the antitrust concept of bundling[4]) occurs when a seller combines two products or services in a package, requiring consumers to purchase both.  An upsell occurs when a consumer completes a primary transaction, and then receives a solicitation for an additional product or service.  There are two types of upsells:  internal and external.  In an internal upsell, a consumer buys an item from a seller, who then offers a negative option plan.  By contrast, in an external, or third-party upsell, a consumer buys an item from one seller, who then offers a negative option plan from a second seller.  The report discusses marketing principles for all these types of offers.

## II.   Summary of Panels and Comments

The Negative Option Workshop had four panel discussions, each addressing different topics related to online negative option marketing.  Panel One focused on the benefits and costs of negative option offers generally, from both business and consumer perspectives.  Panel Two presented information about consumer behavior online, including the extent to which people read online notices and disclosures.  Panel Three analyzed the FTC's clear and conspicuous standard in light of current research regarding online disclosures and the application of this standard to online negative option offers.  Panel Four discussed online negative option disclosures using mock Internet advertisements with negative option offers created by industry and consumer groups.  All four panels presented recommendations for online negative option offers.  This section summarizes the discussions from the four panels.

### A.  Panel One: The Benefits and Costs of Negative Option Offers

The first workshop panel addressed the benefits and costs of negative option offers and featured Professor Avery Katz of Columbia Law School;[5] Robert Sherman, Counsel to the Direct Marketing Association ("DMA"); Rita Cohen, a Senior Vice President of the Magazine Publishers Association of America ("MPA"); and Susan Grant of the National Consumers League ("NCL").  The panelists discussed:

   1)  the benefits of negative options to sellers;

   2)  the benefits of negative options to consumers;

   3)  potential problems of negative options for consumers; and

   4)  recommendations for marketing negative options online.

### 1.  Benefits of Negative Option Offers to Sellers

Negative option offers benefit sellers by lowering costs and increasing revenue, thereby generating higher profits.  The panelists described three ways negative options lower costs for sellers.  First, according to DMA, such offers allow sellers to stock inventory efficiently.  By shipping products to consumers on a predetermined schedule, sellers can stock the appropriate inventory.[6]  Second, MPA noted that negative options help sellers avoid costs related to renewals. In continuity plans, for example, sellers do not have to send multiple renewal notices and process consumer responses because buyers must specifically reject products to stop receiving them.[7] Third, MPA explained that uninterrupted subscriptions save sellers money because interruptions

require sellers to update mailing lists, and, if a consumer subsequently renews, to send out missed copies in a separate, expensive mailing.[8]

In addition, Professor Katz explained how negative options lower overall messaging costs for sellers and buyers. Generally, a transaction requires two messages: an offer and an acceptance. Because buyers tend to reject most offers, allowing buyers to reject offers by inaction saves time and effort. In some situations, such as newspaper subscriptions or ongoing service contracts, however, buyers tend to accept most offers. In these situations, the parties can save costs by allowing buyers to accept by inaction. Professor Katz explained that this cost savings is the economic rationale for negative options.

According to the panelists, negative option offers may increase sellers' revenue and decrease their costs – therefore, increasing profits – in three significant ways. First, Professor Katz explained that sellers can increase sales through negative options. Similarly, MPA noted that, in the context of magazine subscriptions, consumers are more likely to try a new magazine if they can receive an issue and cancel without having to pay if they do not like it.[9] MPA further explained that negative option offers allow sellers to develop long-term relationships with consumers, who will more likely purchase additional goods from the seller in the future.[10] Second, sellers make higher profits as a result of the reduction in messaging costs described above. Third, sellers can charge more because the cost to buyers, in terms of time, energy, and other resources, of accepting an offer is lower, and the cost of rejecting an offer is higher, than in the usual case. As a result, buyers are willing to pay somewhat more and tend to accept some offers they would normally reject through inaction. Sellers understand this and charge higher prices under a negative option, thereby increasing revenue and profit.[11]

### 2. Benefits of Negative Option Offers to Consumers

Panelists also noted several significant ways in which negative option offers benefit consumers. First, DMA and MPA stated that consumers enjoy the convenience of the arrangements. Depending on the type of negative option offer, consumers receive uninterrupted service or product shipments for as long as they want, and either avoid or face a greatly simplified renewal process.[12] Second, DMA noted that some negative option offers allow consumers to examine products before purchasing.[13] For example, consumers can receive and examine or inspect magazines and products such as collectibles before incurring a charge or agreeing to pay for the items. Third, some negative option offers, DMA remarked, allow consumers to indicate their interests to sellers – such as in books or music – and their willingness

to receive more items in those categories.[14]  Fourth, Professor Katz explained that sellers may give buyers some up-front benefits, such as introductory gifts and free trials, to induce participation in a negative option.  Sellers may do so out of recognition that some buyers are reluctant to participate in a negative option because they are worried about accepting some offers they would normally reject, or paying more because of the seller's ability to charge more, as discussed above.  Finally, to the extent sellers in competitive markets pass on the cost reductions described in the previous section, consumers may also benefit from lower prices.

### 3.   Potential Problems with Negative Option Offers for Consumers

Despite their benefits, negative option offers also pose potential problems for consumers. According to Professor Katz, consumers lack bargaining power in these transactions because their silence constitutes acceptance of an offer and they must take action to reject future products or provisions of services.[15]  Reduced bargaining power, combined with the fact, as discussed above, that sellers may charge more for products sold via negative option offers, makes consumers vulnerable to "opportunistic offers with a very high price or with poor terms."[16] Professor Katz explained that to compensate for negative option offers with high prices or poor terms, sophisticated consumers may demand up-front benefits, such as introductory gifts or free trial offers, while sellers may take advantage of less savvy consumers.[17]  Some negative option practices generate significant consumer dissatisfaction.[18]  According to NCL, consumers generally complain less about prenotification negative option plans, such as book or music clubs, than they do about other negative option offers.[19]  NCL explained that with prenotification plans, consumers typically respond to advertisements and agree to buy on a negative option basis because they want the specific goods offered.[20]  They also enjoy the benefit of receiving periodic announcements of products and notice of their option to cancel at any time.  By contrast, NCL noted that negative option continuity plans generate dissatisfaction.  In particular, NCL receives many complaints about such plans in the external, or third-party, upsell context.[21]  NCL reports that consumers often do not know that, if they accept the offer, the first merchant will transfer their financial account information to the second merchant.[22]  As a result, with a negative option upsell, even though the consumer has not shared this information with the second merchant, the second merchant may automatically charge the consumer's account at the end of a free trial period.  In short, NCL explained that in a negative option upsell situation consumers may not realize they agreed to a second purchase; may not know the second seller; and may not consent to transfer their credit card information to the second seller.

### 4.   Panelist Recommendations

Several panelists recommended practices for sellers using negative option offers.  DMA, MPA, and NCL agreed that sellers should clearly disclose the existence and terms of the negative option offer.  DMA noted that the disclosures should be "easy to find, easy to read, and easy to understand."[23]  With regard to timing, MPA suggested marketers first make disclosures during the initial solicitation.[24]  NCL recommended that, in the free trial context, marketers make disclosures again at the end of the free term and obtain the consumers' consent to start charging.[25]

NCL also suggested that three specific negative option practices should be prohibited outright because they create serious detrimental consequences that cannot be prevented through disclosures.  First, according to NCL, companies that have consumers' financial information should not be allowed to share it with others for marketing purposes.[26]  Second, in a free trial context, NCL believes marketers should not be able to automatically enroll consumers in a paid plan at the end of the trial period without first notifying consumers and obtaining their consent to the paid plan.[27]  DMA disagreed with NCL about the cost and practicality of such additional notice.[28]  DMA noted that, even if inexpensive, marketers should not have to provide additional notice because consumers already consented to the arrangement when they accepted the free trial offer.[29]  Third, NCL recommended prohibiting sellers from charging consumers without their explicit consent.[30]  According to NCL, unauthorized billing is a particular concern when merchants charge consumers' debit cards, which, unlike credit cards, may charge consumers overdraft fees.[31]  NCL suggested that the FTC address continuity plans in its Prenotification Negative Option Rule.[32]

## B.  Panel Two: Analysis of Consumer Behavior Online

The second panel focused on consumer behavior online, and, in particular, on how people read and understand online contracts and notices.  The panelists were Susannah Fox, Associate Director of the Pew Internet and American Life Project; Professor Robert Hillman of Cornell Law School; and Jens Grossklags, a Ph.D. candidate at the School of Information at the University of California at Berkeley.[33]  This panel discussed:

1) characteristics people exhibit online;

2) the extent to which consumers read online notices; and

3) recommendations for marketers to encourage consumers to read and understand negative option disclosures.

1.   Consumer Online Behavior

Ms. Fox presented demographic statistics regarding the Internet.  Based on research conducted by the Pew Internet and American Life Project, Ms. Fox explained that 70 percent of adults in the United States use the Internet.[34]  People over the age of 65 increasingly go online, as do people without college degrees.[35]  All the panelists noted that people using the Internet tend to, or are likely to, exhibit certain characteristics, including confidence, exuberance, and a desire for immediate gratification.  Each of these is discussed in turn below.

Internet users exhibit unwarranted self-confidence.  In a Pew study, users expressed confidence that they can keep their computers free from unwanted programs, but evidence shows many of these users unknowingly have harmful adware or spyware on their computers.[36]  Mr. Grossklags encountered similar unwarranted confidence in the subjects of his studies.  He explained that users believe they can fix any problem they may encounter by, for example, installing pop-up blockers, uninstalling programs, or, in the case of negative options, canceling the agreement.[37]  They do not consider that they may encounter difficulty addressing the negative consequences they may suffer.  Ms. Fox reported that Pew's evidence shows that not until users have been burned once — by spyware, for example — do they take steps to prevent the problem from reoccurring.[38]

A second characteristic of people online involves what Professor Hillman and Mr. Grossklags described as "click happy" or exuberant Internet use.  Specifically, users click through webpages quickly, without paying much attention because they want to complete a given transaction.  Professor Hillman cited research finding that online shoppers "enter a seamless sequence of responses, a flow state in which their sense of time and reality become distorted and their self-control is diminished."[39]  As a result, and as discussed in more detail below, users do not read or understand the terms of agreements they enter into online.[40]

A third trait consumers demonstrate online, as they do offline, is the desire for immediate gratification.  Mr. Grossklags reported that consumer research shows that people have a strong desire for immediate gratification while undervaluing the future costs of their purchasing decisions.[41]  Compared to the offline world, consumers can more easily achieve immediate gratification online because they do not have to interact with others, wait in line, or even leave the house.  According to Mr. Grossklags, consumers' quest for immediate gratification, combined with their "click happiness" and the possibility of entering into a "flow state," suggests perils for consumers presented with online negative option contracts.[42]

## 2.   Online Notices and Disclosures

The panelists explained that many consumers do not read notices and disclosures they
encounter when buying or accepting goods or services online.  For example, one notice
consumers often encounter when purchasing goods or downloading software is the end user
licensing agreement, or "EULA."  According to Professor Hillman, research shows that people
rarely read the terms of standard contracts, such as the EULA, before agreeing to them.[43]
Professor Hillman conducted an informal student survey in which 4 percent of the respondents
indicated they read standard online forms as a general matter, while approximately 30 percent
read the terms if they do not know the vendor or if the price is high.[44]  Professor Hillman posits
that people do not read online forms because they are long, complicated, and full of legal terms.[45]
The subjects of Professor Hillman's study cited impatience and confidence that nothing will go
wrong – traits consistent with "click happiness" and "flow states" – as reasons for not reading.[46]
Notably, they reported impatience even though 83 percent said they entered contracts online
while at home, and 62 percent did so in the evening, when time was presumably less of a factor
than during the day.[47]

In another study, Mr. Grossklags and his colleagues researched whether people read notices
(either EULA-like long notices or short notices) when downloading software applications with
spyware features that would negatively affect their computers.[48]  The findings were consistent
with Professor Hillman's in that very few users read the standard EULA notice before installing
software.[49]  On average, users spent 45 seconds scanning the notice, when fully reading it would
typically take 10 minutes.[50]  Although very few subjects read the EULA, the majority proceeded
to install software.[51]  With respect to one of the software applications offered, 70 percent of
the subjects installed the program, but when later informed by the researchers of its spyware
features, 98 percent of that group said they would not install that program in the future.[52]

In another component of Mr. Grossklags' study, users who installed one program saw
an additional short notice with pertinent terms, including:  1) what information the software
company collects from users' computers; 2) how the company uses that information; and 3) how
the software affects users' computers negatively by, for example, automatically installing new
software in the future.  Only 23 percent of those who were presented with this post-installation
notice decided to keep, rather than uninstall, the program.[53]  Similarly, when shown the same
short notice *before* installing the software, only 30 percent of the subjects chose to install the
same program.[54]  This data indicates that far fewer people chose to install (30 percent) or keep

(23 percent) potentially harmful software after viewing well-designed short notices as compared to those users who installed such software after only seeing long EULA notices (70 percent).

### 3.   Panelist Recommendations

Because online consumers often fail to read important notices, panelists made four recommendations regarding how marketers could disclose information concerning a negative option offer in a manner that encourages users to read and fully understand such information. The recommendations pertain to consumers' access to disclosures, the length of disclosures, the contents of disclosures, and cancellation procedures.

First, Professor Hillman proposed making standard contracts available to consumers before they begin a transaction with a seller.[55]  He preferred this approach to requiring consumers to click on or accept each material term of an offer, which could unnecessarily encumber transactions.[56]  Although Professor Hillman recognized that such availability would probably not increase consumers' reading of the contracts, he suggested that because watchdog groups would have better access to the terms, and could call attention to terms consumers might find unattractive, marketers would have a greater incentive to disclose adequately all material terms and/or make their offers more attractive to consumers.[57]  Mr. Grossklags questioned the effectiveness of this recommendation, noting that watchdog groups already have access to the standard contract language of many EULAs, and yet some marketers still fail to disclose adequately the material terms of offers.[58]

Second, regarding the length of disclosures, Mr. Grossklags recommended that marketers use short notices to increase the likelihood that people read them, and include the information most important to consumers.[59]  Ideally, a short notice would be no longer than five to six sentences, and would present all material terms in a comprehensible format such as a bulleted list of commonly-asked questions.[60]

Third, pertaining to content, Mr. Grossklags posited that short notices should also reveal any hidden or future costs to consumers – such as shipping and transaction costs – so that consumers can evaluate the full cost of a product.[61]  He noted, however, that determining the long-term cost of products sold in the negative option context is difficult for plans with indefinite durations.[62]

Finally, Mr. Grossklags also suggested that marketers provide a clear exit for consumers, who often do not understand the terms of even short notices because of their overconfidence, their entry into the "flow state," and marketers' attempts to deter users from reading.  Therefore, marketers should use clear, simple, and effective cancellation procedures.  In the event a

consumer does enter into a negative option plan and decides to discontinue that plan, according to Mr. Grossklags, acceptance and cancellation procedures should mirror one another.  In other words, it should be as easy to cancel as it is to accept and the consumer should be able to cancel through the same means as he or she accepted the offer.[63]

## C.  Panel Three: Application of the Clear and Conspicuous Standard to Online Offers with Negative Option Features

The third panel discussed the FTC's clear and conspicuous standard for disclosures and the application of this standard to negative option offers online.  The panelists were Lesley Fair, an attorney in the FTC's Division of Consumer and Business Education; Professor Mariea Hoy of the School of Advertising at the University of Tennessee; Jerry Cerasale, Senior Vice President of DMA; and Mark Huffman, Contributing Editor, Consumeraffairs.com ("Consumer Affairs").[64] The panel discussed:

1)  the FTC's clear and conspicuous standard and empirical research regarding online disclosures;

2)  the importance and challenges of making negative option disclosures; and

3)  recommendations for online negative option disclosures.

### 1.  The Clear and Conspicuous Standard and Online Research

The FTC's Policy Statement on Deception provides that a marketer must disclose clearly and conspicuously any information necessary to prevent an advertisement or promotion from materially deceiving consumers.[65]  As Ms. Fair explained, when evaluating the effectiveness of any such disclosure, the test is whether reasonable consumers considering the transaction read and understand the disclosure.  The key issue under the FTC Act is the consumer's net impression, not what the advertiser intends to convey.[66]  The FTC's publication Dot Com Disclosures sets forth guidance for marketers evaluating whether online disclosures meet the clear and conspicuous standard using the four Ps – prominence, presentation, placement, and proximity.[67]  Professor Hoy used the guidance in Dot Com Disclosures in her recent study of banner advertisements on the top 100 websites.  She reviewed the advertisements to determine whether they contained disclosures, and whether the disclosures met the FTC's clear and conspicuous standard.  The study found that many of the banner ad disclosures were not clear and conspicuous.[68]

With respect to prominence, Ms. Fair explained that marketers need to pay attention to the appearance of the text of the disclosure.  For example, is it big and legible enough for consumers to read easily, particularly considering the age of the audience?  Advertisements targeted to seniors, or even consumers over 40 years old, for example, might require disclosures in larger print than those targeted to teens.[69]  Professor Hoy concluded that small type, all-capital letters, or hard-to-read fonts made some disclosures difficult to read.[70]  Also related to prominence is the extent to which the color of the disclosure text contrasts with the background color.[71]  Some advertisements Professor Hoy examined used text in colors that starkly contrasted with the background, which created a strong glare on the monitor and made reading the text difficult.[72]

Regarding presentation, Ms. Fair explained that advertisers should ask whether the wording, format, and font are easy for consumers to understand, encourage careful reading, and are free of legal jargon.[73]  Marketers also should ensure that other graphics on the screen do not compete with the disclosure for consumers' attention.[74]  Professor Hoy's study noted that some website features distract consumers.  For example, consumers who encounter a hyperlink between the offer and the disclosure may click away from the disclosure, failing to read it.  Professor Hoy explained that consumers are easily distracted in their browsing behavior and, once led a few pages away from an important disclosure, may not make it back to the disclosure.[75]

Professor Hoy explained that the degree to which consumers must scroll to read the full disclosure is an additional factor to consider in terms of presentation.  Professor Hoy's study found that 85 percent of the disclosures she studied required scrolling to find and read the full text.[76]  Professor Hoy described what she termed a "kitchen sink mega disclosure"– *i.e.,* a long, dense recitation of numerous, often unrelated, items requiring consumers to scroll repeatedly to read all of the information.[77]  According to Professor Hoy, scrolling is not an effective disclosure method because consumers will not scroll down and read the entire disclosure.[78]

Placement and proximity both relate to geography.  Ms. Fair explained that marketers should ask:  1) is the disclosure placed where consumers will look, and 2) is it close to the claim it qualifies?[79]  For instance, in Professor Hoy's study, nearly a third of the advertisements reviewed required consumers to click on various links to find the disclosures; thus the disclosures were not in close proximity to the claims.[80]  In addition to her study, Professor Hoy discussed other online research that uses eye-tracking software to follow Internet users' eye movements as they view webpages.[81]  The research, which examined webpages with claims and disclosures as well as pages displaying results from search pages, such as Google, found that users often scan a

webpage in an F-shaped pattern, reading across the top, down the left side and a little bit in the middle.[82]  Professor Hoy opined that this eye-tracking research may help marketers determine the best placement for important information.

New technology presents additional challenges for marketers attempting to make negative option disclosures clear and conspicuous.[83]  Both DMA and Consumer Affairs noted the growing use of mobile devices, such as cell phones, to access the Internet.[84] DMA mentioned cell phones as a particular problem because their screens are too small to include disclosures with the offer, and scrolling is often difficult or impossible.  As a result, according to DMA, smaller screen sizes may force marketers to make disclosures via hyperlinks.[85]

Regarding default settings and the variety of Internet browsers, DMA explained that marketers cannot predict what consumers will see when they access the Internet because consumers choose what to allow on their devices.[86]  For this reason, audio disclosures may be ineffective because consumers can turn off the sound.[87]  Further, marketers may not be able to rely on pop-up windows for making disclosures because many computers have software that allows consumers to block pop-up messages.[88]

Ms. Fair reiterated that when analyzing disclosures, the key issue under FTC law is the consumer's net impression – will the consumer see, read, and understand the disclosure?  The gold standard is a location where consumers cannot miss the disclosure to take part in the transaction.[89]

## 2.   Clear and Conspicuous Negative Option Disclosures

The panelists also discussed how the clear and conspicuous standard applies to negative option marketing.  They noted the importance of disclosures in the negative option context and discussed some of the biggest problems with negative option disclosures.

### a.   *The Importance of Negative Option Disclosures*

Disclosures are an integral part of the negative option product or service offer.  Both Consumer Affairs and DMA explained that effective negative option disclosures must inform consumers about the nature of the purchase and that a transaction is taking place.[90]  If consumers do not see or read the disclosures, they cannot provide informed consent to the offer.  Without informed consent, a consumer's acceptance is not valid.  In the negative option context, according to Consumer Affairs, disclosures should inform the consumer of the existence and terms of the transaction, as well as the continuing relationship with the seller.[91]

Both DMA and Consumer Affairs highlighted the adverse business consequences for marketers who fail to make appropriate disclosures.  According to Consumer Affairs, if consumers feel they were enrolled in negative option plans without their consent and incur unwanted charges as a result, they likely will stop purchasing from that company.[92]  DMA noted that the potential loss of consumer trust should motivate sellers to make sure consumers understand the terms and agree to them.  Earning and keeping consumers' trust is important for all businesses, but, as DMA suggested, it is particularly true for Internet marketers because of the increasing volume of Internet purchases and the ease with which consumers can buy from competitors.[93]

>    *b.   Problems With Negative Option Disclosures*

Negative option offers provide significant benefits and conveniences, but certain types of negative option offers are also prone to disclosure problems.  Echoing observations made in Panel One, DMA noted that consumers generally enjoy automatic renewal newspaper subscriptions and prenotification negative option plans for books and music with little complaint.[94]  Problems more often arise with continuity plans or free-to-pay conversions, when, as Consumer Affairs described, the seller fails to disclose the existence of a negative option offer.[95]  This failure is a particular problem in the context of external upsells because the first company may share the consumer's billing information with a second company.[96]

Both DMA and Consumer Affairs noted that sharing billing information in a third-party upsell context can injure consumers who may not know of the information-sharing.[97]  They agreed that marketers must make appropriate disclosures to notify consumers that the transaction involves a second company that will obtain their credit or debit card information directly from the initial marketer.[98]  In addition, they noted that consumers may direct their anger at the initial marketer if it fails to make appropriate disclosures regarding the identity of the second seller and the transfer of billing information.  The consumer who trusts the first company and intends to purchase from it may blame that company for unwanted goods received from, and charges imposed by, the second company.[99]

### 3.   Panelist Recommendations

The panelists offered recommendations for making negative option disclosures clear and conspicuous.  Professor Hoy provided seven recommendations based on her own study and other research.  First, she suggested that marketers use repetition.  The Internet offers marketers nearly

infinite space to repeat information as often as necessary to ensure consumers read it.[100]  Second, according to Professor Hoy, marketers should locate important information where consumers will likely look, such as in the F-shape pattern revealed in eye-tracking research.[101]  Similarly, if a hyperlink is necessary, Professor Hoy recommended placing it in the same F-shaped area.[102]  Third, Professor Hoy advised marketers to consider enhancing the text size of the disclosures. In her view, marketers should design websites to allow consumers to control text size and background contrast, if possible.[103]  Fourth, marketers should not place hyperlinks between offers and disclosures because consumers may click on the hyperlinks and not come back to the disclosures.[104]  Fifth, Professor Hoy noted that marketers should label disclosures so consumers see and read them, perhaps using standard terms that consumers know and recognize.[105]  Sixth, Professor Hoy stated that marketers should minimize their use of links to make disclosures. If links are necessary, she again emphasized labeling and explained that labels need to alert consumers that they need to click on the link to access important information.[106]  Finally, Professor Hoy recommended that marketers limit the extent to which consumers need to scroll to read information.[107]

The panelists acknowledged the research from the morning panel indicating that consumers click past and fail to read many disclosures.[108]  To ensure consumers read disclosures, Consumer Affairs recommended that marketers use a fail-safe mechanism at the end of the transaction "to grab them by the lapels, hit them over the head, and say you're about to buy something."[109] For example, Consumer Affairs suggested showing consumers a summary screen with the item purchased, cost, method of shipment, shipping costs, and a "submit" button, before the sale becomes final.  The sale would not go through unless and until the consumer clicked that button.[110]

## D.  Panel Four:  Making Effective Disclosures in Negative Option Marketing Online

Panel Four explored how to make negative option disclosures clear and conspicuous, yet compatible with the advertising message.  To promote discussion, FTC staff created a mock Internet advertisement based on a fictitious product with a negative option feature.  FTC staff asked the Electronic Retailing Association ("ERA") and Consumer Reports WebWatch ("WebWatch") to modify the mock advertisement to include a hypothetical negative option offer that reflected their vision of marketing principles for online negative option offers. Linda Goldstein presented ERA's advertisement, and Beau Brendler presented Web Watch's

advertisement.  David Mallen, from the National Advertising Division of the Council of Better Business Bureaus, and Nathaniel Good, a Ph.D. candidate at the University of California, Berkeley, School of Information Science, discussed and critiqued the advertisements produced by ERA and WebWatch.

### 1.   Summary of FTC Staff's Mock Advertisement Exercise

FTC staff's mock Internet advertisement features a saute pan offered by a fictional company, Fantastique Cuisine (Appendix ("App.") A).[111]  The pan costs $89.95, plus $7.95 shipping and handling.  The mock advertisement includes a series of four webpages:  a product description page (App. A, page one); a shopping cart page listing the product and cost, with a check-out button at the bottom (App. A, page two); an ordering page, on which consumers could enter shipping and billing information (App. A, page three); and a summary page reviewing the order, listing all charges, with a "place order" button at the bottom to complete the transaction (App. A, page four).  FTC staff gave ERA and WebWatch the terms of a hypothetical negative option offer and asked them to design an advertisement based on the four webpages above and integrating those negative option terms they believe the advertisement should disclose.  FTC staff asked ERA and WebWatch to comply with the relevant legal standards and create a compelling, persuasive, commercially-viable advertisement that exemplifies the principles marketers should follow when making negative option offers online.[112]

The terms of the hypothetical negative option feature include the following:

1) Purchasing the pan automatically enrolls consumers in a 30-day trial of Closet Gourmet Cook's Club, a fictitious entity;

2) As members of the club, consumers receive a free recipe file box in the mail and monthly recipes by email, along with restaurant discounts;

3) If consumers do not cancel within the 30-day trial, they incur a $4.95 monthly charge on the card used to buy the pan;

4) Membership continues indefinitely until consumers cancel; and

5) Closet Gourmet Cooks is a separate company from Fantastique Cuisine, the seller of the pan.[113]

### 2.   Summary of the Mock Advertisement Disclosures

FTC staff would like to thank ERA and WebWatch for creating these mock advertisements. Both advertisements were professionally presented, and we commend these organizations for

the considerable time and effort they invested preparing the advertisements.  Moreover, we are grateful for their willingness to invite constructive comments from other panelists.

  a.  *ERA Mock Advertisement*

Linda Goldstein presented ERA's advertisement and noted initially that the premise of the exercise, the bundling of the pan and club membership, requires disclosing the negative option offer at an earlier point than in a non-bundled negative option transaction.[114]  According to ERA, with non-bundled offers, disclosures must be made before consumers provide consent and incur a financial obligation.[115]  Here, however, because enrollment in the club is not optional, ERA determined that the advertisement needs to include something on the first page relating to the offer's negative option feature.[116]  Therefore, the following statement appears on the bottom of ERA's first page, the product description page:

> With your purchase you'll also enjoy a 30 day free trial membership in the Closet Gourmet Cook's Club with automatic renewal at $4.9[5]/month.
>
>   Click here for details.  (App. B, page one)

Consumers who want more details can click on the link, which opens a pop-up screen listing the full terms of the membership club (App. B, page two).[117]  ERA believes that a disclosure of all the material terms of the offer on the product description page is unwarranted at this point because it will distract consumers from the primary offer when they have not yet shown interest in purchasing the product.[118]

ERA's advertisement includes the following information about the negative option feature on the bottom of the next page, the shopping cart page:

> Includes 30 day free trial membership in Closet Gourmet Cook's Club with automatic renewal at $4.9[5]/month.  Click here for details.  (App. B, page three)

As with the first page, the advertisement discloses the existence of the negative option offer, with the full terms accessible by hyperlink.  ERA believes that a full disclosure of all material terms is still unnecessary at this point because the consumer has not consented to the sale or incurred a financial obligation.[119]

ERA created three alternative scenarios for the last two pages to illustrate that there is more than one correct way to make these disclosures.  Alternative One discloses the full terms of the negative option offer along the right side of the ordering page, where consumers enter shipping

and payment information (App. B, page four).  Although ERA elected to disclose the full offer terms here, it believes it may be appropriate to put some of the terms, such as the cancellation information, on the next page.[120]  On the final summary page of Alternative One, ERA lists the recipe club free trial membership along with the pan as the item purchased and includes a button labeled "Review Club Details" at the bottom of the page that links to the full terms (App. B, page five).

In Alternatives Two and Three, ERA has consumers enter shipping and payment information on two separate pages.[121]  In ERA's view, placing the payment and shipping information forms on different pages lets the marketer decide where to locate disclosures.[122]  Thus, on the shipping page in both Alternatives, ERA's disclosure states:  "Shipment includes the 30 day free trial membership in Closet Gourmet Cook's Club with automatic renewal at $4.95 a month." (App. B, page six).

In Alternative Two, once a consumer enters shipping information and clicks "Continue," a pop-up window discloses the terms of the negative option offer (App. B, page seven). Consumers must click "Close Window" to exit the pop-up and move to the next page, the payment page.[123]  On that page, below the fields for credit card information, and above the "Place My Order" button, ERA includes this disclosure:

> By clicking "Place My Order" below, you agree to the following:
> - Your purchase includes a 30-day free trial membership in Closet Gourmet Cook's Club.
> - You authorize Cook's Gourmet to obtain your account information from Fantastique Cuisine and to charge your cards $4.95/month after the free trial unless you cancel.  (App. B, page eight)

In Alternative Three, after entering shipping information and clicking "Continue" as in Alternative Two, the consumer proceeds to the payment page (App. B, page nine).  There, the following disclosure appears below the fields for credit card information and above the "Place My Order" button:

> I understand that my purchase includes a free 30 day trial membership in Closet Gourmet Cook's Club and free recipe box.  As a club member, I'll enjoy three new recipes emailed to me each month and discount coupons for savings at my favorite restaurants.  After the free trial unless I cancel, my membership will automatically continue for just $4.95 [a] month which I authorize Closet Gourmet to charge to the credit card I'm providing.  I can cancel at anytime by calling 1-800-xxxx or online at www.cooksclub.com, but no matter what I decide the recipe box is mine to keep.  (App. B, page nine)

### b. Consumer Reports WebWatch Mock Advertisement

Beau Brendler, Director of Consumer Reports WebWatch, presented WebWatch's mock advertisement.[124]  Like ERA, WebWatch includes disclosures about the negative option offer on more than one page in the ordering sequence, however, the placement and content of the disclosures differ from ERA's.  On the first page, the product description, WebWatch includes a disclosure about the negative option offer that reads:

> NOTE:  Purchase of this item enrolls you automatically for a free 30-day trial in the Closet Gourmet Cook's Club.  Club membership is $4.95 a month, automatically billed to your credit card.  You'll be e-mailed 3 gourmet recipes each month from New York's finest restaurants, and you'll receive a recipe box with your pan that's yours to keep even if you decide to cancel club membership right away.  Click here for more details.  (App. C, page one)

WebWatch explained that it considered the hypothetical scenario involving the bundling of the pan with the membership unusual enough to strongly emphasize this feature for the consumer.  Therefore, WebWatch's initial disclosure seeks to alert consumers that they cannot uncouple the two transactions.[125]

If a consumer clicks for more details at this point, the consumer proceeds to a new page describing the terms and conditions of the Cook's Club offer (App. C, page two).  WebWatch added this page so that one page in the series includes all of the terms and conditions of the transaction.126

On the next page, the shopping cart page, the following disclosure appears below the product's total cost and above the "Checkout" button:

> NOTE:  Clicking the checkout button and purchasing the all-purpose saute pan automatically enrolls you in a 30-day free trial of the Closet Gourmet Cook's club.  Subsequent monthly membership [at] $4.95/ month automatically billed to credit card as "Closet Gourmet Cook's." (App. C, page three)

WebWatch included this disclosure to attempt to call attention to both the consumer's automatic enrollment in the Cook's Club upon purchase and the third-party billing feature.[127]

The next page of the sequence is the ordering page.  WebWatch placed the following disclosure between the fields for shipping and credit card information:

> I understand the terms and conditions of this transaction, that purchase automatically enrolls me in a 30-day free trial of the Closet Gourmet Cook's Club.  Fantastique Cuisine will disclose my credit card information to a third party which, after 30 days, will charge my account $4.95 per month membership (as "Closet Gourmet Cook's ["]).  With my purchase I will receive a free recipe file which I may keep even if I choose to cancel membership.  I may cancel membership at any time by calling, 1-800-cookclub, or online at www.closetgourmetcooks.com (App. C, page four)

Consumers must click the adjacent check box to indicate that they understand the terms of the offer.  If they fail to do so, even if they enter credit card information, an error message appears and the transaction fails.[128]

The final page of the WebWatch advertisement, the summary page, includes the following in the breakdown of the purchase cost:  "One-month trial membership in the Closet Gourmet Cook's Club.  Click here for details.  FREE" (App. C, page five).  WebWatch believes this presents the offer in a marketing-friendly way while alerting consumers again to the free trial.[129]

WebWatch also designed an alternative shopping cart page, on which consumers must click either "Yes" or "No" to accept or decline the Cook's Club membership as part of their pan purchase (App C, page six).  Although not part of the hypothetical, WebWatch presented this alternative because it believes that the best policy from a consumer perspective is to allow consumers to buy the pan with or without the trial membership.[130]  In this version, after checking "Yes" or "No," consumers proceed to the ordering page and complete the transaction.

### 3.   Evaluation of the Disclosures in the Mock Advertisements

Following the ERA and WebWatch presentations, the panel discussants, Nathan Good, from the University of California School of Information Science, and David Mallen, from the National Advertising Division of the Council of Better Business Bureaus, orally evaluated both advertisements.  Mr. Good also provided a detailed written analysis of ERA and WebWatch's submissions based on his own and others' research of online consumer behavior.  Mr. Mallen provided brief written comments on both advertisements.[131]  In their view, to comply with the FTC Act, the advertisements need to clearly and conspicuously disclose the club membership, the monthly cost of the membership, cancellation information, and the third-party billing feature, before the consumer agrees to purchase the pan.[132]  According to Mr. Good and Mr. Mallen, although both advertisements disclosed the negative option offer's material terms, they opined that some disclosures were more effective than others.

### a. ERA Advertisement

ERA's initial product description includes a short disclosure alerting consumers to the Closet Gourmet Cook's Club trial offer with a "Click For Details" link.  Mr. Good described this disclosure as a promising start, but argued that ERA should have included more details about the offer at this point.[133]  Similarly, Mr. Mallen stated that it may be more effective to make all material disclosures at this point, before the consumer places the item in the shopping cart.[134] Mr. Good further stated that the disclosure resembles a banner advertisement, which consumers routinely ignore.[135]  If consumers click on the link, a pop-up notice appears.  According to Mr. Good, not only does the pop-up distract from the logical progression and flow of the checkout process, but research shows that users often automatically close pop-ups without reading their content.[136]

Mr. Good noted that the text on the shopping cart page regarding the negative option offer was set off with an asterisk and, therefore, hard to find because it was placed away from the main focus of the user's attention.[137]  In his view, at this point in the transaction, a user would focus on the price and quantity information located in the middle of the screen.  Therefore, because the membership, unless cancelled, increases the total cost of the transaction, Mr. Good suggested placing the trial membership notice closer to the price of the pan. [138]

The discussants also evaluated ERA's three alternative ordering sequence webpages.  The first alternative contains a disclosure of the negative option offer along the right side of the webpage.  Mr. Good described this as an awkward location because it breaks the grouping of the webpage, making it harder for consumers to notice and associate it with their purchase.[139]  In addition, he noted that the disclosure appears on a page where consumers provide information to complete the order, such as payment information, having already made a purchasing decision.[140] According to Mr. Good, the notice would better inform consumers at an earlier point, when they have read about the pan, but have not yet decided whether to purchase it.[141]

The next page in ERA's first alternative, the "Place Order" page, lists the free trial offer along with the pan's cost.  According to Mr. Good, this page has good feedback for consumers,  keeps the disclosure in line with the purchase items, and allows consumers to continue the transaction or cancel the order.[142]  He noted, however, that the page may not adequately inform consumers about the exact terms of the free trial membership, future charges, and how to cancel.[143]  To find such information, consumers must click on a link located at the bottom of the webpage.

In ERA's second alternative ordering sequence, a pop-up window discloses the negative option terms.  Mr. Good reiterated his assertion that consumers typically ignore pop-ups or their software blocks them, thus disclosures presented in pop-ups are not effective.[144]  Regarding the next page in the ordering sequence, which includes disclosures above the credit card information fields, Mr. Good noted that this page provides better feedback to consumers than the disclosure on the right side of the page.[145]  In his view, the disclosure here is concise, uses bullet points, and is located where consumers will likely see it.  He opined, however, that the disclosure font is too small and resembles one of the license agreements that consumers often ignore.[146]  In addition, consumers enter credit card information at this point and will likely look back and forth between their card and the screen, possibly distracting them from reading the text below.  According to Mr. Good, consumers will want to move forward upon entering their billing information, so the best opportunity to catch their attention comes before that point.[147]

Regarding ERA's third alternative, although the disclosure also appears above the credit card information, Mr. Good believes this alternative is more effective than the others because it contains a more complete description, including cancellation instructions.[148]  He did note, however, that the font may still be too small, as in the second alternative sequence of pages.[149]  Despite the helpful information regarding how to cancel online or by phone, consumers may not remember the web address or phone number when they need it.  Mr. Good, therefore, recommended that the marketer send an email to consumers including cancellation information, along with a means to re-access the website in order to cancel.[150]  In his view, the most consumer-friendly cancellation method would allow cancellation via the same means by which consumers placed their order.[151]

### b.  WebWatch Advertisement

Turning to WebWatch's advertisement, both Mr. Mallen and Mr. Good agreed with WebWatch's approach of disclosing the material terms of the club offer before consumers add the pan to the shopping cart.[152]  However, they both felt that consumers likely would not read the disclosure on the first page due to its length.[153]  Mr. Good added that the disclosure resembles a licensing agreement, which research shows many consumers click past without reading.[154]  To make it more effective, he proposed reformatting the disclosure, perhaps using short bullet points.[155]

On WebWatch's second page, the disclosure of the detailed terms appears if consumers click on the link for details.  Mr. Good opined that this disclosure provides good notice to consumers

because of its large, relatively easy-to-read font.  He noted, however, three potential problems.[156]  First, the dense recitation of terms and conditions resembles a license agreement, which consumers tend not to read.  Second, consumers might ignore the disclosure because the text seems disconnected from the product purchase and description.  Third, the disclosure does not explain the link between the recipe club and the pan.

On the next page, the shopping cart page, the disclosure appears under the product listings and above the checkout button.  Mr. Good approved of the disclosure of information at this point, but noted two presentation problems similar to those found in prior disclosures.[157]  First, the text is lengthy and not presented in a way that will grab consumers' attention.  Second, the format resembles that of an often-ignored license agreement.  Mr. Good suggested changing the heading from "Note" to "Important information for your 30 day trial" or, more directly, to "After 30 days, your card will be billed, info below" to ensure consumers know the disclosure contains important information.

The shipping information page follows the shopping cart page and includes a disclosure above where consumers enter credit card information.  The disclosure includes a check-box that consumers must click to indicate they understand the terms of the club trial offer.  Mr. Good noted that the page helpfully incorporates an opt-in mechanism and the text placement (above the credit-card entry) is noticeable.[158]  Like ERA's disclosures, however, the disclosure appears after consumers have made a purchasing decision, at a time when they simply want to complete the transaction.  As a result, in Mr. Good's view, consumers may click the box automatically without reading the text.[159]

The final page in the WebWatch sequence, the summary page, includes the club membership in the list of items purchased.  The trial membership is listed as "FREE", next to a "Click here for details" link.  Mr. Good opined that including such information as part of the overall purchase information is an excellent practice because consumers typically scan a summary page to confirm their order and, therefore, will likely notice the membership.[160]  He did note, however, that consumers may ignore the "details" link because it requires breaking the flow of the transaction to learn more.  Therefore, he suggested that WebWatch add a bullet point describing the additional potential charges, such as "free for 30 days/$4.95 per month billed automatically after," to reduce the need for consumers to click elsewhere to learn the terms of the "free" trial.[161]

Finally, Mr. Good commented that WebWatch's alternative shopping cart page (App. C, page six), requiring consumers to accept or decline the club membership, is a better approach because

22

it clearly alerts consumers to the fact that they must make a choice.[162]  He noted that the design includes many good features, such as a line-item description of the offer at the time of decision making, opt-in choices that facilitate reading, the use of highlighting and large fonts to attract attention, and inclusion of the information above the checkout button.[163]   As discussed above, this alternative scenario un-bundled the pan and club membership, giving consumers a choice to take or leave the membership, and was not part of the exercise.  As such, ERA did not include an example of negative option disclosures for an un-bundled negative option offer that the discussants could evaluate.

###    4.   Negative Option Disclosures Generally

In addition to presenting and evaluating the mock advertisements during Panel Four, the panelists discussed negative option disclosures more generally.  Representatives of ERA and WebWatch described their organizations' views regarding negative option offers, and the panel discussed challenging aspects of, and recommendations for, making effective disclosures.

####    *a.   ERA and WebWatch Views*

ERA first described its general views regarding negative option disclosures.  As a threshold matter, ERA believes that if a marketer discloses the conditions associated with a negative option transaction adequately, it can reasonably expect consumers to abide by them, just as consumers expect sellers to abide by the conditions of the offer.[164]

Regarding online disclosures, ERA explained that an online negative option offer is a continuous process, consisting of a sequence of webpages.  When evaluating disclosures, therefore, one must view the process in its entirety to determine the consumer's net impression.[165]  With that in mind, ERA made four additional points about online disclosures.  First, marketers should make disclosures unavoidable and present them before the consumer incurs any financial obligation.[166]  Second, marketers need not make an early disclosure, such as on the first page, except for bundled products like the hypothetical pan and recipe club.  According to ERA, an early disclosure is unwarranted because marketers need to gauge a consumer's interest before disclosing all the negative option details.[167]  Third, marketers need not make post-consent disclosures if they disclosed the material terms properly and consumers consented to them.[168]  Fourth, pop-ups, when properly used, can effectively make negative option disclosures.[169]

WebWatch also discussed its views regarding disclosure obligations, customer service, and opt-ins.  WebWatch believes marketers should disclose negative option terms early in the

transaction process and that they should disclose relevant financial relationships fully.[170]  In its view, such disclosures are part of providing good customer service.  WebWatch prefers that marketers structure negative option offers with an opt-in feature.  A clear Yes/No choice would be a simple, consumer-friendly, way to present negative option offers on small devices such as cell phones, which may be particularly complicated marketing contexts for consumers.[171]

### b.  *Disclosure Challenges and Panelist Recommendations*

Mr. Good raised two major challenges for marketers making negative option disclosures, consumer "inertia" and inattention, and offered some recommendations.[172]

As an example of inertia, Mr. Good cited the commonly-used feature of online shopping carts, which involve a standard linear progression from order to check-out that varies little among sites.[173]  Because of this standardization, consumers move through the process quickly, almost through habit, and become impatient clicking through screens to complete the transaction.[174]  Such behavior is consistent with the research cited in earlier panels regarding consumers being "click happy" and entering a "flow state."

It may be challenging to provide adequate disclosures when a consumer is in such a state of inertia.  According to Mr. Good, marketers should consider increasing the number of disclosures and screens consumers must click through, while taking care to maintain a logical progression for the transaction.[175]  Mr. Good bases his recommendation on online consumer eyetracking research, which indicates that ensuring consumers understand the transaction process prevents them from becoming frustrated or distracted by having them click through additional screens.[176]  If a shopping sequence deviates from the usual flow, consumers may become confused and abandon the transaction before completing the purchase.[177]

The second major challenge, inattention, is the difficulty in both catching and keeping consumers' attention online.  Mr. Good explained that consumers' prior experiences and habits may cause them to miss certain text and cues that designers create to inform consumers.[178]  Further, consumers are accustomed to certain webpage designs and features, and, therefore, may ignore peripheral designs and features that seem unrelated to their main task, completing the transaction.[179]  For example, consumers likely will ignore text placed next to navigation icons or graphics.  They also will ignore banner advertisements, and, therefore, likely will ignore text in or near banner advertisements as well.

To combat inattention, Mr. Good offered several suggestions.  First, keep similar items grouped together.[180]  Second, research shows that consumers' eyes generally follow their mouse

cursor, so marketers should place information consumers need to read where their cursor is most likely to be.  For example, putting text about price, shipping, and final cost in the shopping cart will likely catch consumers' attention.[181]  By contrast, research reveals that pop-ups do not effectively grab consumers' attention.[182]  Finally, echoing the sentiments of earlier panelists, Mr. Mallen noted that pre-checked boxes do not effectively disclose information because they signal to consumers that the information is routine or unimportant.[183]

### E.  Comments Filed in Response to Federal Register Notice

In addition to the workshop panelists, individuals and groups offering both consumer and industry perspectives submitted comments in response to the FTC's Federal Register Notice.[184]

Three consumers and one consumer organization submitted comments.  One consumer urges the FTC to examine the difficulties consumers face when cancelling negative option plans.  Another notes that, in the automatic renewals context, marketers should have to send out reminder notices well in advance of renewal dates.  A third questions the appropriate way to measure affirmative consent online, whether by check box, scroll box, typing initials, or clicking a "submit" button and requests that the FTC provide guidance.  NCL also filed a comment reflecting the substance of Susan Grant's workshop presentation, summarizing common consumer complaints regarding negative option offers, and making three general recommendations:  1) marketers should improve their negative option disclosures; 2) marketers should be prohibited from sharing consumers' financial information for marketing purposes; and 3) continuity plans should be brought within the purview of the FTC's Negative Option Rule.

Two industry groups, ERA and MPA, also submitted comments.  ERA believes that the present regulatory structure – including the Prenotification Negative Option Plan Rule, the deception and unfairness standards of Section 5 of the FTC Act, and the Telemarketing Sales Rule – already sufficiently addresses issues related to online negative option marketing.  ERA also emphasizes the importance of allowing marketers flexibility in presenting negative option offers and highlighted its own Advance Consent Marketing Guidelines.  In its comment, MPA notes that it publishes guides for its members on topics related to negative option marketing.  MPA noted that its guides mirror the recommendations of many of the workshop panelists, including the use of clear and conspicuous disclosure of material terms and easily implemented cancellation procedures.  Regarding cancellation procedures, MPA recommends that marketers employ adequately staffed toll-free numbers and promptly process cancellations via recorded

phone messages.  Notably, MPA also recommends sending reminder notices to magazine subscribers prior to the start of each renewal term.

Finally, the Samuelson Law, Technology, & Public Policy Clinic of the University of California, Berkeley, School of Law submitted evidence related to several key issues of negative option marketing:  consumers' reading and installation behavior, presentation of price, intertemporal decision-making, and transaction costs.[185]  The research and evidence are consistent with Mr. Grosskloss' and Mr. Good's workshop presentations.

## III.  Marketing Principles for Online Negative Option Offers

Based on recent FTC cases alleging deceptive practices in online negative option marketing and comments of workshop panelists, FTC staff have developed five principles to guide industry in complying with Section 5 of the FTC Act when making online negative option offers.  These principles address:

1)  the disclosure of material terms;

2)  the appearance of disclosures;

3)  the timing of disclosures;

4)  obtaining consumers' affirmative consent; and

5)  cancellation procedures.

**<u>Principle One</u>:  Marketers should disclose the material terms of the offer in an understandable manner.**

Principle One addresses the disclosure of the material terms of a negative option offer. Section 5 requires that marketers clearly disclose an offer's material terms in an understandable manner.[186]  To comply with the law, marketers of negative option offers should disclose, at a minimum, the following key terms:  the existence of the negative option offer; the offer's total cost; the transfer of a consumer's billing information to a third party, if applicable; and how to cancel the offer.[187]  Moreover, to make disclosures understandable to consumers, marketers should avoid making vague or unnecessarily long disclosures and also avoid making inconsistent disclosures for the same offer.[188]

**Principle Two:  Marketers should make the appearance of disclosures clear and conspicuous.**

Principle Two addresses the appearance of negative option disclosures.  Section 5 requires that disclosures be clear and conspicuous.[189]  To present disclosures so that they comply with Section 5, marketers should, at a minimum, do the following.

First, place disclosures in a location on the webpage where consumers are likely to see them.  To ensure that consumers are likely to see them, marketers should avoid:  placing them far down on web pages or near distracting features such as banner ads or hyperlinks to unrelated webpages; burying them in long paragraphs of dense text; and displaying them such that consumers must enlarge the screen containing the terms or scroll to read the material terms.[190]

Second, label disclosures (and links to them) to indicate the importance and relevance of the information.[191]  For example, labels such as "terms of use," "home delivery plan," and "Click here to see how this offer works" do not adequately convey to consumers that any accompanying text discloses material terms of the negative option offer.[192]  Avoid using links to disclose information, such as cost information, that is an integral part of or inseparable from a negative option offer; instead limit their use to the disclosure of lengthy details such as specific instructions on how to cancel.[193]

Third, use text in sizes and colors that make them easy to find and read.[194]  Accordingly, disclosure text should not be:  small; in long passages that are single-spaced or in all-capital letters; or in colors that do not adequately contrast with the webpage background.[195]

**Principle Three:  Marketers should disclose the offer's material terms before consumers pay or incur a financial obligation.**

Principle Three addresses the timing of negative option disclosures.  Section 5 requires disclosing the material terms of the negative option offer before consumers agree to the purchase.[196]  Often, consumers agree to a purchase at the point when they finalize their orders by, for example, clicking a button labeled "Finalize my Order" or "Submit my Order."  To comply with Section 5, marketers should disclose the terms before consumers incur a financial obligation.[197]  During the panel discussion, participants discussed situations where it may be appropriate to disclose important information more than once in an advertisement.

**Principle Four:  Marketers should obtain consumers' affirmative consent to the offer.**

Principle Four addresses consent to negative option offers.  Section 5 requires that marketers obtain consumers' consent to such offers.[198]  To comply with Section 5, marketers should require

consumers to take an affirmative step, such as clicking "I agree," for example, to demonstrate their consent.[199]  Similarly, marketers should not rely on pre-checked boxes, which consumers may neither notice nor read before completing their order, as evidence of consumers' consent.[200]

**Principle Five:**  **Marketers should not impede the effective operation of promised cancellation procedures.**

Principle Five addresses cancellation procedures for negative option offers.  Section 5 requires that such procedures be effective.[201]  To comply with Section 5, marketers should not impede the effective operation of promised cancellation procedures, and should honor cancellation requests that comply with such procedures.[202]  In implementing effective cancellation procedures, marketers should not, among other things:  hang up on consumers who call to cancel; place them on hold for an unreasonably long time; provide false information about how to cancel; or misrepresent the reasons for delays in processing consumers' cancellation requests.[203]

Following the five principles set forth above should maximize the likelihood of compliance with Section 5, although whether a particular negative option offer violates Section 5 will depend on an individualized assessment of the advertisement's net impression and the marketer's business practices.

# IV.  Suggested Areas for Future Research

Looking to the future, the comments and workshop presentations suggest areas for research that may inform the actions of FTC staff, marketers, and consumer advocates.  With such research, the FTC could better advise online marketers, educate consumers, target deceptive practices, and fashion appropriate relief for marketers who violate the FTC Act.  Research in several areas would be especially useful.  First, further research in the area of online consumer behavior – including where consumers look, what they read, and what they are likely to click – would help FTC staff to evaluate the appropriateness of the timing, content, and placement of online disclosures.  Second, research into how consumers use mobile devices with very small screens to purchase products or services could help in understanding the role of clear and conspicuous disclosures in emerging technological contexts.  Third, it would be helpful to learn more about the value and effectiveness of follow-up reminders, which several panelists recommended.  Particularly relevant studies would evaluate whether consumers notice and read post-transaction correspondence, whether email or mail more effectively communicates

disclosures, whether post-transaction disclosures improve consumer satisfaction, and whether such disclosures increase cancellation rates.  Finally, studies evaluating the effectiveness and burdensomeness of various negative option cancellation procedures would aid in the understanding of how to best provide appropriate means of cancellation.

## V.   Conclusion

The workshop brought together industry and consumer groups, and members of the academic community, to discuss marketing negative option offers in the ever-expanding online marketplace.  Panelists throughout the day explained that Internet-based negative option marketing poses unique issues not present in print or telephone marketing.  The marketing principles set forth in this report, therefore, attempt to address these issues.

# Endnotes

1.  This Report represents the views of the FTC staff and does not necessarily represent the views of the Commission or any individual Commissioner. The FTC announced this workshop in a Federal Register Notice. Public Workshop:  Negative Options: An FTC Workshop Analyzing Negative Option Marketing, 71 Fed. Reg. 77753 (Dec. 27, 2006).  The workshop transcript ("Tr.") is available at:  http://www.ftc.gov/bcp/workshops/negativeoption/index.shtml.

2.  The Commission has several law enforcement tools to combat abuses in negative option marketing.  Section 5 of the FTC Act prohibits unfair and deceptive trade practices.  The Rule Concerning the Use of Prenotification Negative Option Plans (16 C.F.R. Part 425) regulates one kind of negative option offer.  The Telemarketing Sales Rule (16 C.F.R. Part 310) applies to negative option offers made over the telephone.  Additionally, the Electronic Funds Transfer Act (15 U.S.C. § 1693 et seq.) can apply to transactions involving recurring charges to consumers' debit cards or bank accounts, and the Unordered Merchandise Statute (39 U.S.C. § 3009) can apply to negative option offers involving the mailing of unordered merchandise.

3.  Two FTC publications that address online marketing more generally, Dot Com Disclosures:  Information about Online Advertising, and Advertising and Marketing on the Internet:  Rules of the Road, provide guidance on how to make negative option disclosures clear and conspicuous to obtain consumers' express informed consent.  These publications are available on the FTC website at:  http://www.ftc.gov/bcp/edu/pubs/business/ecommerce/bus41.pdf, and http://www.ftc.gov/bcp/edu/pubs/business/textile/bus21.shtm.

4.  Bundling, for antitrust purposes, involves situations in which buyers could purchase items separately from a seller, but receive more advantageous terms from that seller by purchasing goods or services together.

5.  Professor Katz's entire presentation is available at http://www.ftc.gov/bcp/workshops/negativeoption/presentations/Katz.pdf.

6.  Sherman, Tr. 56.

7.  Cohen, Tr. 60.

8.  Cohen, Tr. 60.

9.  Cohen, Tr. 62.

10.  Cohen, Tr. 60-1.

11.  Katz, Tr. 43.

12.  Sherman, Tr. 54.  Referring to automatic renewals, Ms. Cohen noted:  "Given the hectic pace of today's jam-packed lifestyle, customers value the convenience of not having to write a check or send back a renewal notice to subscriptions that are part of their daily routine."  Cohen, Tr. 60.

13.  Sherman, Tr. 55-6.

14.  Sherman, Tr. 53-4.

15.  Katz, Tr. 41.

16.  Katz, Tr. 44.

17.  Katz, Tr. 41.

18.  Grant, Tr. 67-70.

19.  Grant, Tr. 67.  Ms. Grant noted that, in general, consumers complain about sellers' failure to disclose the existence of the negative option offer more than they complain about other aspects, such as the difficulties of cancelling.

20.  Grant, Tr. 67.

21.  Grant, Tr. 67-8.

22.  Grant, Tr. 68.

23.  Sherman, Tr. 57.

24.  Cohen, Tr. 63.

25.  Grant, Tr. 70.

26.  Grant, Tr. 70.

27.  Grant, Tr. 70.

28.  Sherman, Tr. 80-1; Grant, Tr. 81.

29.  Sherman, Tr. 80.

30.  Grant, Tr. 71.

31.  Grant, Tr. 71.

32.  Grant, Tr. 70.

33.  The entire presentations of Ms. Fox and Mr. Grossklags are available at http://www.ftc.gov/bcp/workshops/
negativeoption/presentations/Fox.pdf and  http://www.ftc.gov/bcp/workshops/negativeoption/presentations/
Grossklags.pdf.

34.  Fox, Tr. 84-5.

35.  Fox, Tr. 85-6.

36.  Fox, Tr. 86-7.

37.  Grossklags, Tr. 105.

38.  Fox, Tr. 88.

39.  Hillman, Tr. 94.

40.  Hillman, Tr. 94-5; Grossklags, Tr. 104-5.

41.  Grossklags, Tr. 107-8.

42.  Grossklags, Tr. 108.

43.  Hillman, Tr. 91.

44.  Hillman, Tr. 95-6.

45.  Hillman, Tr. 92.

46.  Hillman, Tr. 96.

47.  Hillman, Tr. 96.

48.  The study, Noticing Notice: A Large-Scale Experiment on the Timing of Software License Agreements, is
available at:  http://people.ischool.berkeley.edu/~jensg/research/paper/Grossklags07-CHI-noticing_notice.pdf.

49.  Grossklags, Tr. 102.

50.  Grossklags, Tr. 102-3.

51.  Grossklags, Tr. 103.

52.  Grossklags, Tr. 103; *see also* Grossklags presentation slide 6.

53.  Grossklags presentation slide 8.

54.  Grossklags presentation slide 8.

55.  Hillman, Tr. 99-100.

56.  Hillman, Tr. 98.

57.  Hillman, Tr. 100.

58.  Grossklags, Tr. 117.

59.  Grossklags, Tr. 114, 122.

60.  Grossklags, Tr. 122.

61.  Grossklags, Tr. 106.

62.  Grossklags, Tr. 106-7.

63.  Grossklags, Tr. 110.

64.  The entire presentations of Ms. Fair and Professor Hoy are available at http://www.ftc.gov/bcp/workshops/ negativeoption/presentations/Fair.pdf and http://www.ftc.gov/bcp/workshops/negativeoption/presentations/ Hoy.pdf.

65.  Fair, Tr. 125-7; FTC Policy Statement on Deception, appended to *Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984), available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm.  The specific requirements necessary to satisfy the "clear and conspicuous" standard often vary by the type of media in which the advertisement appears.  For example, in print advertisements, the FTC has found fine print footnotes or dense blocks of text insufficient to modify a claim made elsewhere in the ad.  In television commercials, problematic elements have included video superscripts that are superimposed on distracting backgrounds or that compete with the commercial's audio elements.  The publication FTC Advertisement Enforcement Disclosures in Advertising (2001), available at http://www.ftc.gov/bcp/workshops/disclosures/cases/index.html, summarizes representative FTC cases regarding disclosures made in print advertisements and television commercials. As noted in Endnote 3, supra, two other FTC publications, Dot Com Disclosures:  Information about Online Advertising, and Advertising and Marketing on the Internet:  Rules of the Road provide guidance on the "clear and conspicuous" standard in online advertisements.

66.  Fair, Tr. 129-30.

67.  Fair, Tr. 135; *see also* http://www.ftc.gov/bcp/edu/pubs/business/ecommerce/bus41.pdf.  Regarding the application of the clear and conspicuous standard to media other than the Internet, the publication FTC Advertisement Enforcement Disclosures in Advertising (2001), available at http://www.ftc.gov/bcp/workshops/ disclosures/cases/index.html, summarizes representative FTC cases regarding disclosures made in print advertisements and television commercials.  Ms. Fair also mentioned the 2001 workshop titled, "Disclosure Exposure:  An FTC-NAD Workshop on Effective Disclosures in Advertising," available at http://www.ftc.gov/ bcp/workshops/disclosures/index.shtm.

68.  Hoy, Tr. 139-40.

69.  Fair, Tr. 129.

70.  Hoy, Tr. 142-4.

71.  Hoy, Tr. 142-4.

72.  Hoy, Tr. 142-3.

73.  Fair, Tr. 130.

74.  Fair, Tr. 131.

75. Hoy, Tr. 145-6.

76. Hoy, Tr. 141.

77. Hoy, Tr. 144.

78. Hoy, Tr. 141, 144, 148.

79. Fair, Tr. 132.

80. Hoy, Tr. 141.

81. Hoy, Tr. 146.

82. Hoy, Tr. 146-7.  Ms. Hoy also referred to a "golden triangle," which is an inverted triangle, similar to the top portion of the letter F.  This triangle is visible on slide 12 of Ms. Hoy's presentation, which includes a heat-lamp image showing where users looked when viewing a Google search results page.

83. On May 6-7, 2008, the FTC hosted a Town Hall meeting to explore the evolving mobile commerce marketplace and its implications for consumer protection policy. *See* http://www.ftc.gov/bcp/workshops/mobilemarket/index.shtml.

84. Cerasale, Tr. 160; Huffman, Tr. 158.

85. Cerasale, Tr. 162-3.

86. Cerasale, Tr. 152-3.

87. Cerasale, Tr. 152-3.

88. Cerasale, Tr. 173.

89. Fair, Tr. 132.

90. Cerasale, Tr. 149; Huffman, Tr. 155-6.

91. Huffman, Tr. 155-6.

92. Huffman, Tr. 162.

93. Cerasale, Tr. 149-50.

94. Cerasale, Tr. 151-2.

95. Huffman, Tr. 155-6.

96. Huffman, Tr. 156-7.

97. Huffman, Tr. 156-7; Cerasale, Tr. 161.

98. Huffman, Tr. 156-7; Cerasale, Tr. 161.

99. Cerasale, Tr. 159-60; Huffman, Tr. 162.

100. Hoy, Tr. 146.

101. Hoy, Tr. 146-7.

102. Hoy, Tr. 148.

103. Hoy, Tr. 147.

104. Hoy, Tr. 148.

105. Hoy, Tr. 143-4, 148.

106. Hoy, Tr. 148.

107. Hoy, Tr. 148.

108. Hoy, Tr. 145-6; Cerasale, Tr. 149-50; Huffman, Tr. 155.

109. Huffman, Tr. 157.

110. Huffman, Tr. 157.

111. *See also* http://www.ftc.gov/bcp/workshops/negativeoption/presentations/Spector.pdf.

112. Spector, Tr. 176.

113. Spector, Tr. 176.

114. Goldstein, Tr. 177-92; Ms. Goldstein's entire presentation is available at  http://www.ftc.gov/bcp/workshops/
     negativeoption/presentations/Goldstein.pdf.  The FTC has modified some of the images in Appendix B to
     highlight central design aspects, as indicated on each such page.

115. Goldstein, Tr. 183-4.

116. Goldstein, Tr. 186-7.  Ms. Goldstein noted that, from a marketing perspective, the bundled offer does not make
     business sense because the marketer is risking the primary sale, the pan, by bundling it with the club.

117. Goldstein, Tr. 187-8.

118. Goldstein, Tr. 187.

119. Goldstein, Tr. 188.

120. Goldstein, Tr. 189-90.

121. Goldstein, Tr. 189-92.

122. Goldstein, Tr. 190.

123. Goldstein, Tr. 190.

124. Brendler, Tr. 192-9.  Mr. Brendler's entire presentation is available at http://www.ftc.gov/bcp/workshops/
     negativeoption/presentations/Brendler.pdf.  The FTC has modified some of the images in Appendix C to
     highlight central design aspects, as indicated on each such page.

125. Brendler, Tr. 195.

126. Brendler, Tr. 196.

127. Brendler, Tr. 196.

128. Brendler, Tr. 197.

129. Brendler, Tr. 198.

130. Brendler, Tr. 198-9.

131. Mr. Good's written comments are available at http://www.ftc.gov/bcp/workshops/negativeoption/Good.pdf,
     and Mr. Mallen's written comments are available at http://www.ftc.gov/bcp/workshops/negativeoption/Mallen.
     pdf.

132. Good comments at 3; Mallen comments at 1.

133. Good comments at 2.

134. Mallen comments at 1.

135. Good comments at 2.

136. Good comments at 2.

137. Good comments at 3.

138. Good comments at 3.

139. Good comments at 3.

140. Good comments at 3.

141. Good comments at 3.

142. Good comments at 3.

143. Good comments at 3.

144. Good comments at 3.

145. Good comments at 3.

146. Good comments at 3.

147. Good comments at 3.

148. Good comments at 4.

149. Good comments at 4.

150. Good comments at 4.

151. Good comments at 4.

152. Good comments at 4; Mallen comments at 1.

153. Good comments at 4; Mallen comments at 1.

154. Good comments at 4.

155. Good comments at 4.

156. Good comments at 4.

157. Good comments at 4.

158. Good comments at 5.

159. Good comments at 5.

160. Good comments at 5.

161. Good comments at 5.

162. Good comments at 5.

163. Good comments at 5.

164. Goldstein, Tr. 179.

165. Goldstein, Tr. 182-3.

166. Goldstein, Tr. 180, 182-5.

167. Goldstein, Tr. 183-4.  ERA noted that the TSR has expressly identified the point at which consumers incur a financial obligation as the time where critical disclosures need to be made, and, therefore, provides guidance for online offers and precedent for ERA's approach.

168. Goldstein, Tr. 185.

169. Goldstein, Tr. 185.

170. Goldstein, Tr. 194.  Mr. Brendler noted that the *New York Times*, Barnes & Noble, and Monster have signed on to the WebWatch Internet Guidelines.

171. Goldstein, Tr. 197.

172. Good comments at 1.

173. Good comments at 1.

174. Good comments at 1.

175. Good comments at 2.

176. Good comments at 2.  Mr. Good referred to the research of Jakob Nielson, a computer useability expert.  Using eyetracking software, Mr. Nielson found that consumers tend to scan websites in an F-shape pattern.  *See* Nielsen, Jakob, F Shaped Pattern for Reading Web Content (2006).

177. Good comments at 2.

178. Good comments at 2.

179. Good comments at 2.

180. Good comments at 2.

181. Good comments at 2.

182. Good comments at 2.

183. Mallen comments at 2.

184. All of the comments are available at http://www.ftc.gov/os/comments/negativeoptionwrkshop/index.htm.

185. http://www.ftc.gov/os/comments/negativeoptionwrkshop/527292-00007.pdf.

186. *See, e.g.*, *FTC v. JAB Ventures,* No. CV08-04648 (C.D. Cal. 2008); *FTC v. Complete Weightloss Center*, No. 1:08cv00053 (D.N.D. 2008).

187. *See JAB Ventures, supra* n.186; *Complete Weightloss Center, supra* n.186 ; *FTC v. Berkeley Premium Nutraceuticals*, No. 1:06cv00051 (S.D. Ohio 2006); *FTC v. Think All Publ'g*, No. 4:07cv11 (E.D. Tex. 2006); *FTC v. Hispanexo*, No. 1:06cv424 (E.D. Va. 2006); *FTC v. Consumerinfo.com*, No. SACV05-801 (C.D. Cal. 2005); *FTC v. Conversion Mktg.*, No. SACV04-1264 (C.D. Cal. 2004); *FTC v. Mantra Films*, No. CV03-9184 (C.D. Cal. 2003); *FTC v. Preferred Alliance*, No. 103-CV0405 (N.D. Ga. 2003); *United States v. Prochnow*, No. 102-CV-917 (N.D. Ga. 2002); *see also* Sections II.A.4, II.C.2.b, and II.D.2, 3, *supra*.

188. *See JAB Ventures, supra* n.186*; Mantra Films, supra* n.187*; see also supra,* Sections II.A.4, II.B.3, and II.C.2.a.

189. *See, e.g., JAB Ventures, supra* n.186*; Complete Weightloss Center, supra* n.186*; see also* Dot Com Disclosures, *supra* n.3.

190. *See FTC v. Ultralife Fitness, Inc.,* No. 2:08-cv-07655-DSF-PJW (C.D. Cal. 2008); *Complete Weightloss, supra* n.186; *Think All Publ'g, supra* n.187; *Mantra Films, supra* n.187; *United States v. Mazda Motor of America*, No. 8:99cv01213 (C.D. Cal. 1999); *In the Matter of America Isuzu Motors,* FTC Docket No. C-3712 (1996); *see also* Section II.C, *supra*.

191. *See Berkeley Premium, supra* n.187*; Think All Publ'g, supra* n.187; *see also* Section II.C.3, *supra*.

192. *See Ultralife, supra* n.190; *Berkeley Premium, supra* n.187*; Think All Publ'g,, supra* n.187; *see also* Section II.C.3, *supra*.

193. *See* Dot Com Disclosures, *supra* n.3 at 7-8.

194. *See JAB Ventures, supra* n.186*; Complete Weightloss, supra* n.186; *Think All Publ'g, supra* n.187; *In the Matter of Palm*, FTC Docket No. C-4044 (2002); *see also* Section II.C.3, *supra*.

195. *See JAB Ventures, supra* n.186*; Complete Weightloss, supra* n.186; *Think All Publ'g, supra* n.187; *In the Matter of Palm*, *supra* n.194; *see also* Section II.C.3, *supra*.

196. *See, e.g., JAB Ventures, supra* n.186; *Complete Weightloss, supra* n.186; *Berkeley Premium, supra* n.187; *Think All Publ'g, supra* n.187; *see also* Section II.D.3, *supra*.

197. *See JAB Ventures, supra* n.186; *Complete Weightloss, supra* n.186; *Berkeley Premium, supra* n.187; *Think All Publ'g, supra* n.187; *see also* Sections II.C.3, II.D.2, and II.D.3, *supra*;  http://www.ftc.gov/bcp/conline/pubs/ buspubs/dotcom/index.pdf.

198. *See, e.g.*, *Complete Weightloss, supra* n.186; *Berkeley Premium, supra* n.187; *Think All Publ'g, supra* n.187; *Mantra Films, supra* n.187.

199. *See Mantra Films, supra* n.187; *see also* Section II.D.4.b, *supra*.

200. *See Mantra Films, supra* n.187; *see also* Section II.D.4.b, *supra*.

201. *See, e.g., FTC v. Universal Premium Services*, No. CV06-0849 (C.D. Cal. 2006); *FTC v. Remote Response*, No. 06-20168 (S.D. Fla. 2006); *Berkeley Premium, supra* n.187; *Hispanexo, supra* n.187.

202. *See Universal Premium, supra* n.201; *Remote Response, supra* n.201; *Berkeley Premium, supra* n.187*; Hispanexo, supra* n.187; *see also* Sections II.B.3, II.D.2, and II.E, *supra*.

203. *See Universal Premium, supra* n.201; *Remote Response, supra* n.201; *Berkeley Premium, supra* n.187; *Hispanexo, supra* n.187.

Appendices: Mock Advertisement Exercise

39







App. A, page 3





**Fantastique Cuisine - Shop**

File   Edit   View   Favorites   Tools   Help

Address   http://www.fantastiquecuisine.com/shop/sautepan

Home   |   Shop   |   Gift Registry   |   Store Locator   |   Contact Us

# Fantastique Cuisine

All-Purpose Saute Pan

The perfect pan for all your cooking needs — great for cooking food quickly over high heat or simmering slowly over low heat to bring out that perfect flavor. The deep design (4 quarts) easily accommodates your favorite stew or even a whole chicken. Plus, it can be used both on the stove top or in the oven.

This attractive and versatile pan is made with a hard enamel exterior and a nonstick interior.

It comes in three beautiful colors to go right from stove to table:

- steel gray
- bright yellow
- cobalt blue

Price:  $89.95
S&H:  $7.95

With your purchase you'll also enjoy a 30 day free trial membership in the Closet Gourmet Cook's Club with automatic renewal at $4.99/month.

Search
keyword or item #

▶ View similar items

▶ Click here for Details

Add to cart

Email a friend

Add to registry

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

Text Circled by FTC Staff



App. B, page 2

Text Circled by FTC Staff



App. B, page 3

Text Circled by FTC Staff



App. B, page 4

Text Circled by FTC Staff



Text Circled by FTC Staff



App. B, page 6

Text Circled by FTC Staff



App. B, page 7

Text Circled by FTC Staff



Text Circled and Enlarged for Legibility by FTC Staff



App. B, page 9

Text Circled and Enlarged for Legibility by FTC Staff



Text Circled and Enlarged for Legibility by FTC Staff



**Details on your free 30-day trial to Closet Gourmet Cooks Club**

Consumers who purchase the pan will automatically be enrolled in a 30-day free trial of the Closet Gourmet Cook's Club. As a club member, consumers will receive in the mail with the pan a recipe file box for no additional charge. Consumers will then receive, by e-mail, three gourmet recipes each month. The recipes are from some of the finest restaurants in New York City, many of them featured in Tagat's top 100. Consumers also will receive special discount coupons for dining in restaurants throughout the U.S.

After the 30-day free trial, consumers will be charged $4.95 a month for the recipes on the same credit card they used to purchase the pan. The $4.95 a month charge will show up on credit card statements with the name Closet Gourmet Cook's.

Membership will continue indefinitely unless consumers cancel. Consumers can cancel at any time – even before the first shipment of recipe cards - and avoid receiving any cards or incurring any financial obligation – by calling 1-800-cookclub, or online at www.closetgourmentcooks.com. If consumers cancel before the first shipment, they can keep the file box.

Search

Add to cart

Email a friend

Add to registry

Home    Shop    Gift Registry    Store Locator    Contact Us

Terms & Conditions | Site Map | Privacy Policy | Contact Us | Fantastique Cuisine Home

Text Circled by FTC Staff

App. C, page 2



Text Circled by FTC Staff



Text Circled and Enlarged for Legibility by FTC Staff

I understand the terms and conditions of this transaction, that purchase automatically enrolls me in a 30-day free trial of the Closet Gourmet Cook's Club. Fantastique Cuisine will disclose my credit card information to a third party which, after 30 days, will charge my account $4.95 per month membership (as "Closet Gourmet Cook's). With my purchase I will receive a free recipe file which I may keep even if I choose to cancel membership. I may cancel membership at any time by calling 1-800-cookclub, or online at www.closetgourmetcooks.com



Text Circled by FTC Staff



App. C, page 6

Text Circled by FTC Staff

| FEDERAL TRADE COMMISSION | ftc.gov |
|---|---|
| 1-877-FTC-HELP | FOR THE CONSUMER |