**Exhibit J**



**WILLIAM H. SORRELL**
ATTORNEY GENERAL
**JANET C. MURNANE**
DEPUTY ATTORNEY GENERAL
**WILLIAM E. GRIFFIN**
CHIEF ASST. ATTORNEY
GENERAL

TEL: (802) 828-3171
FAX: (802) 828-2154
TTY: (802) 828-3665
CIVIL RIGHTS: (802) 828-3657

http://www.atg.state.vt.us

**STATE OF VERMONT**
**OFFICE OF THE ATTORNEY GENERAL**
**109 STATE STREET**
**MONTPELIER, VT**
**05609-1001**

October 13, 2009

**BY FEDERAL EXPRESS AND EMAIL**

The Honorable Donald S. Clark
Secretary, Federal Trade Commission
Room H-135 (Annex Q)
600 Pennsylvania Avenue, NW
Washington, DC 20580

> Re:   Prenotification Negative Option Rule Review
>        Matter No. PO64202

Dear Secretary Clark:

On behalf of the Attorneys General of the States of Arkansas, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Mexico, Ohio, Oregon, Tennessee, Vermont, and West Virginia ("the States"), and in response to an Advance Notice of Proposed Rulemaking published in the Federal Register, 74 Fed. Reg. 22720 (May 14, 2009), we are writing to comment on the Federal Trade Commission ("FTC") rule on Use of Prenotification Negative Option Plans, 16 C.F.R. Part 425 (hereinafter referred to as "the PNOR"). The Attorneys General are the officials charged with enforcing the laws of the States designed to protect consumers from unfair and deceptive business practices.

The existing PNOR was originally promulgated in 1973, with technical amendments being made in 1998. The rule currently regulates only one type of negative option marketing—the so-called "prenotification negative option plan"—which involves an arrangement whereby consumers receive periodic announcements that merchandise will be delivered to them unless they decline to accept it within a set time frame. Importantly, the Commission seeks input on whether to extend the scope of the rule to regulate other forms of negative option marketing, most notably "trial conversions." *See* 74 Fed. Reg. at 22721.



For the reasons stated below, we strongly encourage the FTC to expand the rule, but only if the revisions are adequate to ensure that consumer protections are put into place with respect to consent to be charged after the trial period, periodic notification of charges, maximum duration of charges, method of cancellation, and applicability of the rule to services.

Much of the public discussion of the PNOR has focused on improving *disclosure* as a way of protecting consumers from being harmed by trial conversion negative option marketing.  *See, e.g.,* FTC, NEGATIVE OPTIONS, A REPORT BY THE STAFF OF THE FTC'S DIVISION OF ENFORCEMENT (Jan. 2009) (hereinafter "NEGATIVE OPTIONS").  However, in the context of free to pay conversions, it is our firm view that improved disclosure of terms will *not* adequately protect consumers.  Rather, there is a need for *substantive* regulatory provisions to ameliorate the harmful aspects of this form of negative option plan.

Therefore, we strongly encourage the FTC to add new provisions to the PNOR to regulate trial conversions, and, with respect to that form of negative option, to (1) prohibit charges following a "free" trial without receiving the affirmative consent of the consumer at the end of the trial; (2) mandate periodic notification to consumers of charges to their accounts in trial conversions; (3) set a cap on the number of months that a consumer may be charged and require an affirmative opt-in by the consumer to exceed that time limit; (4) require companies to permit consumers to cancel in the same method of communication as the solicitation to the consumer; and (5) include "services" under the PNOR.

## I.   BACKGROUND

The FTC uses the term "negative option marketing" broadly, to refer to those commercial transactions in which sellers interpret a consumer's failure to take affirmative action—either to reject an offer or to cancel an agreement—as affirmative assent to be charged.  As the FTC has recognized, these kinds of transactions "change the typical relationship between the buyer and seller," in which the buyer is bound only if she responds affirmatively to an offer made by the seller.  *See* NEGATIVE OPTIONS at 2.

The common law of the States reflects this basic proposition, that in order for a binding contract to exist, the offeree must affirmatively accept the terms of the offer.  *See* 2 Samuel Williston & Richard Lord, A TREATISE ON THE LAW OF CONTRACTS 6:50 (4th ed. 2007); *see also Adams v. State Capital Life Ins. Co.*, 182 S.E.2d 250, 252 (N.C. App. 1971) ("Silence and inaction do not amount to an acceptance of an offer."); *Gov't Employees Ins. Co. v. Group Hospitalization Med. Services, Inc.*, 589 A.2d 464, 468-69 (Md. App. 1991) (silence and inaction can operate as acceptance of offer in only a few, limited circumstances).  Ordinarily, consumers govern their behavior based on the idea that they must in effect say "yes" before a deal is made.  Negative option marketing ignores this commonly-understood principle by deeming silence to be acceptance.  *See In re Baum's Estate*, 117 A. 684, 685 (Pa. 1922) (offeree has a right to make no reply to offers and his silence and inaction cannot be construed as assent to offer).

The Honorable Donald S. Clark
Re: Prenotification Negative Option Rule Review
Page 3 of 9

Accordingly, consumers customarily do business based on the premise that they will not be bound, or incur any monetary obligations, unless and until there is a full "meeting of the minds" and genuine assent between the parties. Rooted in the concepts of offer and acceptance, consumers base their behavior on the notion that they are not "on the hook" until a "deal" is done, be it in the form of a handshake or a fully executed written contract. Free to pay conversion marketing turns those rules on their head, contrary to reasonably understood consumer expectations and assumptions. Lured by catch phrases such as "risk free" or "trial offer," consumers ultimately find themselves bound in some fashion to take affirmative steps, all because their silence was deemed to be acquiescence.

Consequently, consumers are stuck with terms and monetary obligations to which they did not knowingly assent. By their comments, the States do not mean to suggest that consumers do not have an obligation to read and understand all material terms and conditions; the reality, though, is that free to pay conversion marketing uses a form of trickery, and sleight of hand as it were, to reap millions from consumers in a manner flatly contrary to the ordinary rules of consumer transactions. There is an inherent deception built into these plans by the marketers such that the rule of "caveat emptor" cannot control this marketplace.

As evidenced by consumer data gathered by the States, negative option marketing of the trial conversion type is an area ripe for deception and abuse, consistent with the FTC staff's observation that "some negative option practices generate significant consumer dissatisfaction." NEGATIVE OPTIONS at ii. The States have taken steps to combat these abuses through a number of enforcement actions, both at the multistate and individual state level. *See, e.g., Minnesota ex. rel. Hatch v. US Bank, NA, et al.,* No. 99-872 (D. Minn. 2000) (Amended Final Judgment and Order for Injunctive and Consumer Relief); *Minnesota ex rel. Hatch v. Fleet Mortgage Corp.*, 158 F. Supp. 2d 962 (D. Minn. 2001); *Minnesota ex rel. Hatch v. Fleet Mortgage Corp.* 181 F. Supp. 2d 995 (D. Minn. 2001); *In re Citibank* (N.Y.S. Dept. of Law filed Feb. 22, 2002) (Assurance of Discontinuance); *People v. Chase Bank*, No. GIC850483 (Cal. Super. Ct. for San Diego County filed July 12, 2005) (Complaint); *AT&T Mobility*, No. 09-2-00463-1 (Wash. Dist. Ct. for Thurston County filed Feb. 26, 2009) (Assurance of Discontinuance); *Iowa ex rel. Miller v. Vertrue, Inc.*, No. EQ53486 (Iowa Dist. Ct. for Polk County filed May 15, 2006) (Petition in Equity).

## II.    STATES' OBSERVATIONS

The States have identified a number of significant problems in negative option trial conversions, the most troublesome of which involve the sale of services like discount membership programs. These include:

The Honorable Donald S. Clark
Re: Prenotification Negative Option Rule Review
Page 4 of 9

- The misleading character of negative options advertised as involving "free" or "trial" offers. The long-term impression created by this type of terminology is that consumers have *no obligation* to do anything, not that their silence after acceptance of the offer will open them to recurrent charges of unlimited duration.[1]

- Consumers' lack of awareness as to the existence of ongoing periodic charges to their credit card or bank account, in connection with trial conversions. The reality is that many consumers do not scrutinize their account statements and thus can go for long periods of time without realizing that they are being charged. Modest charges, like $19.95 per month, can "fly under the radar." This is particularly true with respect to bank account charges, the details of which, on an account statement, can be inscrutable to even well-educated consumers.

- The piling up of trial conversion charges over long periods of time, amounting to substantial amounts of money, even where consumers make little or no use of the goods or services offered. With no time cap on charges, consumers can incur hundreds of dollars worth of charges, or more.

- The difficulty faced by consumers in contacting the seller of the goods or services in order to cancel a trial conversion. There is no reason why a consumer who is bound by consent communicated in a particular way—electronically, for example—should not be able to cancel in the same manner.

*Examples of consumer complaints.* Reflective of the kind of frustration experienced by consumers are the following examples of consumer complaints received by the States:

- A professional couple in Vermont paid over $750.00 through a joint credit card payment, and $49.95 monthly increments, for a discount plan that neither of them authorized, wanted, or knew they had purchased. The periodic charge was small enough that the couple did not question the bill.

- An Oregon woman ordered what was advertised on the internet as a "Free Trial Offer" of a teeth whitening product for only $4.87 shipping and handling and ended up getting charged $78.41 and enrolled in an auto-ship program.

---

[1] Under the FTC's Guide Concerning Use of the Word "Free" and Similar Representations, 16 C.F.R. § 251.1(a)(2), in using the word "free," an offeror must exert "extreme care so as to avoid any possibility that consumers will be misled or deceived."

The Honorable Donald S. Clark
Re: Prenotification Negative Option Rule Review
Page 5 of 9

- A Maryland consumer reported ordering a "free" bottle of Resveratrol by internet and agreeing to pay shipping charges of $3.95. After the consumer received the shipment, his account was charged $87.13. The company reported to the consumer that because he did not cancel he was charged full price.

- A Hawaii man reported that he signed up on the internet for "free trial" samples of an acai berry supplement and authorized a nominal shipping charge. The company sent him a two-month supply and enrolled him in an auto-ship program. His credit card was charged $79.90 once a month for three months until he noticed the charges.

- In 2003, an Iowa couple discovered what they believed to be an unauthorized charge on their MasterCard in the amount of $89.95 for Simple Escapes. Indeed, they ultimately discovered that such charges stretched back to 1998, and totaled $489.70.

- In 2003, another Iowa couple discovered a $96.00 charge for "MWI Connections" on their AT&T MasterCard, and complained that the charge was unauthorized. They stated they had no idea what the charge was for until they contacted the company and were told it had to do with entertainment coupons.

- In 2005, an Iowa couple reviewed their bank statement and discovered that $199.95 had been withdrawn on their debit card the previous month for something called "Essentials." As it turns out, the wife had placed a call to order an unrelated product in 2002, had agreed to join the Essentials program, and had subsequently been charged hundreds of dollars over the course of four years.

These consumer complaints offer a snapshot of the substantial numbers of complaints that our offices receive about trial conversions each year. The complaints we receive underscore the fact that the inherently deceptive nature of trial conversions render retailers' disclosures meaningless and confuse and dupe even the most sophisticated consumer.

*Trial conversions in telemarketing and on the internet.* As outlined above, negative option plans, especially trial conversions, present particular problems and obstacles to consumers. While some such offers are currently the subject of regulation by the FTC (that is, those that are telemarketed and involve preacquired account information, *see* Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(a)(6)(i)), other trial conversions are not similarly regulated, whether presented on the telephone or over the internet. Under these plans, sellers seek to entice consumers with words like "free" and "trial period," inherently implying that the trial comes with no obligation on the part of the consumer. The TSR, as it pertains to only that telemarketing involving preacquired account information, has focused on disclosures, and not attacked head-on the substantive problems in these kinds of sales, leaving room for continued abuse of consumers.

The Honorable Donald S. Clark
Re: Prenotification Negative Option Rule Review
Page 6 of 9

Whereas in continuity sales plans, consumers receive regular notification with every shipment of merchandise, prompting them to take affirmative steps to cancel the plan if that is their preference, with trial conversions the recurrent charges are the subject of no notification from the seller and continue on silently and without limit.

To further illustrate the use of trial conversions on the internet, we have attached Exhibit 1, which is a redacted screen shot of a retailer's home page and an order page.

Compounding the problems for consumers is their inability to cancel once they realize their accounts have been charged. Consumers who have accepted the offer through the internet or by email may learn that such mechanisms are not available as a means of cancellation. Consumers may be forced to call a telephone number instead, which is not always toll-free, and they complain of being put on hold for unreasonable lengths of time. They also often find it difficult to get confirmation of a cancellation in writing from the seller. Such difficulties in cancellation compound the frustration caused by this type of negative option plan.

*Data from the States.* Confirming the need for greater substantive regulation of trial conversions is consumer data gathered by the States.

For example, in May of 2006, the Office of the Iowa Attorney General announced the results of a survey and the commencement of its suit against Memberworks, Inc., now known as Vertrue, Inc., which markets discount membership plans through trial conversions. With a response rate of 88 surveys returned of 400 originally mailed, 67 percent of responding consumers were unaware of their membership in the negative option sales plan. Additionally, almost all of the remaining consumers had never used the plan, or believed they had previously cancelled their membership. No responding consumer expressed satisfaction with their membership.[2]

Similarly, in 2007, the Vermont Attorney General's Office surveyed state residents by mail who had been billed for one of several discount plan memberships involving a "trial conversion" negative option and sold by a major over-the-phone purveyor of such plans. There were 100 respondents. Of that number, 33 recalled having signed up for a membership, and 67 did not; 53 expressly answered that they had not agreed to be billed. In addition, only 6 responded that they had ever used the plan. When the Attorney General's Office asked the seller to substantiate that the 53 "non-agreeing" consumers had consented on the phone to be billed, the company produced documentation for some, but not all, consumers, including 19 tape recordings that reflected some degree of consumer consent (albeit in a number of cases after the consumers had initially indicated a reluctance to sign up).

---

[2] The Iowa Attorney General's news release announcing his action against Vertrue, Inc., can be found at www.state.ia.us/government/ag/latest_news/releases/may_2006/MemberWorks.html.

The Honorable Donald S. Clark
Re: Prenotification Negative Option Rule Review
Page 7 of 9

Data from Colorado also shows that a company can make a great deal of money from early billings under a trial conversion, even when consumers who later discover the recurrent charges cancel their participation. That is, the revenue generated from the early charges levied against consumers in such plans can be great enough to favor using this form of negative option marketing. Thus, an investigation by the Colorado Attorney General identified a company that grossed more than $8 million in only six months, even with an attrition rate above 75 percent after the first charge, which consumers discovered when they received their credit card bills. (The discovery might not have been even that quick if the charge had been to the consumers' *bank* accounts.)

Even more telling is a comparison of this same company's total number of shipments of its product before and after implementing the trial conversion plan. In 2004, the business reported approximately 1,500 shipments; one year later, after implementing its trial conversion plan to market the same product, the company reported more than 19,500 shipments.

By way of summary, if, as in the Vermont survey, a large majority of trial conversion participants do not recall ever having consented to be charged, and a majority of them affirmatively deny having given such agreement, then there is a clear need for better regulation of these offers. The issue is less the lack of up-front disclosure and consent-giving. The problem is rather that it is unreasonable to expect consumers enticed by a free trial offer both to remember, over an unlimited period of time, a spur-of-the-moment assent to be billed periodically, and to scrutinize (and decipher) their account statements month after month in order to recognize the charges. In light of these realities, the best, and perhaps the only, way to ensure that consumers understand why and in what amount they are being billed, and agree to such billing, is to ensure that they affirmatively consent to the charges after the trial period, receive periodic notice of future charges, and as a "backstop" safeguard, are protected by an outer limit on the duration of the billing.

## III.   SPECIFIC SUGGESTIONS

Based on their experience with consumers in this area, and with an eye toward protecting the public, the States strongly recommend that the FTC amend the PNOR in the following ways:

### A.   Require Affirmative Written Consent to Bind Consumers at the End of Free Trials.

The PNOR should be revised so as to require consumers' affirmative written consent following the "free" trial period in a trial conversion. That is, before a company may charge a consumer for a product or service previously received during a trial period, the company should be required to obtain written consent from the consumer to be charged in the future. Consent given at the outset of the trial period is not sufficient, because the trial period is most often touted as being without obligation and because it can and does lull consumers into a state of forgetfulness; only at the end of the trial does the relationship

The Honorable Donald S. Clark
Re: Prenotification Negative Option Rule Review
Page 8 of 9

between consumer and business transform into one in which the consumer is actually being charged. This change would do much to reveal the true market for these services and substantially reduce the possibility that the services are being sold to consumers who do not want them or are unaware of their purchase of them.

### B.    Require Periodic Notices.

The States are of the view that while up-front disclosures in trial conversions offer limited protection to consumers, *periodic* disclosures accompanying recurrent charges would be of significant value. These should be provided at no less than quarterly intervals. Periodic notice would make consumers aware of, or remind them of, the recurring charges and help prevent the continuation of unknowing or unwanted enrollment in these plans.

### C.    Impose Contract Maximum Time Limits.

Because it is unreasonable to assume that most consumers intend to be charged in perpetuity in connection with trial conversions, the States recommend the setting of an outer time limit on such charges, as a "backup" safeguard. Our suggested time limit is 18 months. At the expiration of that time limit, the company offering the negative option plan would be required to seek new written consent from the consumer. If no new consent is obtained, the contract would be terminated.

### D.    Require Fair Cancellation Processes.

Cancellation of negative option plans is made difficult for consumers when they are required by the seller to cancel using a different method of communication than the method by which they agreed to the offer. To reduce this difficulty, the States propose requiring that consumers be allowed to cancel their memberships by the same method as their enrollment (as well as by other methods, at the business' option). For example, if a consumer enrolled through an internet website, the company should provide an internet cancellation option.

### E.    Include "Services" Under the Negative Option Rule.

Currently, the PNOR only regulates negative option marketing "in connection with the sale, offering for sale, or distribution of goods and merchandise." 16 C.F.R.        §
425.1(a). However, many of the offerings promoted by negative option plan companies could be considered *services*, thus circumventing the rule's current provisions, if they were expanded to include trial conversions. To guard against the dangers of negative option marketing, the States recommend that this definition be broadened to include "services."

The limited scope and provisions of the PNOR are insufficient to protect consumers from the pitfalls of trial conversions. By instituting the States' recommendations, the dangers of this common form of negative option marketing can be mitigated.

The Honorable Donald S. Clark
Re: Prenotification Negative Option Rule Review
Page 9 of 9

We thank the Federal Trade Commission for its consideration of these comments.

Sincerely yours,

Elliot Burg
Assistant Attorney General

Enc.



Exhibit 1

Because of the prominent use of the terms "FREE" or "RISK-FREE TRIAL OFFER" in the ads and the small print used to disclose the continuity and delayed billing features, consumers do not realize that upon the expiration of the limited trial period, they will be enrolled in a program that purports to provide a web-based service or ongoing shipments of the "free" product and will be charged on a continuing, periodic basis.

Many of the offerings promoted via trial conversion plans are services such as club memberships, which are particularly problematic since consumers never receive a tangible product and frequently are not even aware that they are enrolled in the clubs for months or years unless cryptic charges on their accounts tip them off.

Most consumers agree to free trials without any intention to be enrolled in auto-ship programs or web-based clubs and or to be charged in perpetuity.



Consumers fail to realize that they will automatically incur a charge or will pay an even greater amount within 20 to 30 days if they do not take affirmative action to return the unused portion of the "free" product or otherwise cancel the plan. Consumers are almost never not reminded of this obligation after the initial online transaction.

Throughout the transaction, the consumer is under the impression that the only charge he or she is authorizing is the shipping charge for the free sample.

The consumer's consent given at the outset of a trial period is not sufficient because the trial period can and does lull consumers into a state of forgetfulness.

Consumers are met with busy signals on retailers' phone lines and auto-response emails when they try to return unwanted product and cancel unwanted memberships, making it very difficult to meet the return deadlines set by the retailer.