UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                      )
BRUCE KEITHLY, *et al.*,                               )        No. C09-1485RSL
                                                      )
                              Plaintiffs,              )
                                                      )
              v.                                       )        ORDER GRANTING IN PART
                                                      )        INTELIUS' MOTION FOR
INTELIUS INC., *et al.*,                               )        JUDGMENT ON THE PLEADINGS
                                                      )
                              Defendants,              )
              v.                                       )
                                                      )
ADAPTIVE MARKETING, LLC,                               )
                                                      )
                       Third Party Defendant.          )
_____)

        This matter comes before the Court on "Defendants' Rule 12(c) Motion for

Judgment on the Pleadings to Dismiss Plaintiffs' Amended Consolidated Class Action

Complaint."  Dkt. # 70.  Plaintiffs assert that defendants Intelius Inc. and Intelius Sales, LLC

(collectively, "Intelius"), used deceptive marketing practices to sign individuals up for

subscription services offered by Intelius and/or third-party defendant Adaptive Marketing, LLC,

between July 17, 2007, and the present.  Intelius seeks a summary determination that

(a) plaintiffs have failed to plead fraud adequately, (b) defendants' advertising was not deceptive

under the Washington Consumer Protection Act ("CPA"), RCW 19.86 *et seq.*, (c) plaintiff

Donovan Lee lacks standing to pursue a CPA claim, (d) plaintiffs cannot maintain a nationwide

ORDER GRANTING IN PART
INTELIUS' MOTION FOR
JUDGMENT ON THE PLEADINGS

1   class action under the CPA, (e) plaintiffs' unjust enrichment claim fails as a matter of law,

2   (f) defendants are not subject to the Stored Communications Act, 18 U.S.C. § 2701, *et seq.*, and

3   (g) there is no substantial controversy that could justify declaratory relief under 28 U.S.C.

4   § 2201.

5   **STANDARD AND SCOPE OF REVIEW**

6            Where, as here, a motion under Fed. R. Civ. P. 12(c) is used to raise the defense of

7   failure to state a claim, the Court's review is the same as it would have been had the motion been

8   filed under Fed. R. Civ. P. 12(b)(6). McGlinchy v. Shell Chem. Co., 845 F.2d 802, 810 (9th Cir.

9   1988).[1]  In the context of a motion to dismiss on the pleadings, the allegations of the complaint

10  are taken in the light most favorable to plaintiffs.  In re Syntex Corp. Sec. Litig., 95 F.3d 922,

11  925-26 (9th Cir. 1996); LSO, Ltd. v. Stroh, 205 F.3d 1146, 1150 n.2 (9th Cir. 2000).  A claim

12  will not be dismissed unless the allegations in support thereof, taken as a whole, fail to give rise

13  to a plausible inference of actionable conduct.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544,

14  556 (2007).

15           Although the Court generally confines its review to the contents of the complaint

16  (Campanelli v. Bockrath, 100 F.3d 1476, 1479 (9th Cir. 1996)), Ninth Circuit authority allows

17  the Court to consider documents referenced extensively in the complaint, documents that form

18  the basis of plaintiffs' claim, and matters of judicial notice when determining whether the

19  allegations of the complaint state a claim upon which relief can be granted (United States v.

20  _____

21      [1]  Plaintiffs argue that defendants' motion is premature because Adaptive Marketing, LLC, has
    not yet answered the third-party complaint filed by Intelius.  Rule 12(c) states that a party may move for
22  judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial . . . ."
    All allegations in support of and defenses against plaintiff's claims have been asserted:  the pleadings
23  regarding the issues raised in defendants' motion are, in fact, closed for purposes of Rule 12(c).
    Adaptive Marketing's response to Intelius' demand for indemnification/contribution is not relevant to,
24  much less dispositive of, any of plaintiffs' claims, and the Court is able to determine whether judgment
    on the pleadings is appropriate based on the existing record.
25

26  ORDER GRANTING IN PART
    INTELIUS' MOTION FOR
    JUDGMENT ON THE PLEADINGS          -2-

1    Ritchie, 342 F.3d 903, 908-09 (9th Cir. 2003)).  Both plaintiffs and defendants have submitted

2    extra-pleading documents for the Court's consideration.  Four categories of documents are

3    discussed below.

4    **A. Screen Shots**

5            Defendants urge the Court to take judicial notice of the archived and regenerated

6    screen shots of the pages plaintiffs would have seen when they purchased Intelius products on

7    the internet.  Pursuant to Fed. R. Ev. 201, the Court may take judicial notice of adjudicative facts

8    if they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable

9    of accurate and ready determination by resort to sources whose accuracy cannot reasonably be

10   questioned."  The screen shots are not generally known:  the webpages have been removed from

11   the internet and now exist, in whole or in part, only within defendants' archives.  Nor is the

12   Court (or plaintiffs) able to resort to any source other than defendants to determine the accuracy

13   of these documents.  There is no indication that plaintiffs downloaded each of the webpages they

14   viewed as part of the transactions or that this information was maintained by an uninterested

15   third-party that can attest to its provenance and accuracy.  Because the effect of judicial notice is

16   to deprive a party of an opportunity to conduct discovery and rebut the moving party's evidence,

17   the Court's inability to confirm the accuracy of the facts presented in these documents suggests

18   that judicial notice is not appropriate.  See Rivera v. Philip Morris, Inc., 395 F.3d 1142, 1151

19   (9th Cir. 2005).

20           In the alternative, defendants argue that the screen shots should be considered

21   under the doctrine of incorporation by reference because plaintiffs' claims rely on the content of

22   the webpages and the authenticity of the pages cannot reasonably be questioned.  See Branch v.

23   Tunnell, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds, Galbraith v. County of

24   Santa Clara, 307 F.3d 1119, 127 (9th Cir. 2002).  It is clear that plaintiffs' claims are based on

25

26   ORDER GRANTING IN PART
     INTELIUS' MOTION FOR
     JUDGMENT ON THE PLEADINGS          -3-

1   the design of and statements made on Intelius' webpages and that review of the actual pages,

2   rather than plaintiffs' description of those pages, would be helpful in ascertaining whether they

3   are likely to deceive consumers.  Plaintiffs object to their consideration, however, on the ground

4   that defendants have failed to show that the webpages are accurate and authentic.  Defendants

5   have provided the declaration of a senior manager in their consumer business unit to explain

6   what the screen shots are, where they were maintained in the normal course of Intelius' business,

7   how they are related to the transactions at issue in this litigation, and (where necessary) the steps

8   taken to regenerate the webpages so the Court can review them in the form that was presented to

9   plaintiffs.  Plaintiffs suggest that some or all of these statements might not be true and point out

10  that the recreation of some of the webpages may have introduced error.  Plaintiffs have not,

11  however, presented any evidence to contradict defendants' representations and do not

12  affirmatively identify any discrepancies between the webpages they saw and those presented by

13  defendants with their motion.  For purposes of this motion, the Court finds that the accuracy and

14  authenticity of the screen shots are not reasonably in dispute.[2]

15

16

17

18

19

---

20      [2]  In addition to challenging the accuracy of the screen shots submitted by defendants, plaintiffs
    also argue that the screen shots are incomplete in that they do not reflect plaintiffs' entire experience
21  while on Intelius' website.  A review of the screen shots submitted shows that the representations made
    to consumers, the design elements used on each page, and even the nature and sequence of the pages
22  were not uniform.  In addition, the screen shots presented do not track the initial purchase of the Intelius
    product, nor are they presented as one would see them on a normal computer screen (*i.e.*, with content
23  hidden beyond the margins of the screen, visible only by scrolling down or across).  The Court's
    consideration of these documents in the context of this motion is without prejudice to plaintiffs' ability
24  to conduct discovery regarding the accuracy and authenticity of the screen shots presented by
    defendants.
25

26  ORDER GRANTING IN PART
    INTELIUS' MOTION FOR
    JUDGMENT ON THE PLEADINGS          -4-

**B.  Documents Referenced in the Complaint**

Plaintiffs have submitted the terms and conditions governing their use of the Intelius website, reports and statements presented to the Senate Committee on Commerce, Science, and Transportation in November 2009, and an Federal Trade Commission ("FTC") report regarding "Negative Options."  These documents are referred to, if not quoted, in plaintiffs' complaint, and defendants have not challenged their authenticity.  For purposes of determining whether the allegations of the complaint raise a plausible inference of unlawful conduct, the Court will consider these documents.

**C.  Filings in King County Superior Court and FTC Guidance Documents**

The Court will take judicial notice of (1) the complaint filed by the State of Washington against Intelius Inc. in King County Superior Court, (2) the Consent Decree filed by the parties in that matter, and (3) guidance documents published by the FTC.  Defendants have not challenged the authenticity of these documents, and their existence and contents can be ascertained by resort to public records.  When determining whether plaintiffs have asserted a plausible claim for relief, the Court will consider these documents.  The findings and opinions contained therein have not been conclusively established, however, and defendants may contest their accuracy in this litigation.

**D.  Correspondence with Government Agencies**

Plaintiffs have submitted two letters for consideration, one of which is addressed to the Washington State Office of the Attorney General and the other is addressed to the Secretary of the Federal Trade Commission.  Plaintiffs have not identified, and the Court has not found, any references to these letters in their complaint.  Nor have plaintiffs shown that these letters are maintained by the governmental agencies to which they were directed in a manner that would justify judicial notice.

ORDER GRANTING IN PART
INTELIUS' MOTION FOR
JUDGMENT ON THE PLEADINGS                     -5-

1    For purposes of this motion, the allegations of the complaint, the screen shots

2 submitted by defendants, and Exhibits A, B, C, D, E, G, H, and I to the Declaration of Mark A.

3 Griffin (Dkt. # 82) will be accepted as true and construed in the light most favorable to plaintiffs.

4 LSO, Ltd. v. Stroh, 205 F.3d 1146, 1150 n.2 (9th Cir. 2000).[3]

5                              **BACKGROUND**

6    Intelius is an on-line information service.  Customers can go to Intelius' website

7 and, among other things, purchase background checks, search for individuals, and identify

8 callers by cell phone number.  Since its creation in January 2003, Intelius has processed more

9 than sixteen million orders for over four million different customer accounts.  Use of Intelius'

10 services is subject to certain terms and conditions, including an agreement that the use is

11 governed by Washington law.

12    When a customer purchases an Intelius service, he or she is offered an array of

13 additional products and services, some of which are offered by Intelius and some of which are

14 offered by third parties, such as Adaptive Marketing.  A single customer can be subjected to a

15 number of different marketing techniques within a single transaction, all of which are designed

16 to result in the sale of products and/or services other than the one that the customer initially

17 sought.  In plaintiff Keithly's case, he was offered four additional services using three different

18 marketing techniques.[4]  One of the marketing techniques involves the presentation of a list of

19

20    [3] The Court has also considered the parties' supplemental submissions (Dkt. # 89, # 103, and

21 # 108) and plaintiff's request to strike the cases submitted by defendants.  Plaintiff's request to strike
(Dkt. # 92) is DENIED.

22

23    [4] As noted above, the screen shots provided by defendants reflect only part of Keithly's
interaction with Intelius' website.  Whether Keithly received other offers for products and services as he

24 navigated through the site cannot be ascertained on the current record.  The documents produced
regarding plaintiff Bebbington's transactions show that he was offered seven additional

25 services/products using four different marketing techniques.

26 ORDER GRANTING IN PART
INTELIUS' MOTION FOR
JUDGMENT ON THE PLEADINGS         -6-

1   "select add-ons" in a three-column menu.  The menu describes the offered services, identifies the

2   cost for each service, and has a box to check if the customer wants to add the service to their

3   order.  This technique is fairly straightforward and does not form the basis of any of plaintiff's

4   claims.

5           Another marketing technique offers a price reduction on the product/service that

6   the consumer originally sought if the customer purchases an additional service.  After the

7   customer has selected the desired service (in Keithly's case, a background report), he is told that

8   a search is being performed and that certain categories of information are available.  The next

9   screen reflects his order as it currently stands, but provides two pricing options.  The first

10  column states "$10 off" in white writing in a blue circle, followed by "$39.95" in a gray bar,

11  followed by "Add to Cart" in white writing in a red bar, followed by "Special Price with Identity

12  Protect" in blue writing.  The reference to "Identity Protect" is unexplained and in smaller font

13  than the rest of the disclosures.  The second column follows the same graphic patterns, but states

14  "$49.95," "Add to Cart," and "Limited Time Offer."  The consumer is basically given a choice

15  between paying $39.95 for the desired service plus the mysterious "Identity Protect" or paying

16  $49.95 for the service alone.[5]

17          If the consumer chooses the cheaper option, the next screen is dominated by a

18  boxed summary of the types of information provided in a background report and the services

19  included in "Identity Protect."  The "Continue" button is the most notable design element on the

20

21          [5] In plaintiff Bebbington's case, after he selected the product he wanted and input the search
    criteria, he was presented with an additional three-column screen entitled "Select a Product or Special
22  Offer."  Two pricing options for the product he chose were presented in the first column.  The second
    and third columns touted two additional Intelius products, each of which could be purchased at a
23  discounted price "with FREE Identity Protect Trial."
          After completing his initial purchase, Bebbington requested additional People Search Reports.
24  The discounted pricing options were not offered on these later purchases, presumably because
    Bebbington had already signed up for Identity Protect when purchasing his first People Search Report.
25

26  ORDER GRANTING IN PART
    INTELIUS' MOTION FOR
    JUDGMENT ON THE PLEADINGS              -7-

page:  it is red with white writing, is located within the primary text box at the top center of the page, and immediately follows the "$10 off" and "$39.95" design elements described above. Under the "Continue" button, a gray button indicates that the customer may "Remove Identity Protect" and pay the regular price of $49.95.  At the bottom of the box, the details of the "Identity Protect" offer are provided:

> **Offer Details:**
> Click "Continue" button to accept this special offer price and activate your trial membership to take advantage of the great benefits that Identity Protect has to offer.  The membership fee of $19.95 per month will be charged/debited by Intelius.com to the credit/debit card you use today with Intelius.com after the 7-day trial.  Special Offer only available to Non Identity Protect Customer.

At the top right of the page, a box containing an order summary states:

> **1. Background Report**  **$39.95**
> *Identity Protect Discount.  You saved $10.00.*
> **2.** Identity Protect Trial  **$0.00**[6]
> **Total Charge**  **$39.95**
> <span style="color:green">Your Savings:  $10.00</span>

Under the order summary, but outside the box and in a slightly smaller font, is the following disclosure:

---

[6] The order summaries associated with plaintiff Bebbington's order, which were generated seven months after Keithly's order, state:

> 1. People Search Report  $0.95
>  *Identity Protect Discount. You saved $1.00.*
> 2. Identity Protect Trial  $0.00
>  *Cancel anytime.  After your trial, you will be billed $19.95 per month.*
>
>      Total $0.95
>     You Saved $1.00

ORDER GRANTING IN PART
INTELIUS' MOTION FOR
JUDGMENT ON THE PLEADINGS  -8-

1
2
3
4

> After your 7 day free trial, if you do not cancel your Identity Protect membership your credit card will be billed $19.95 and each month thereafter that you continue your membership.  You may cancel anytime.

5
6
7

> We are committed to protecting the information you provide.  Intelius is both Verisign Security Certified and McAfee Secure Certified.

8   Security-related logos fill in the bottom right of the webpage.

9          Once the customer clicks on the "Continue" button, there are no more

10  opportunities to remove "Identity Protect" from the order, no mention of the 7-day trial period or

11  the $19.95 monthly charge, and no instructions on how to cancel the service.  The order

12  summary described above appears three more times, each time stating that the "Identity Protect

13  Trial" costs $0.00.  On the next sequence of screens, the customer is offered two additional

14  services in the menu format described above, requested to sign into his or her account by

15  providing an email address and password, and prompted to input payment information which

16  will result in a "charge from Intelius for $39.95 for this purchase."  A red button with white

17  writing states "Confirm the Purchase and Show My Report."

18          At this point, the third (or, in Bebbington's case, fourth) marketing opportunity

19  arises.  Instead of showing the purchased report, the consumer is thanked and told that the "order

20  has been successfully completed."  In plaintiff Lee's case, a blue banner tells the consumer that

21  he can **"Take our 2009 Community Safety Survey and claim $10.00 CASH BACK when**

22  **you try Family Safety Report**."[7]  The "Community Safety Survey" is preceded by the

23

24          [7]  The services offered through this marketing technique apparently varied by time period.  The
25  screen shots provided by defendants market services called "24Protect Plus," "ValuMax,"

26  ORDER GRANTING IN PART
    INTELIUS' MOTION FOR
    JUDGMENT ON THE PLEADINGS           -9-

statement, "Complete the survey below and the short registration form to claim $10.00 Cash Back as a member of *Family Safety Report* FREE for 7 days (<u>Click Here for Details</u>)."  The survey has only two questions, the second of which has nothing to do with community safety and everything to do with billing.  A green banner at the top of a text box running down the left side of the screen states "Please type in your email address below," with yellow spaces for the email address and confirmation.  In the bottom left corner of the screen is a red "YES and show my report" button above a gray  "<u>No, show my report</u>" button.  The "No" button, which is the correct one to choose if the consumer wants to purchase only the product he initially intended to buy, barely stands out from the blue/gray background of the text box in which it is located.

The details of the Family Safety Report offer are strewn between these colored buttons and blocks in significantly smaller gray type.  If read, the consumer would understand that clicking the "YES and show my report" button would activate a 7-day free trial membership of Family Safety Report and allow him to claim the $10.00 cash back.  The consumer would also realize that if he failed to call the 1-800 number provided in the offer details within the 7-day trial period, he would be charged $19.95 per month, or the "then-current membership fee," for as long as he remained a member.  The disclosures also reveal that entry of the customer's email address would authorize the purveyor of Family Safety Report to charge/debit the account he had used to purchase the initial Intelius item.  No information is provided regarding the company that is offering this service.  The webpage contains the Intelius logo in the upper right corner, but the disclosures state that Intelius will securely transfer the customer's billing information "to Family Safety Report, a service provider of Intelius."

The products and services offered after the consumer has input his payment information were offered by third party defendant Adaptive Marketing.  Under a July 2007

"SavingsAce," and "People Search."

ORDER GRANTING IN PART
INTELIUS' MOTION FOR
JUDGMENT ON THE PLEADINGS                -10-

1  agreement between Intelius and Adaptive Marketing, Intelius provides Adaptive access to

2  consumers and receives revenue for each customer who accepts the offer of a free trial period.

3  By the end of the first quarter 2008, almost 40% of Intelius' revenue came from Adaptive.

4  When the 7-day trial period for an Adaptive product or service expires, the $19.95 monthly

5  charge placed on the consumer's credit card does not identify Adaptive Marketing as the source

6  of the charge and often consists of unintelligible abbreviations.  Pursuant to their agreement,

7  Intelius is prohibited from communicating with any customer with respect to an Adaptive

8  Marketing product or service without Adaptive's prior written consent.  Hundreds of

9  Washington consumers have unknowingly enrolled in Adaptive Marketing programs while

10  attempting to purchase an Intelius product.  Despite complaints to Intelius, many consumers

11  have been unable to obtain refunds from either Intelius or Adaptive.

12  **DISCUSSION**

13  **A.  Washington Consumer Protection Act ("CPA"), RCW 19.86 *et seq*.**

14            The Washington Consumer Protection Act prohibits "[u]nfair methods of

15  competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

16  RCW 19.86.020.  A private cause of action exists under the CPA if (1) the conduct is unfair or

17  deceptive, (2) occurs in trade or commerce, (3) affects the public interest, and (4) causes injury

18  (5) to plaintiff's business or property.  Hangman Ridge Training Stables, Inc. v. Safeco Title Ins.

19  Co., 105 Wn.2d 778, 780 (1986).  Defendants argue that plaintiffs have failed to allege unfair or

20  deceptive conduct.[8]

21  _____

22       [8]  Defendants also argue that plaintiffs have failed to satisfy the heightened pleading
   requirements of Fed. R. Civ. P. 9(b).  Rule 9(b) applies to all averments of fraud in federal court,

23  whether arising out of state or federal law.  Vess v. Ciby-Giegy Corp., 317 F.3d 1097, 1103 (9th Cir.

24  2003).  Where fraud is not an essential element of a claim, as is the case here (see Hangman, 105 Wn.2d
   at 785), Rule 9(b) nevertheless applies if plaintiff chooses to allege that the defendant has engaged in

25  fraudulent conduct (Vess, 317 F.3d at 1103).  For the most part, plaintiffs have simply described

26  ORDER GRANTING IN PART
   INTELIUS' MOTION FOR
   JUDGMENT ON THE PLEADINGS          -11-

1        In order to satisfy the first element of a CPA claim, plaintiff need not show that

2   defendants intended to deceive or defraud, but only that the practice had the capacity to deceive

3   a substantial portion of the purchasing public.  Robinson v. Avis Rent A Car Sys., Inc., 106 Wn.

4   App. 104, 115 (2001).  For purposes of this motion, the Court assumes that whether a particular

5   act has the capacity to deceive is a question of fact, to be determined by the Court only if the

6   evidence could support only one reasonable verdict.  See Triton Energy Corp. v. Square D Co.,

7   68 F.3d 1216, 1221 (9th Cir. 1995).[9]  When determining whether conduct has the capacity to

8   deceive under the CPA, the Court considers federal cases and administrative rulings regarding

9   the construction of similar statutes and similar conduct.  Panag, 166 Wn.2d at 47 (citing RCW

10  19.86.920).

11       Under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), an

12  act or practice is deceptive if "first, there is a representation, omission, or practice that, second,

13  is likely to mislead consumers acting reasonably under the circumstances, and third, the

14  representation, omission, or practice is material."  Fed. Trade Comm'n v. Pantron I Corp., 33

15  F.3d 1088, 1095 (9th Cir. 1994) (quoting and adopting standard in Cliffdale Assocs., 103 F.T.C.

16  110, 164-65 (1984)).  Because deception may result from the use of statements not technically

17  _____

18  defendants' business practices, marketing methods, and revenue streams.  Whether those practices and
    methods are deceptive can be determined without reference to Intelius subjective intent.  For purposes of
19  this motion, plaintiffs' allegations regarding Intelius' state of mind (such as ¶ 25) have not been
    considered.
20

21       [9] Although issues such as the capacity to deceive and what a reasonable person would do in
    certain circumstances are generally considered issues of fact, the Washington Supreme Court recently
22  held that "[w]hether a particular act or practice is 'unfair or deceptive' is a question of law."  Panag v.
    Farmers Ins. Co. of Wash., 166 Wn.2d 27, 27 (2009).  But see Guijosa v. Wal-Mart Stores, Inc., 144
23  Wn.2d 907, 921 (2001) (noting that "the jury was free to determine what could constitute an unfair and
    deceptive act or practice . . .").  Because only defendant has requested dispositive relief (and neither
24  party has addressed this interesting issue of state law), the Court will limit its analysis to whether a
    reasonable jury could find that the undisputed conduct alleged by plaintiffs is deceptive.
25

26  ORDER GRANTING IN PART
    INTELIUS' MOTION FOR
    JUDGMENT ON THE PLEADINGS          -12-

false or which may be literally true, the test under Section 5 and the CPA is whether the net impression created by a solicitation, viewed as a whole rather than as individual parts, is deceptive.  Fed. Trade Comm'n v. Cyberspace.com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006); Panag, 166 Wn.2d at 50.  In evaluating the tendency of a sales pitch to deceive, the Court "should not look to the most sophisticated readers but rather to the least."  Panag, 166 Wn.2d at 50 (quoting Jeter v. Credit Bureau, Inc., 760 F2d 1168, 1174 (11th Cir. 1985)).

Having considered the pleadings and papers submitted by the parties in the light most favorable to the plaintiffs, the Court finds that a reasonable jury could conclude that two of the three marketing techniques challenged by plaintiffs are deceptive in that they have the capacity to deceive a substantial portion of the purchasing public.

**1.  Keithly's Experience**

After selecting an Intelius background report for purchase and clicking at least one "Continue" button in order to obtain it, Keithly was presented with another "Continue" button at what defendants label Step 4 of his transaction.  At that point, "Identity Protect" had already been added to his order, but without any meaningful disclosure regarding the service or its price. The details of the Identity Protect offer were revealed only after the product was already in Keithly's cart, putting the onus on him to remove it without making it clear that he had "agreed" to purchase a second product.[10]  Although the details of the offer (including the pricing structure)

---

[10]  This particular technique is telling.  Rather than touting the benefits of Identity Protect and making an effort to convince the consumer that he wants, if not needs, this service, Intelius uses the bare promise of a price reduction to slip Identity Protect into the consumer's cart.  Had Intelius been attempting to identify customers who would knowingly choose to purchase Identity Protect, the solicitation would have been formatted very differently to highlight the service that was being offered and ensure a knowing selection of the service.  Instead, Intelius developed a multi-step system through which there was a significant likelihood that consumers, having unknowingly added Identity Protect to their carts, would not take the necessary steps to remove it, resulting in the purchase of an unwanted item.

ORDER GRANTING IN PART
INTELIUS' MOTION FOR
JUDGMENT ON THE PLEADINGS          -13-

1  were revealed twice at Step 4, they were the least conspicuous elements on the page.  They are in

2  the same font size and type as the information around them and are placed in such a way that a

3  reasonable consumer could skim the page, realize that the surrounding materials are unimportant

4  to the goal of obtaining a background report, and miss the crucial details of the Identity Protect

5  offer.

6        The elements that are most noticeable at Step 4 convey the impression that the

7  consumer is purchasing a background report for $39.95 (a savings of $10.00) and that Identity

8  Protect costs nothing.  A reasonable consumer in Keithly's position could believe that clicking

9  the red "Continue" button would answer his every need:  it would allow him to purchase the

10 product he wanted for a total of $39.95.  Nothing about the key design elements would suggest

11 that Keithly should be hunting for other terms and conditions and, even if he did, the details of

12 the offer blend in with the description of "Identity Protect Benefits" and the site security

13 information to such an extent that he could miss them.  The consumer could reasonably believe

14 that clicking "Continue" would complete the order he had initiated at least four screens ago.  He

15 would be incorrect, as Keithly later found out, but given the design of this particular screen and

16 the steps of the transaction up to this point, a reasonable consumer could click "Continue"

17 without realizing that he had purchased a second product and was authorizing future charges to

18 his credit/debit account.

19       Once Keithly navigated away from the page labeled Step 4, there were no other

20 opportunities to remove Identity Protect from his order and no further disclosures regarding the

21 nature of the subscription service or its pricing structure.  In the course of an internet interaction

22 that involved at least ten screens, the $19.95 monthly subscription fee was disclosed only at Step

23 4 and was not highlighted in any way.  After Step 4, there were no other warnings that Identity

24

25

26 ORDER GRANTING IN PART
   INTELIUS' MOTION FOR
   JUDGMENT ON THE PLEADINGS        -14-

1    Protect would cost $19.95/month after the first seven days or that Keithly was authorizing future

2    charges against his credit/debit account.  Instead, every order summary presented between Step 4

3    and the end of the transaction indicated that Identity Protect would cost $0.00.  When Keithly

4    was finally asked for his payment information, he was expressly told that he was authorizing a

5    charge of $39.95.  By the time Keithly was permitted to complete his purchase (at least seven

6    screens after he first attempted to initiate the search), there was nothing on the screen to suggest

7    that Keithly was agreeing to pay for anything other than the background check he had originally

8    sought.  At no point during the transaction did Intelius provide information regarding how to

9    cancel the Identity Protect subscription.  Nor did the transaction confirmation contain

10   information that would put Keithly on notice that he had purchased more than he intended:  is

11   stated simply "Thank You your order has been successfully completed."

12            Not everyone would be fooled by this marketing technique.  Some individuals

13   would understand that obtaining something for nothing is a rare event and, at Step 3, would

14   decline the offer of a $10.00 discount on the assumption that there was a catch.  Others would

15   take the time to read every word of the screen shot labeled Step 4 and realize that the advertised

16   $0.00 price tag for Identity Protect would jump to $19.95 per month after the first seven days.

17   But not everyone is so wary and/or detail-oriented, nor is the CPA designed to protect only those

18   who need no protection.  The capacity of a marketing technique to deceive is determined with

19   reference to the least sophisticated consumers among us.  The FTC has noted that on-line

20   consumers do not read every word on a webpage and advises advertisers that they must draw

21   attention to important disclosures to ensure that they are seen.  Decl. of Mark A. Griffin (Dkt.

22   # 82), Ex. I at 5.  This is particularly important when the consumer has no reason to be looking

23   for, and therefore is not expecting to find, a disclosure.  Id.  It is not unreasonable for a consumer

24   to assume that he can safely complete an uncomplicated internet transaction without fear of

25   being swindled or saddled with unwanted goods and services if he reviews the order summary

26   ORDER GRANTING IN PART
     INTELIUS' MOTION FOR
     JUDGMENT ON THE PLEADINGS            -15-

1    and clicks on the link or button that purportedly completes the purchase.

2         Consumers who access the Internet can quickly access the sites of thousands of
3         different vendors.  The reason why consumers can comfortably browse and
          window shop without having to delve into the fine print governing each vendor's
4         site is that, based on experience, they know that until they follow some well-
5         established steps, they are not financially bound to the vendor.  In almost all
          consumer transactions online, consumers select a product or service and complete
6         a multi-step checkout process that requires entering a preferred payment method as
          well as shipping and billing addresses.  When the transaction is completed,
7         consumers are presented with a confirmation page with details of the completed
8         transaction.  This norm of online commerce is what allows consumers to safely
          explore the web, become informed about advertisement offers and complete
9         transactions online.

10   Decl. of Mark A. Griffin (Dkt. # 82), Ex. C at 2.

11        The marketing technique discussed here, however, does not comport with these
12   expectations.  In Keithly's case, a service was added to the consumer's order based on nothing
13   more than the selection of a cheaper pricing option.  The true price of the item was disclosed on
14   a single page in a subdued and easily-overlooked manner.  The order summary misleadingly and
15   repeatedly stated that the cost of the added service is $0.00, and the payment authorization was
16   expressly limited to the amount the consumer intended to pay for the originally-sought item.
17   The confirmation page contained no information regarding what was purchased, the future
18   charges, or how to cancel the subscription service.  This technique, combined as it was with two
19   other marketing techniques also designed to foist additional products or services on the
20   consumer, actually deceived Keithly and, according to the Attorney General, other Washington
21   consumers.  Because this marketing scheme presents a subscription service to the consumer in
22   such a way that a substantial portion of the population is not even aware that an offer has been
23   made, much less accepted, one could reasonably find that this technique has the capacity to
24   deceive.
25

26   ORDER GRANTING IN PART
     INTELIUS' MOTION FOR
     JUDGMENT ON THE PLEADINGS            -16-

**2. Bebbington's Experience**

Bebbington's experience with Intelius was substantially similar to Keithly's with one material exception. After Identity Protect was added to Bebbington's order at Step 3, the "Order Summary" box on the next four screens stated not only that Identity Protect cost $0.00, but also that it could be "Cancel[led] anytime. After your trial, you will be billed $19.95 per month." This disclosure was on the screen when Bebbington provided his payment information. Despite all of the other design and transactional elements that tend to make the Identity Protect offer deceptive (as discussed above with regards to Keithly), a reasonable consumer could not ignore or skim over the repeated disclosure of the $19.95 monthly cost, especially when it was conspicuously presented at the moment the consumer was required to authorize the purchase. The disclosure is by no means perfect. As plaintiff's counsel pointed out at oral argument, the reference to "billing" is ambiguous and might suggest to the consumer that he would receive an invoice or bill for the service at the end of the trial period, at which point he would have an opportunity to decide whether to continue the subscription. Perfection is not the standard, however: Intelius merely has to advertise and sell its goods in a manner that is not likely to deceive a substantial portion of the purchasing public. Given that standard, the Court finds that Bebbington was not, as a matter of law, subjected to a deceptive practice.

**3. Lee's Experience**

The screen shots regarding Lee's transaction with Intelius are incomplete. The Court assumes, for purposes of this motion, that Lee submitted his payment information on a form similar to that presented to Keithly and Bebbington, then clicked the "Confirm the Purchase and Show My Report" button. Lee's purchase was confirmed with a brief "thank you" message. The purchased report was not forthcoming, however. Instead, Lee was presented with a banner stating "Take our 2008 Community Safety Survey and claim $10.00 CASH BACK when you try Family Safety Report." If the consumer is not interested in Family Safety Report,

ORDER GRANTING IN PART
INTELIUS' MOTION FOR
JUDGMENT ON THE PLEADINGS          -17-

1   he would likely scan the page for a button or link that would, hopefully, reveal the report he had

2   just purchased.[11]   A text box down the left side of the page contains all of the dominant design

3   elements.  Those elements instruct the consumer to enter and confirm his email address, then

4   provide a choice of a red "YES And show my report" button or a smaller, gray "No, show my

5   report" button.

6            A careful or suspicious consumer might conclude that further investigation is

7   necessary because both buttons will apparently lead to the desired report.  A less careful, but not

8   unreasonable, consumer could conclude that providing Intelius with his email address and

9   clicking the big red "YES" button would reveal the report he had been trying to get for an

10  undisclosed number of screens.  Because the consumer never selects an additional product or

11  service and is not asked for his account information, he could reasonably believe, based on his

12  past experiences with internet transactions, that there would be no unpleasant surprises on his

13  credit/debit account.

14           He would be wrong.  By providing an email address, the consumer is authorizing

15  Intelius to transfer his account information to the undisclosed third party who is offering the

16  Family Safety Report service.  By clicking the "YES And show my report" button, the consumer

17  triggers a seven day free trial of Family Service Report, after which his account will be charged

18  $19.95 per month unless he calls the toll free number provided on the screen.  Although all of

19

20           [11]   Because of the way the survey is presented, a reasonable consumer could answer the survey

21  questions even if he did not intend to purchase Family Safety Report.  The initial impression created by
    the advertisement is that completing the survey is a condition precedent to receiving $10.00 cash back.

22  This impression is incorrect, however.  The fine print reveals that the survey is actually just a
    distraction, an operational nullity:  the consumer obtains the right to claim the $10.00 by signing up for a

23  seven day trial subscription of Family Safety Report, not by taking the survey.  In the context of this
    marketing technique, the less suspicious among us could reasonably, but wrongly, complete the survey

24  in an effort to obtain a $10.00 rebate and, as discussed above, follow the other directions on the screen

25  in an effort to obtain the previously-purchased report.

26  ORDER GRANTING IN PART
    INTELIUS' MOTION FOR
    JUDGMENT ON THE PLEADINGS          -18-

1   this information is disclosed in small gray text on the page, the consumer may not even know

2   that he is in the midst of a purchase that requires his care and attention.  Without some reason to

3   look for additional disclosures, a reasonable consumer could miss the text while focusing on the

4   design elements that are most likely to reveal the report he has already purchased.  None of the

5   normal cues related to a consumer transaction are presented:  no product is selected, no order

6   summary is provided, no payment information is exchanged, and no confirmation of the

7   transaction is generated.  By providing an email address and clicking the red button, the

8   consumer will have purchased an on-going service from an undisclosed entity.  Unless the

9   consumer had the forethought to print the webpage before moving on, he will have no idea how

10  to contact the purveyor of the service once the subscription fee starts showing up on his account

11  statement.  Taken in the context of the overall Intelius transaction, it is not surprising that a

12  substantial number of Washington citizens unknowingly "accepted" the offered subscription

13  service.  One could reasonably find that this technique has the capacity to deceive under the

14  CPA. [12]

15

16      [12]  The Court respectfully disagrees with the analyses and conclusions of Baxter v. Intelius, Inc.,

17  2010 WL 3791487 (C.D. Cal. Sept. 16, 2010), and In re VistaPrint Corp. Marketing and Sales Practice
    Litig., 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009), aff'd sub nom. Bott v. VistaPrint USA Inc., 392

18  Fed. Appx. 327 (5th Cir. 2010).  Those decisions focus primarily on the language of the disclosure to
    determine whether the offer was deceptive.  Such a truncated analysis is improper under the Washington

19  Consumer Protection Act because the Court must view the marketing technique as a whole and in
    context before determining whether it has the capacity to lead consumers astray.  The issue is not, as

20  VistaPrint suggests, whether or not consumers should be held to terms that they declined to read.  The
    issue is whether a reasonable consumer could have been unaware that there was a bargain in the offing,

21  such that the failure to look for and review the terms of the unexpected bargain would be justified.  Nor
    is the Baxter court's point that the consumer "affirmatively accepted" the offer details when he entered

22  his email address persuasive.  The entry of an email address was used as a proxy for a number of
    standard internet practices (including the addition of the product to the cart, the presentation of an order

23  summary, and the request for payment information).  While the offer details and the entry of the
    consumer's email co-exist on one page, the pieces of the transaction are presented in such a way that a

24  reasonable consumer could think he was simply jumping through the necessary hoops to obtain his

25

26  ORDER GRANTING IN PART
    INTELIUS' MOTION FOR
    JUDGMENT ON THE PLEADINGS          -19-

**B.  Standing Under the Consumer Protection Act**

Plaintiff Lee is a resident of Ohio.  There is no indication that he was in Washington when he encountered Intelius' allegedly deceptive website or when he unknowingly subscribed to Family Safety Report.  Lee therefore lacks standing to assert a CPA claim because he cannot show that the alleged deceptive conduct affects the people of Washington.  See RCW 19.86.010(2) (defining "trade" or "commerce" as "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington").  Lee's allegations may support a finding that Intelius' conduct affected a resident of another state, but that does not satisfy the statutory or jurisdictional limits of the CPA.  Because "nothing in [the law of Washington] indicates that CPA claims by nonresidents for acts occurring outside of Washington can be entertained under the statute," Lee's CPA claim must be dismissed.  Schnall v. AT&T Wireless Servs., Inc., 168 Wn.2d 125, 142 (2010).[13]  The same analysis applies to the claims of all nonresident members of the proposed class.

**C.  Unjust Enrichment**

Plaintiffs allege that Intellius has obtained significant revenues, either directly from plaintiffs or through third party defendant Adaptive Marketing, that in all fairness should be returned to plaintiffs.  Plaintiffs allege that Intelius knew that some of the "purchases" made by its customers were unknowing and that retention of the money it was collecting directly or indirectly would be unjust.  Plaintiffs have adequately alleged facts supporting all of the

---

purchased report.

[13]  Plaintiffs argue that the choice of law provision in Intelius' terms and conditions of use conveys standing under the CPA.  Plaintiffs do not explain how a contractual agreement between private parties can expand the statutory and jurisdictional limits discussed in Schnall.  Nor have they identified any case law that would support their theory.  While plaintiffs may have a contractual right to the protections of the CPA, the breach of that right would result in a breach of contract claim, not a direct claim under a statute that does not, by its terms, apply.

ORDER GRANTING IN PART
INTELIUS' MOTION FOR
JUDGMENT ON THE PLEADINGS                    -20-

1  elements of an unjust enrichment claim under Washington law:  (1) defendants received a

2  benefit, (2) at plaintiffs' expense, and (3) the circumstances would make it unjust for Intelius to

3  retain the benefit without payment.  Young v. Young, 164 Wn.2d 477, 484-85 (2008).[14]

4  **D.  Stored Communications Act, 18 U.S.C. § 2701, et seq.**

5          Plaintiffs assert that Intelius violated the Stored Communications Act ("SCA")

6  when it disclosed the contents of a communication stored by Intelius, namely the billing

7  information provided by plaintiffs, to third party defendant Adaptive Marketing.  The SCA

8  applies to "electronic communication services," defined as "any service which provides to users

9  thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).

10 Intelius is not an internet service provider, a telecommunications company, or a public carrier of

11 any kind.  Although it uses electronic communications to conduct its business on the internet, it

12 does not provide the wire or electronic communication services utilized by its customers and is

13 therefore not subject to the SCA.

14                              **CONCLUSION**

15         For all of the foregoing reasons, defendants' motion to dismiss is GRANTED in

16 part and DENIED in part.  The Consumer Protection Act claims of nonresident plaintiffs fail as a

17 matter of law, as do plaintiffs' Stored Communications Act claims.  In addition, the Identity

18 Protect offer that was presented to plaintiff Bebbington, while not perfect, is not unfairly

19 deceptive because the pricing structure was conspicuously and repeatedly disclosed during the

20 transaction, including at the time Bebbington was required to enter his payment information.

21 _____

22       [14]  Defendants' citation to Young for the proposition that the benefit must be conferred upon
   defendant directly "by the plaintiff" is misleading.  The passage quoted by defendants is actually taken
23 from an earlier Court of Appeals case.  The Supreme Court's own statement of the elements of an unjust
   enrichment claim does not include the reference to "by the plaintiff."  Young, 164 Wn.2d at 484-85.
24 While the Court has no doubt that some benefits are simply too remote to form the basis of an unjust
   enrichment claim, that is not the case here.
25

26 ORDER GRANTING IN PART
   INTELIUS' MOTION FOR
   JUDGMENT ON THE PLEADINGS          -21-

1    Plaintiffs' other Consumer Protection Act claims, their unjust enrichment claim, and their claim

2    for declaratory relief may proceed.

3

4         Dated this 8th day of February, 2011.

5

6                                                Robert S. Lasnik
                                                 United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   ORDER GRANTING IN PART
     INTELIUS' MOTION FOR
     JUDGMENT ON THE PLEADINGS            -22-