UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

```
                              )
BRUCE KEITHLY, DONOVAN LEE,   )
EDITH ANNA CRAMER, and MATTHEW)
BEBBINGTON, individually and on)
behalf of all others similarly)
situated,                     )
                              ) CASE NO. CO9-1485RSL
        Interim Lead Plaintiffs, )
v.                            ) SEATTLE, WASHINGTON
                              ) February 3, 2011
INTELIUS, INC., A Delaware    )
Corporation; and INTELIUS SALES, ) MOTION TO DISMISS
LLC, a Nevada Limited Liability)
Company,                      )
                Defendants,   )
v.                            )
                              )
ADAPTIVE MARKETING, LLC, a    )
Delaware Limited Liability Company,)
                              )
        Third Party Defendant, )
                              )
                              )
```

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

 For the Plaintiff:     VICTORIA S. NUGENT


 For the Defendant:     ARTHUR W. HARRIGAN


 Reported by:           NANCY L. BAUER, CCR, RPR
                        Federal Court Reporter
                        (206) 370-8506
                        nancy_bauer@wawd.uscourts.gov

February 3, 2011                                    9:00 a.m.

PROCEEDINGS
_____

THE CLERK:  CO9-1485L, Bruce Keithly, et al. v.

Intelius, Inc., et al.  Counsel, please make your appearances

for the record.

MS. NUGENT:  For plaintiffs, Your Honor, Victoria

Nugent, and I'm joined today by my colleague, Karin Swope,

and our client, Bruce Keithly.

THE COURT:  Okay.  Thank you.  And the next row?

MR. GRIFFIN:  Mark Griffin of Keller Rohrback.

MS. CASE:  Whitney Case, Keller Rohrback.

THE COURT:  Thank you.

MR. HARRIGAN:  Good morning.  Arthur Harrigan

representing Intelius.  I'm here with my partner, Tyler

Farmer, and Mr. Bill Beaver, Intelius' general counsel.

THE COURT:  We are here on Intelius's motion to

dismiss.  I know we have a separate motion about judicial

notice and the like.  I don't really want to hear a lot of

argument on the judicial notice thing.  I'm going to consider

the screen shots that were submitted for purposes of the

motion here today.  I know they're disputed, generally, by

plaintiff, although plaintiff hasn't presented any contrary

versions of it, as has happened in some cases.  But suffice

it to say, for moving-forward purposes, I'm going to consider

this case from the perspective of what Intelius has submitted

1    was in effect at that time.

2        So, Mr. Harrigan?

3            MR. HARRIGAN:  Thank you, Your Honor.  Your Honor,

4    I'd like to start with -- go in chronological order,

5    essentially, and start with the Adaptive ad of June 19th,

6    2008.  And with the sort of opening point that an ad that

7    was -- two ads that were less clear than the one at issue in

8    this case, which I'll show you, demonstrate in a second, have

9    been approved by three courts in two cases as unequivocally

10   not misleading, and the court knows what those cases are.

11       In the *VistaPrint* case, which is the first one, there was

12   another element in common with this case, which is that the

13   complaint tended to be stated in conclusory terms, as opposed

14   to laying out the specific elements that were deemed to be

15   deceiving.  The court noted that that was not appropriate and

16   that the allegations are, quote, clearly and unequivocally

17   refuted by the website pages themselves, unquote.

18       In the *Baxter* case, the district court, similarly, found

19   the result to be clear and unequivocal, and that was

20   affirmed -- and the *VistaPrint* case was affirmed in the Fifth

21   Circuit.

22       I think another important point about this area of the law

23   is that the standard for what is deceptive is an objective

24   standard.  And I quote, in support of that proposition, the

25   plaintiffs, who say in their brief, quote, The purpose of the

1  capacity-to-deceive test is to deter deceptive conduct before

2  injury occurs, unquote.  Quoting the Washington Supreme Court

3  in the *Indoor Billboard* case, ends when plaintiffs further

4  say, "Moreover, the question of whether a representation is

5  deceptive is answered objectively from the perspective of a

6  reasonable consumer, and not subjective."

7      So, basically, Your Honor, as the courts did in the other

8  two cases, you look at the ad, and you figure out whether

9  it's, in fact, deceptive or not.

10          THE COURT:  But, Mr. Harrigan, my problem with the

11  two cases, particular the Northern District of California

12  case and the Texas case, is, it looks at the language as if

13  it was a contract staring you in the face, that you have time

14  to read, that you're looking over, or you would say, I don't

15  want to read it.  I'm just going to sign.  And in those

16  situations, you either should have read it, or you didn't

17  read it and you -- if you had questions about it, you should

18  have answered them.  But what's missing in both those

19  district judges' decisions, respectfully to my colleagues in

20  other parts of the country, is the dynamic and the context of

21  seeing these things while you think you're buying something

22  else and working your way through online marketing.

23      And online marketing has a culture all its own that says

24  at some point I'm going to get to an end point here, and I'm

25  going to have a confirmation of what I bought, how much it

1    cost, and what the details are, and if I want to print it, I

2    can print it.  And what Adaptive and what Intelius do here is

3    put things in manners that are not easy to detect when you're

4    following a certain path that you're used to.

5         And so rather than just throw those two cases at me, let's

6    analyze it from the perspective from an online consumer, who

7    is working his way through screen shot after screen shot

8    after screen shot, and see whether the process is

9    straightforward and fair, or whether it's designed to get

10   people into situations where they're buying something they

11   don't want, they don't need, and they don't use.

12        MR. HARRIGAN:  Your Honor, I agree that that is an

13   issue.  The cases, I think, actually do shed some light on

14   that, but we don't get to argue about that.

15        We handed up a notebook that lays out the facts, which is

16   essentially the screen shots, starting with the ad in the --

17   in the June ad in the Adaptive part of this case.  And the

18   way that this works in the notebook, Your Honor, I hope, is,

19   we've given you a little typed-up sheet here with numbers and

20   letters on it.  And if you open the notebook, you will see

21   the ad that was discussed by Judge Guilford in the California

22   *Baxter* case, and under that, or opposite that, is the

23   Intelius ad.  And part of the purpose of this is to show that

24   the Intelius version of the Adaptive ad is clearer than the

25   one that Judge Guilford ruled on, but it will also address

1  the questions the court just raised.

2      So by quick explanation, on the little sheet that is

3  attached, there are numbered paragraphs and lettered

4  paragraphs that correspond to the numbers and letters.  On

5  the second page here, which is the Intelius version of the

6  Adaptive ad, the letters are the areas in which this one is

7  clearer, we believe, than the one that Judge Guilford held

8  was crystal clear.

9      But let's start at the top, because the claim -- one of

10  the issues the court just mentioned is similar to the claim

11  that Judge Guilford addressed first in his opinion, which was

12  that the offer was deceptive because it was not clearly a new

13  transaction, which, I think, is part of the issue here, which

14  is, when you get to this page after you have purchased your

15  report from Intelius, are you made aware that you are now

16  being made a different and new offer?  Because if you are,

17  then, obviously, you're going to read and see what that offer

18  is before you accept it.

19      So the question really is, when you get to this page, what

20  is likely -- what is a reasonable consumer likely to do?  And

21  Judge Guilford said that the, "Thank you.  Your order has

22  been successfully completed," that statement at the top, is

23  clear and unambiguous and tells you that that part is over

24  and now you're on to something else.  He also noted that

25  there are two possible responses offered, and one is, "Yes,

1    show me my report," and, "No, and show me my report," which

2    also, he said, indicated there was a new transaction in the

3    offering.

4         THE COURT:  Isn't the graphic display of, "Yes, and

5    show me my report," quite different than the, "No, and show

6    me my report," in terms of color, in terms of shade, in terms

7    of font?

8         MR. HARRIGAN:  It's different; however, one of the

9    points of difference between these two ads is, even though

10   Judge Guilford found that at this part of the Adaptive ad,

11   even at before it was clear, if you look down by letter A,

12   you'll see that the Intelius version, the wording is larger

13   and there is a box around the "No, and show me my report"

14   that was not present in the other case.

15     The other question is, are you being made -- I think the

16   other key thing here, which the two have in common, is that

17   before you can click on the "yes" button, you have to put

18   your email address in here twice.  So this is not a situation

19   where someone can just glance at this page, hit "yes," and

20   move on to the next page and acquire something.  They have to

21   actually spend at least enough time to see, oh, I have to put

22   my email address in; oh, I've got to type it in again.  You

23   can't just copy it.  You have to type it in again.  And it

24   appears to me, at any rate, that that step would suggest,

25   again, that not only is there a new transaction, but it

1   forces the user to slow down and see what's going on here.

2       So what is the consumer told about what is going on here?

3   Well, if they look at the top of the request for the email

4   address, right under, "Please type your email address," it

5   tells you that you're going to have your credit card

6   information sent to another entity.

7           THE COURT:  It tells me that if I take off my glasses

8   and get very close to the computer screen.

9       But what is this Family Safety Report anyhow?  What is

10  this Community Safety Survey?  What is this all about?

11  Mr. Harrigan, my *Cyberspace* case, you know, people send

12  checks to companies, and on the back, it says, "By endorsing

13  this check, you agree to have us bill your telephone

14  $19.95" -- I forget -- "$39.95 for Internet service."  And,

15  yes, it said very clearly what was going on.  But it's put in

16  a place where people are not expecting it.  It's sent to

17  businesses that are routinely just cashing their checks.  And

18  then people look at their bills five or six months later and

19  realize they've been charged 500 bucks or 600 bucks for

20  something they never used.  Isn't that pretty strong evidence

21  that people have been deceived into getting something they

22  didn't want?  They never used it.

23          MR. HARRIGAN:  Well, Your Honor, that was the case in

24  that particular instance.  I read that case, and, you know,

25  first of all, people were absolutely misled into believing

that this was a routine part of some previous transaction where they were going to get a refund in a small amount and not bothering looking at it. And there was no purchase transaction taking place at the time at all. It was simply something they got in the mail that looked like it wasn't worth bothering about and move on to the next thing.

And, you know, Your Honor, I don't know that that case would have been a lot different if the statements had been on the front or if it had said, you know, put in your email address here twice before you endorse this check, but I think it might have been different.

THE COURT: I'm sure the people who were pulling those scams then are doing those scams on the Internet now.

We're talking about context, and my problem that I have with the Texas case, especially, is there was no analysis of context.

And what about the fact that the Attorney General of the State of Washington has moved on this because they've had so many complaints about it? Doesn't that tell us that there are a number of people out there who are being misled and deceived by this structure?

MR. HARRIGAN: Your Honor, I think if you read what the Attorney General has said about the complaints, the statement, at least, that's in the brief, is a generic statement about interstitial ads and the problems that they

1    can lead to, and they reference hundreds of complaints.

2        And I think, for example, if you compare it to your case

3    with the check writing, there were two things about that that

4    I think are important:  One is, the court -- the Ninth

5    Circuit said that the information about people who were being

6    misled, quote, bolsters, unquote, the conclusion that this is

7    deceptive, because the deception has to be objectively

8    determinable by the retailer before they put the ad out,

9    because they're going to violate the Consumer Protection Act

10   the minute they put it out there.  And I think context or no

11   context, we have literally two courts saying this isn't just

12   clear, it's unequivocally clear, and how, you know -- how is

13   a retailer, under an objective standard, supposed to do

14   better than that?

15            THE COURT:  Well, let's talk about that.  Let's say

16   don't put your email address, put you credit card in or put

17   your debit card in.  How about giving us some place where the

18   800 number to cancel is available rather than one step in a

19   ten-step process that, if you don't think to print the page,

20   you never see the 800 number again?  How about telling the

21   person that this is not an Intelius product but it is an

22   Adaptive product?  How about telling the person that if they

23   have a problem, they can't call Intelius because they won't

24   respond it to?  How about telling the people that a huge

25   amount of Intelius' profit comes from this, and that they're

getting a tremendous kickback from Adaptive every time they

sell one of those things?  How about telling the consumer

those things, and then letting the consumer decide if they

really want this or if they really need this?  That's what

I'm looking at.

MR. HARRIGAN:  Well, I think if you look down at this

page, the 1-800 number is set out where the number "5"

appears and the letter "E" appears.  Because here, in this

ad, Intelius has said, call our toll-free number, and the

toll-free number is right there in the -- in other words, it

tells the person exactly how to cancel it.

THE COURT:  Right.  But, again, this is one screen

shot, and this is where I think the district judges went awry

in their analysis in the other cases, is, yeah, if you stare

at this page long enough, you'll see everything you need to

know.  But that's not how people interact with their

computers when they're getting to the bottom line of, okay,

check here, continue here, continue there, confirm there,

boom, I'm done.

There is a protocol of buying things on the Internet that

people get used to.  And when a company deviates from that

protocol, and, yes, they have everything they need to have

there, I don't dispute that, but they're not displaying it in

a manner, at least arguably, that allows a consumer to

understand what they're getting into.  That is what's missing

1    in the analysis of the Texas case and the North District
2    case.  Is the language there?  Yes, it is.
3        Is a consumer held to what he should have read?  Yes, he
4    is.  But you have to look at the context and say, obviously,
5    if the font was so small you couldn't read it, that would be
6    a reason to say, well, maybe it was deceptive in this case.
7    If the screen flashed at you for five seconds and then moved
8    on to something else, well, that would be a reason to look at
9    it.
10       Their argument is, the way this was displayed, in multiple
11   screen shots, might have given all the information that a
12   consumer needed, but it displayed it in a way that was
13   intended that the consumer not focus on it and make them
14   think they were just moving on to the next phase of buying
15   the very thing they set out purchasing in the beginning.
16          MR. HARRIGAN:  Your Honor, it seems to me that when
17   you're talking about the sequence of screen shots here, what
18   has preceded this is the wrapping up of ordering the report
19   that the individual originally decided to purchase from
20   Intelius.
21       They're told right off the bat that your order has been
22   completed.  Then they're invited to move on to the next step
23   for the $10 cash back.  Then -- I mean, the court mentioned a
24   few items:  One is, what is this Family Safety Report?  Well,
25   unlike the *Baxter* case where it's kind of buried under a

bunch wordage, in the Intelius Adaptive ad, there are three
bullet points that tell you what this is, and it's obviously
not the thing you just bought.  I mean, all you have to do is
just -- "Family Safety Report.  Protect your family now," has
nothing to do with buying a report on an individual -- you
know, finding out whether George Smith lives in Everett,
Washington, or not.

So you know from letter C, when you see the offer of a
Family Safety Report, you want to look down and see it's a
totally different product from what you just did.  Then
before you can buy it, you have to put your email address in
twice.

And, again, unlike the California case, in this case there
is a little parenthetical, which is a very common thing for
people to see on the Internet, "This is a secured page,"
which alerts you that there is a credit card transaction
involved on this page.  And if you were in any doubt, you're
told twice above and below the email address that your credit
card information -- or below the email address that your
credit card information is going to be transferred.

And if you -- and the -- again, in this ad, under "D," the
offer details are set out in a clear heading that show --
that tell you this is an offer, the details are down below.
And as I said, the ability to cancel is tied directly back to
the 800 number that's provided there.

1    So on that basis, Your Honor -- and, Your Honor, this is

2    basically -- this is the page.  It's like not like there are

3    four of them.  You get done buying your report, and then you

4    are presented with this.  And the question is, I believe, can

5    someone, a reasonable consumer who takes the time to put

6    their email address in twice, miss the fact that this is a

7    new transaction?

8    And, you know, Your Honor, the other thing that I want to

9    get back to answering, to address your earlier question:  In

10   the *Cyberspace* case, there was absolutely clear evidence of

11   deception because 225,000 people signed -- you know, endorsed

12   this check, and not -- and one percent of them actually used

13   the Internet service, so clearly they had no idea what they

14   were doing.

15   Here what we have is the Attorney General saying,

16   essentially, these interstitial ads have led to hundreds of

17   complaints.  Well, that's the numerator.  What's the

18   denominator?  We're talking about millions of people who have

19   the opportunity to do this, and very few do, and the question

20   is, how many of those were actually deceived?  And there's no

21   allegation about that, much less evidence about that, in this

22   case, such as there was in your case.

23           THE COURT:  But the Consumer Protection Act and case

24   law is not just designed to protect the sophisticated person,

25   it's designed to protect the unsophisticated consumer.  I

1　think you'd agree with me on case law.

2　　　　MR. HARRIGAN:  Right, a reasonable, unsophisticated

3　consumer.

4　　　And, again, Your Honor, I think, you know, the -- if there

5　were allegations of actual percentages of deception in this

6　case, they could be corroborative, but only corroborative of

7　a previous finding that, objectively, these ads are

8　misleading.

9　　　And I do think that regardless of -- I mean, granted, this

10　court is looking at this, perhaps, in a different context

11　from the other courts.  But the fact is, what is a retailer,

12　who is putting one of these ads on its site, supposed to do

13　to conclude differently from two courts that have said not

14　only is it not deceptive, it's not even close to being

15　deceptive?

16　　　Your Honor, I don't know how much time I have.

17　　　　THE COURT:  You have as much time as you want.

18　　　　MR. HARRIGAN:  Okay.  So I think that, given what the

19　court's approach is here, I think, you know, we need to look

20　at this ad, and it is the one and only page that really is

21　involved here, except for the fact that we -- obviously, what

22　happened just before this is that you obtained a report, and

23　the -- there are no other pages to the flow, so basically

24　where we are is analyzing this page to see whether it's

25　deceptive.

1   I guess my bottom line is that, particularly in light of

2   the requirement for two email addresses, it's reasonable that

3   a consumer is going to look at some part of this and figure

4   out that it's a different product, and at that point they

5   should be on notice that they read it before -- read

6   something before they proceed further.

7   And you can't -- you really can't read much of anything on

8   this page without figuring out that you are being invited to

9   do something different, and, quote, and involving a transfer

10  of credit card information.

11  But I'd like now to turn to the second part of this case,

12  which has to do with Intelius' own products and the

13  identity -- there are two Identity Protect offers, and

14  they're also in this notebook, and there's another little

15  write-up that I prepared to kind of lead us through it.

16  And so the first one is the August of 2010 purchase by

17  Mr. Keithly.  First of all, Your Honor, the Identity Protect

18  product is not a post-transaction.  These two Identity

19  Protect products are not post-transaction products.  This is

20  a garden variety.  If you buy two things, you get a break on

21  the price of one, and it's happening at the same time as the

22  purchase.  And the question is, if you're going to get the

23  discounted version by signing up for Identity Protect, or

24  you're going to pay full price and not sign up for Identity

25  Protect.

And I think the court mentioned some things that might
have been better about the Adaptive ad, and I think that
most, if not all of those things, are present in this ad.

And the fact is, although it's not part of this motion,
but the fact is that Intelius went to great pains to try to
figure out how to make this stuff clear.

The first two pages of Tab B are simply the beginning
process of getting a background report from Intelius, a
normal Intelius product.  The first time that the question of
Identity Protect comes up is called Step 3, and it very
simply says that you can either pay $49.95 or $39.95,
depending on whether you want Identity Protect.  At that
point, it doesn't tell you what Identity Protect is.  It just
tells you that something called Identity Protect gives you
$10 off.

But I think the important thing about this, Your Honor, is
simply that it slows you down and it tells you, okay, which
one of these do I want to pay for?  I guess you could just
blindly click on one if you didn't care.  Most people are
going to decide whether they, at least, want to consider
this.

So you click on "Add to Cart," but the fact is -- you
click on the "Add to Cart" under "$39.95," you're not buying
anything.  Then you go to the next page, and you're told what
you got for the $39.95.

1    Now, if you had said $49.95, you could see a different
2    page that just completed your transaction.  So now you're
3    told, okay, this is background report with Identity Protect,
4    under No. 2 there, and it tells you again about the $10 off.
5        Then under No. 3 here, you see that the person is
6    basically reminded -- or told that they can remove Identity
7    Protect; in other words, they've gone down one fork, but all
8    they have to say is "remove," they're back to the fork again,
9    and they can go down the $49.95 path, or they can continue
10   and they go on to the next page.
11       Okay.  What are they told about Identity Protect?  Well,
12   if you were thinking about this at all, you could hardly
13   miss, "Identity Protect benefits," which has the No. 4
14   pointing at it, and it lists the things that you might want.
15       And, Your Honor, lots of people buy Identity Protect for
16   perfectly good reasons.  They get a $25,000 insurance policy,
17   they get 10 percent off future Intelius purchases, and so
18   forth, and that's all laid out very clearly on this page.
19       There are two places on the page where they are told --
20   and those are Nos. 5 and 7 -- that if they sign up for
21   Identity Protect, they're going to be billed monthly $19.95,
22   and each month thereafter, No. 7.
23       Under No. 6, they're reminded again that they're getting a
24   discount because of Identity Protect, and they save ten
25   bucks.

So if they hit, "Remove Identity Protect," they go back to the $49.95 Identity Protect; if they say, "Continue," they get to the next page.

And this is now Step No. 5.  They are further reminded that they're getting a discounted price because of Identity Protect, and if they see that and they have any doubts, they can click back to the previous page and see what that is.

And then in Step No. 6 -- and by the way, Your Honor, so far, Your Honor, no one has bought anything.  So all the way through this, at any point in time, even after you -- you could have clicked, "Remove Identity Protect," you can always just stop and nothing has happened, or you can go back and check it out some more, if you want to.

On Step 6, they are again reminded of the fact that they're getting a discount by signing up for Identity Protect.

And then finally, on Step 7, they're once again reminded of the discount, and they have to create an account, which takes a while, to complete their transaction, which includes both buying the original product at the discounted price and signing up for Identity Protect.

And, Your Honor, I think that that flow is as clear as it could be, and the only way that you can -- I mean, you have to decide which price you're going to pay.  And it's very unlikely that someone decides on the lower price and

1    doesn't -- or has a question entering his mind, what am I

2    doing to get this lower price?  And I think that question is

3    very clearly answered in these pages.

4        Now, we also have Tab C, which is the next iteration of

5    Identity Protect, and that is a few months later.  On

6    November 1 of 2009, they offered Mr. Bebbington -- and the

7    differences here, if you look at the pages, are that Step 3,

8    the only real difference is that Mr. Bebbington was

9    interested in three things.  So, I mean -- excuse me.  We're

10    on to Step 3 here.  Right.  Each of these three products has

11    a potential for the discount by signing up for Identity

12    Protect, and that's the reason that there are three of them

13    here instead of one.

14        And then in Step 4, the difference is that, instead of two

15    places on this page telling the consumer that they're going

16    to be billed $19.95 a month, there are three.  So the No. 2

17    is pointing at the third one; the other two are just below

18    that box, "Your credit card will be billed $19.95," and then

19    over on the left, under "Offer details," the membership fee

20    of $19.95 a month will be charged by Intelius, et cetera.  So

21    that's in three places here, whereas it was only in two

22    places on the earlier offer.

23        And then when we get to Step No. 5, and, basically, the

24    differences here in Steps 5, 6, and 7 are that each one of

25    those pages tell us, again, that they're going to be billed

$19.95 a month, and that was added to this process between
the April date and the November date.

And finally, on Step No. 7, that's the point in this
process where you actually commit to buy; in other words, you
have to go through everything you've just looked at, and then
you have to reconfirm the purchase and "Show my report." And
there's a reference to the -- a charge for $1.04 because --
that varies. When you filled out the information, Intelius
knows what state you're in, and, therefore, they calculate
the sales tax. So that's the reason for that.

But the bottom line is that you have to go through every
single one of these pages, each one of which reminds you of
the $19.95 commitment that you're making.

Finally, on the last page, you commit to buying. At any
point along the way, you turn your computer off or you want
to go look at the news on the Internet instead, you haven't
bought anything.

So, Your Honor, we believe that the Intelius version of
the Adaptive ad is noticeably clearer than those considered
by the other two courts, and that -- that, in fact, the key
question, really, for a retailer, is, is what I'm putting out
there a violation of the Consumer Protection Act; i.e., is
someone going to be fooled by this? And if those two courts
said anybody who even looks at this is going to know that
they're entering into a new transaction and what the terms

1    are, it's clear, unequivocally so, that ought to be good

2    enough for a retailer to not be violating the Consumer

3    Protection Act.

4       Now, that doesn't mean that some regulator or legislature

5    can't come along and say, "If you're going to do these ads,

6    you've got to do the following things," and that may very

7    well happen.  And, in fact, as you can see from the Identity

8    Protect ads, Intelius has been working to make these things

9    clearer and clearer, even though this is not a similar

10    problem because it is not an interstitial ad, it's a

11    discounted purchase going on at the same time.

12       But the fact is, there has been an empirical process

13    figuring out that, you know, we've got to make these things

14    clearer, and doing so, but that doesn't mean that the first

15    one out of the box violated the Consumer Protection Act.

16       And the fact is that, even between April and November, you

17    can see that there was an effort made to make sure,

18    absolutely sure, that anybody who signs up for Identity

19    Protect knows they're going to be charged $19.95 a month by

20    saying it over and over, but that doesn't mean that saying it

21    twice was not good enough the first time through.

22          THE COURT:  But it doesn't just say you will be

23    charged $19.95.  It says you can cancel at any time.

24          MR. HARRIGAN:  That's correct.

25          THE COURT:  Okay.  Thanks.

1    Ms. Nugent, what about Mr. Harrigan's point that, whether

2 I agree or disagree with the district judges in California

3 and Texas, the company has been told that their material is

4 okay, that it doesn't deceive?  Why can't they rely on that,

5 at least until some regulator or some legislature tells them

6 otherwise?

7         MS. NUGENT:  Because, Your Honor, I mean, this would

8 vary from state to state, and it would depend on how the

9 consumer protection statutes are actually drawn.  The

10 Washington Consumer Protection Statute is a liberally

11 construed remedial statute that is intended to protect the

12 consumers as they actually behave in the marketplace.

13    It's our contention that these ads are deceptive and that

14 the disclosures provided are simply insufficient to, first,

15 convey what it is that the consumers are getting themselves

16 into, but also to overcome very deeply rooted ideas that

17 consumers have about the way the Internet works and the way

18 that purchasing things on the Internet works.

19    And when you have that, and you alluded it to, people

20 understand that you go through a series of steps where you

21 are shown a shopping cart that you have populated yourself.

22 You're given an opportunity to put in your billing and your

23 shipping information.  You're asked to review the whole

24 transaction and then approve it and submit it for an order.

25    And when people have an understanding that that is how you

1  buy something on the Internet, it doesn't work to simply

2  insert some other proxy and call it consent, like typing in

3  your email address.  The disclosures that have been provided

4  simply aren't strong enough to overcome those understandings

5  that people have.

6        THE COURT:  What about the Bebbington situation?  It

7  seems like, as Mr. Harrigan said, they're not conceding that

8  the earlier versions were deficient.  But by the time you get

9  to Bebbington's version, when they tell you over and over you

10  will be charged $19.95 a month, you can cancel at any time,

11  isn't it more of a stretch to say that a person looking at

12  that doesn't realize what they're doing?

13        MS. NUGENT:  Your Honor, I would agree they are

14  marginal improvements, but I would not agree that they're

15  sufficient to prevent this from being deceptive, and I'd just

16  like to sort of walk through my opinion on that.

17        THE COURT:  Okay.

18        MS. NUGENT:  I just want to make sure that I'm

19  looking at the correct exhibit, because they were just handed

20  to me a few minutes before this hearing.  Was it Tab C?

21        MR. HARRIGAN:  Bebbington is Tab C.

22        THE COURT:  Great.

23        MS. NUGENT:  If you look at Step 4 -- well, actually,

24  we can back up.

25     If you start at Step 3, where the different options are

1    presented, what the red arrow that is -- you know, that the

2    defendants have added to this graphic to highlight a

3    particular point, is that in each of these scenarios, the

4    word "free" appears.  The Identity Protect trial is free.  So

5    what a consumer would believe, looking at that, is that

6    simply for trying something and it's free and it won't cost

7    them anything, they're going to get a little bit of a

8    discount on the things that they actually want to buy.  Free,

9    I think, is a difficult word to overcome.

10       If you flip to the next page, at Step 4, again, they have

11    that they're going to get a discount to continue.  You know,

12    once you've decided to accept this free trial, all you need

13    to do is hit the brightest thing on the page, the "continue"

14    button.

15       Appearing below that, you have the "Remove Identity

16    Protect trial" button and pay regular price, and that's in a

17    less intense, less noticeable color and position.

18       If you go to the offer details, which is where somebody

19    would expect to find everything they need to know about this

20    offer they've accepted, the language here is ambiguous about

21    the nature of this negative option.  And, again, negative

22    options are another thing where I think you have to overcome

23    consumer perception of what free trials are and how they get

24    involved in prescription services.  For most people, when you

25    accept a free trial, it means you try a product, and if you

1    like it, you then take steps to subscribe to it on a regular

2    basis, not that you try it, forget about it, never use it at

3    all, and then learn a year later that you've been paying for

4    it all this time because they have your billing information.

5        So the way this is phrased under the offer details, it

6    says, "A membership fee of $19.95 per month will be charged

7    by Intelius.com to the credit, debit card you use today with

8    Intelius.com after the seven-day trial."  And that makes

9    sense in meaning that if you continue to use this, if you

10   intend to go forward, we will simply automatically debit or

11   use your credit card.  That's the way we do business, and

12   that's the way you would pay for this.

13       I think that a customer looking at that page would

14   conclude at that point that they've read what they were

15   supposed to read about the offer, which is really a shame,

16   because the way this is formatted, a better explanation, and

17   one that really should be the explanation, not something in a

18   different font or up here on the far right-hand side in very

19   small print, and that is where Intelius actually discloses

20   the way this negative option works.  It says, "After your

21   seven-day trial, if you do not cancel your Identity Protect

22   membership, your credit card will be billed."  But that's

23   really varied, and I don't think that most people would be

24   looking at that.

25       In some of the guidance that we submitted to the court, it

talks about how people use the Internet and what it is that they're looking for.  The FTC said that people scan pages in an F-shape formation.  They tend to look at the top, they tend to look down the right-hand side, and they tend to look sort of at the dead center of the page that they're looking at.

And if the FTC is aware of this and they're able to put it out in a public report, I think it's fair to say that any retailer in this business knows that, too.  So I think the disclosure is simply not close enough to what it's describing and purposely put it in an inconspicuous place.

I think also another flaw with these pages is that, in the order summary that keeps appearing in the upper right-hand corner, the cost of the Identity Protect trial is listed over and over again as zero.  And, again, that tells somebody that they are getting something for free.  Again, cancel any time after your trial, you'll be billed $19.95 a month.  I think the ordinary consumer assumes that that means I have to take steps to use this after the seven-day period.

And that carries through to the next step, Step 5, and it carries through, you know, to the final step they've listed here for the order summary, where you would actually then enter your billing information and confirm the purchase.

And there's an additional step that -- well, again, then there's Step 7, too.  Again, when it provides the summary,

the order summary, the cost of the Identity Protect trial is
listed as zero.

In a previous exhibit that Intelius submitted to the
court, I believe there was an additional step that showed the
kind of follow-up confirmation that Intelius would send to
somebody about their purchases, and there, again, the cost of
Identity Protect was listed as zero. And that was Step 8 in
Ronald Thunen's exhibit. I think it was Exhibit B that was
submitted with the Rule 12(b) motion in January of last year.

I had a number of points I wanted to make.

THE COURT: I took some of the steam out of your
presentation. Sorry.

MS. NUGENT: That's okay. I wanted to backtrack and
go over a few things that I think are relevant and should be
dispositive here.

We did talk about, in our brief, the idea that the
*VistaPrint* and *Baxter* courts took a fairly rigid approach to
deciding what consumers should and shouldn't do when they're
on the Internet. And, Your Honor, you said it yourself, that
the expectation that could be drawn from those opinions is
you're supposed to be scrutinizing it like it's a contract.
I think it's important to remember that it's actually
supposed to be an offer. It's presumably an ad asking
somebody to buy something, and so that level of scrutiny
seems a bit inappropriate.

 1     But the other thing that is really significant here is

 2   making sure the real world, the way people actually operate,

 3   is a part of the standard and a part of the way these cases

 4   are designed.  The FTC has put forth quite a bit of guidance

 5   in their dot com disclosure statements, I think for ten years

 6   now, telling the retailers that they have to make sure the

 7   disclosures are clear and conspicuous, and that simply

 8   putting them someplace on a page is not enough, that it's not

 9   enough that somebody could find them.  You have to place them

10   where somebody will, in fact, find them.

11     I think one thing that we talked about here as well is

12   that, typically, in a very early stage of the case, the court

13   is forced to determine whether or not somebody is or is not a

14   reasonable consumer, using guidance available from case law

15   or other sources.  But at this point in this litigation, some

16   actual evidence has been developing, and some of it is laid

17   out in the Attorney General's complaint that we submitted.

18     The Attorney General had said that thousands of complaints

19   had been received by his office and the Better Business

20   Bureau and that thousands more had been received by Intelius

21   itself.

22     The Attorney General was also able to get statistics

23   showing how people were actually viewing the ads, and some of

24   those statistics were that 50 percent of the customers were

25   spending less than 30 pages [sic] looking at these pop-up

ads.

        THE COURT:  You said, "less than 30 pages."

        MS. NUGENT:  Sorry.  Less than 30 seconds, which,
given the density of the text and perplexity of some of the
information being conveyed, is clearly not enough time.
Using data that I presume came from Intelius itself, that 100
percent of the customers were going through those pop-ups in
less than 60 seconds.  So, again, I think that that
demonstrates the point that you were making earlier about how
people do tend to move from screen to screen.  They don't
expect to have to read everything and scrutinize it as though
it were a contract.

    I think the last piece of information that's been
developed so far, and through the Attorney General's
investigation, goes to the usage rates.  Mr. Harrigan was
trying to distinguish this case from the *Cyberspace* case,
pointing out the numerator and denominator, how many people
received the ad and how many people actually did something
with it.

    I think we have something comparable here.  The Attorney
General provided, at least, some of the usage statistics for
the programs offered here, and the Attorney General found
that they were below seven percent.  So of the 100 people who
were signed up for something, only seven made any indication
that they were aware of it and even used it, and that's a

1    pretty compelling number.

2         THE COURT:  Great.  Thanks very much, counsel.

3      Mr. Harrigan, looking at your Tab C again on the

4    Bebbington issue, the order summary says, "Cancel any time.

5    After your trial, you will be billed $19.95 per month."

6    You're not billed $19.95 a month, you're charged $19.95 a

7    month.

8         MR. HARRIGAN:  That's correct.

9         THE COURT:  And in other parts, when the charge is

10   being put on a credit card, it is charged.  Is that, "You

11   will be billed," deceptive?

12        MR. HARRIGAN:  Well, Your Honor, I don't think so,

13   particularly in view of the language right under there, "Your

14   credit card will be billed $19.95, plus tax where

15   applicable."  And then over on the left-hand side, it says,

16   "The membership fee of $19.95 will be charged and debited by

17   Intelius to the credit card."  I mean, I guess you can

18   question whether the word "billed" is a really good word to

19   use instead of "charged," but the way it's used here, if

20   anybody looked at any of the other warnings, it's clear that

21   they mean the same thing.

22        THE COURT:  Okay.

23        MR. HARRIGAN:  A couple of points, Your Honor, with

24   regard to the usage issue, with respect to Identity Protect,

25   at least.

It is a largely passive product. Basically, Intelius watches out for indications in the -- out there in cyberspace, for things like telephone number changes and so forth that are sometimes going on when your identity is being stolen, and sends you an alert. But -- and you get insurance and, you know, you get discounts on Intelius products. But it's not like an Internet service provider where, if you're not logging on it, you're not using it. It's kind of like saying you're not using your insurance policy. So I don't think those numbers mean very much.

And I would say with regard to the Adaptive ad and the issue of duration of use, I really that think if someone spent 30 seconds looking at that Adaptive page, it would be possibly difficult not to figure out what was going on there.

THE COURT: But you're brilliant.

MR. HARRIGAN: Not when I'm using a computer, Your Honor.

THE COURT: Okay. Thank you. I appreciate it.

MS. NUGENT: Your Honor?

THE COURT: Yes, go ahead.

MS. NUGENT: There's one thing I wanted to add.

THE COURT: Sure. You didn't take much time.

MS. NUGENT: It goes, again, to the allegations of the complaint being borne out by the evidence that's being developed, which I know is not necessarily to be considered

1    on this Rule 12 motion.  But we did submit to the court,

2    earlier this week, a declaration and some documents that we

3    had obtained from Shelli Strand, who was the consultant that

4    Intelius hired back in 2008 to advise them on how to make

5    their website -- well, to review their website and tell them

6    whether or not it was confusing, and if it were confusing,

7    how to fix it.  And the Strand report, which was appended to

8    Karin Swope's declaration filed earlier this week, goes to

9    recommendations that mirror the allegations that we made in

10   the complaint and the arguments we made in the papers about

11   the appearance, the lack of clarity in terms of who you're

12   dealing with when they are third-party ads, the lack of a

13   clear decline option, the need to actually streamline the

14   text because it's so dense that people can't actually pull

15   out the truly essential and material information that they

16   should be getting.  So I just wanted to bring that to the

17   court's attention.

18           THE COURT:  Okay.  Thank you.

19       I think that it's clear that Intelius' responsibility is

20   not to come up with the perfect way to phrase things so that

21   no one was ever misled, confused, or whatever.  That's not

22   the standard here.  And the fact they are trying to

23   improve -- in general, in the law, we don't hold it against

24   companies or entities when they try to make things better, to

25   say, well, it was lousy to begin with.  So I'm mindful of all

1   those factors in there.

2      And Mr. Harrigan is a wonderful oral advocate, and he has

3   pointed the court's attention to things that definitely need

4   to be considered out of fairness to the defendant here, too.

5   So I want to look very closely at the situation.  It may well

6   be that the court will allow some of the case to go forward

7   but not all of the case, some of the plaintiffs but not all

8   of the plaintiffs, some of the claims but not all of the

9   claims.

10      I do want to take a little bit of time after the

11   presentation to parse exactly what that's going to be, and I

12   will get a decision out to you hopefully by the early part of

13   next week, so we don't have very long to wait on what's going

14   forward here.  I think that it is timely for the court to

15   hear the case.  I know there was some discussion about

16   whether it was premature.  It's not premature.

17      I will address the Stored Communications Act, the

18   individual plaintiff's claims, and whether the Lee case can

19   have a Washington State CPA claim.  So you'll have fairly

20   clear guidance in all those areas.

21      Thanks very much for the excellent briefing and

22   presentation today.  We'll be adjourned.

23

24               (THE PROCEEDINGS CONCLUDED.)

25

## C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 9th day of February 2011.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter